# EXHIBIT "G"

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| AMERICAN BUILDERS INSURANCE COMPANY,<br><br>Plaintiff,<br><br>vs.<br><br>KEYSTONE INSURERS GROUP, INC. and EBENSBURG INSURANCE AGENCY,<br><br>Defendant. | Civil Action No. ____________<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

American Builders Insurance Company, formerly known as Association Insurance Company ("American"), through its undersigned attorneys, avers as follows:

### Nature of the Action

1. American commences this action for:

(a) compensatory damages, consequential damages, pre and post judgment interest, costs, and attorneys' fees against defendant Keystone Insurers Group ("Keystone") for breach of contract;

Case 4:19-cv-01497-MWB Document 1 Filed 08/28/19 Page 2 of 24

(b) compensatory damages, consequential damages, pre and post judgment interest, and costs against Keystone and Ebensburg for professional negligence;

(c) compensatory damages, consequential damages, pre and post judgment interest, and costs against Ebensburg and Keystone for negligent misrepresentation;

(d) compensatory damages, consequential damages, punitive damages, pre and post judgment interest, and costs against Ebensburg and Keystone for fraudulent misrepresentation.

**The Parties**

2. American is a corporation organized and existing under the laws of the State of Delaware, which maintains its principal place of business at 2410 Paces Ferry Road, SE, Atlanta, Georgia. American is authorized by the Pennsylvania Department of Insurance to sell and issue workers' compensation insurance in the Commonwealth of Pennsylvania. American is a citizen of the States of Delaware and Georgia.

3. Keystone is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania, which maintains its principal place of business at 1995 Point Township Drive, Northumberland, Pennsylvania. Keystone

is a citizen of the Commonwealth of Pennsylvania. Keystone is comprised of approximately 300 agency partners, including defendant Ebensburg.

4. Ebensburg is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania, which maintains a principal place of business at 129 E. High Street, P.O. Box 90, Ebensburg, Pennsylvania. Ebensburg is an insurance agency and is a Keystone partner agency. Ebensburg is a citizen of the Commonwealth of Pennsylvania.

**Jurisdiction and Venue**

5. This Court has subject matter jurisdiction over this dispute pursuant to 28 U.S.C. §1332(a)(1) because complete diversity of citizenship exists between plaintiff and defendants and the amount in controversy exceeds $75,000 exclusive of interest and costs.

6. This Court has personal jurisdiction over defendants Keystone and Ebensburg because both defendants are Pennsylvania corporations and regularly conduct business in this Commonwealth.

7. Venue is proper in this district pursuant to 28 U.S.C. §1391(b) because Keystone maintains business offices in this district and a substantial part of the events and omissions forming the basis of America's claims occurred here.

**Factual Background**

8. This action arises out of defendant Keystone's breaches of contractual and professional duties owed to American and defendant Keystone and Ebensburg's negligent and/or fraudulent misrepresentations of material facts that induced American to issue a workers' compensation insurance policy to Custom Installations Contracting Services, Inc. ("Custom Installations"). But for defendants' breaches of duties and misrepresentations of material facts, American would not have issued the workers' compensation insurance policy to Custom Installations. Defendants' actions have caused American to sustain damages in an amount yet to be determined, but believed to be in excess of $1 million.

9. On or about June 16, 2008, Keystone entered into an Agency Agreement with Builders Insurance Group, Association Insurance Company (now known as American Builders Insurance Company), and Vinings Insurance Company. A true and correct copy of the Agency Agreement is attached hereto as Exhibit A.

10. Keystone is a partnership of approximately 300 insurance agencies. Keystone supports its partner agencies with "expertise and insight." Keystone bolsters its partner agencies with added resources, creates and manages specialty insurance programs, and trains agents to become product experts.

Case 4:19-cv-01497-MWB Document 1 Filed 08/28/19 Page 5 of 24

Keystone also provides its partner agencies with "risk management offerings" to improve its partner agencies' the ability to attract and return business.

11. In the Agency Agreement, American grants Keystone the authority to solicit, receive, and accept proposals for insurance, including workers compensation insurance. *See* Agency Agreement, § 1.1 (Exhibit A). Keystone's authority is limited by the underwriting rules and guidelines of American and the terms and conditions contained in the Agency Agreement. *Id.*

12. Keystone delegates to its partner agencies its authority under the Agency Agreement to solicit, receive, and accept proposals for insurance.

13. Under the Agency Agreement, Keystone and its partner agencies, including Ebensburg, receive a commission based on the premium for the insurance policies that it helps to place. *See* Agency Agreement, § 1.3 and § 2.2 (Exhibit A).

14. The Agency Agreement has an implied duty of good faith and fair dealing that, among other things, imposes on Keystone the duty to provide accurate information to American in soliciting proposals for insurance coverage made by Keystone and its partner agencies.

15. Ebensburg is an insurance agency that has obtained insurance policies for businesses and individuals in the Commonwealth of Pennsylvania for

over 50 years.  A substantial portion of Ebensburg's business involves obtaining

workers' compensation insurance for Pennsylvania businesses.

      16.    As one of Keystone's partner agencies, Ebensburg has the

actual, apparent, and/or ostensible authority to submit insurance proposals to

American.

      17.    Custom Installations has been a client of Ebensburg since at

least 2012.  Custom Installations engages in the roofing business, among other

things.

      18.    Before 2015, Custom Installations obtained its workers'

compensation insurance from the Pennsylvania State Workers' Insurance Fund or

SWIF.  Upon information and belief, prior to 2015, Custom Installation stated on

its workers' compensation insurance applications that it was engaged in the roofing

business and that its employees worked over 15 feet above the ground.

      19.    Premiums for insurance obtained through SWIF are higher than

private insurance companies, and insurance agencies such as Ebensburg do not

receive commissions when their clients obtain SWIF workers' compensation

insurance.  As a result, in our about June 2015, Ebensburg sought to obtain

workers' compensation insurance for Custom Installations from a private insurer.

Case 4:19-cv-01497-MWB Document 1 Filed 08/28/19 Page 7 of 24

20. In an attempt to procure workers' compensation insurance for Custom Installation, one or more Ebensburg's employees took information from Custom Installation's prior applications to SWIF and completed applications to approximately four insurers, including American.

21. On one or more applications submitted to insurance companies other than American, Ebensburg accurately stated that Custom Installations' business involves roofing work and that its employees work over 15 feet above the ground.

22. On one such application, another insurer declined to provide coverage because, among other reasons, Custom Installations is involved in "higher than normal roofing work."

23. On Custom Installations' behalf, Ebensburg completed American's Workers Compensation Application ("Application") by providing narrative answers to certain and specific questions contained within the Application and also contained in associated documents, including but not limited to an Underwriter Questionnaire ("Questionnaire") and Risk Questionnaire ("Risk Questionnaire"). The Application, Questionnaire, and Risk Questionnaire are attached hereto and are marked Exhibits B, C & D respectively.

Case 4:19-cv-01497-MWB Document 1 Filed 08/28/19 Page 8 of 24

24. The information sought by American in the Application, Questionnaire and Risk Questionnaire was essential to allow it to determine whether to provide workers' compensation insurance for the type of work identified in the application and also to allow it to underwrite accurately the risk to be insured under the Policy.

25. The Application contains a section titled "Nature of Business/Description of Operations" that required Custom Installations to comment and provide a description regarding its work. Specifically, this section provides:

> Give Comments And Descriptions of Business, Operations and Products, Manufacturing — Raw Materials & Processes, Product, Equipment, Contractor-Type of Work, Sub-Contracts, Mercantile-Merchandise, Customers, Deliveries, Service — Type, Location, Farm-Acreage, Animals, Machinery, Sub-Contracts.

Ebensburg answered this question on Custom Installations' behalf by inserting the phrase "Commercial Remodeling." *See* Exhibit B.

26. In the General Information section of the Application, Custom Installation was asked "[is] any work performed . . . above 15 feet." Ebensburg answered "No" for Custom Installations. *See* Exhibit B, p. 3.

27.     In the Questionnaire and Risk Questionnaire Custom Installation was asked several questions regarding the nature of its work and was asked specifically whether it performed worked above a specific, defined height.

28.     Question 3 on the Questionnaire asked Custom Installations whether "[a]ny [of its] work [was] performed . . . above 15 feet?" On Custom Installations' behalf, Ebensburg reaffirmed the answer provided in the Application and again answered "No." *See* Exhibit C, p. 1.

29.     Question 3.1 on the Questionnaire asked Custom Installations "[w]hat is the maximum height [of your work]?" Again, on Custom Installation's behalf, Ebensburg reaffirmed the answer provided in the Application and affirmatively answered "15 FT." *See* Exhibit C, p. 1.

30.     Question 6 on the Questionnaire asked Custom "[a]re subcontractors used?" Custom answered "No."

31.     Question 1 on the Risk Questionnaire asked Custom Installations whether "[a]ny exterior work [was performed] above 3 stories?" On Custom Installations' behalf, Ebensburg answered "No." *See* Exhibit C.

32.     Question 4 on the Risk Questionnaire asked Custom whether "[] roofing [was] performed by [its] own employees?" Custom answered "No."

33. In Question 6 of the Questionnaire and Question 4 of the Risk Questionnaire Custom Installations represented through Ebensburg that it did not perform any roofing work — directly through its employees or indirectly through subcontractors.

34. The Application ends with the following statement and admonition:

> ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR ANOTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIAL FALSE INFORMATION OR CONCEALS FOR THE PURPOSE OF MISLEADING INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME AND SUBJECTS THE PERSON TO CRIMINAL AND CIVIL PENALTIES.

35. Custom, through its corporate secretary, Michael F. Bichko, signed the application beneath the foregoing statement and admonition and in doing so represented that each answer provided in the Application, Questionnaire and Risk Questionnaire, including the answers referenced above in paragraphs 15 through 13, (collectively "Answers") were true, correct and accurate.

36. Custom Installations' Answers, provided by Ebensburg, which generally misrepresented the nature of its work and specifically misrepresented that Custom Installations did not perform roofing work or work above the defined

height of 15 feet, contained essential facts that formed the inducement for American to issue the Policy to Custom Installations.

37. As a matter of business policy, American does not contract to sell workers' compensation insurance policies to companies that engage in roofing work or work above the defined height of 15 feet and does not issue workers' compensation insurance coverage for such work.

38. American did not learn that Ebensburg completed the Application, Questionnaire, and Risk Questionnaire for Custom Installations until the November 7, 2017 depositions of Ebensburg employees Karen Ligda and Kurtis Deyulis.

39. On July 20, 2015, American issued Custom Installations a workers' compensation insurance policy identified by number WCV-0196284-00 (the "Policy"). American issued the Policy in reliance on the accuracy of the information contained in the Application, the Questionnaire, and the Risk Questionnaire that Custom Installations does not engage in the roofing business and its workers do not work more than 15 feet above ground.

40. Because of the above-described misrepresentations of material fact, American has sued Custom Installations in this Court, Civil Action No. 3:15-cv-00295 for rescission of the workers' compensation insurance policy and for

Case 4:19-cv-01497-MWB Document 1 Filed 08/28/19 Page 12 of 24

fraud (the "Custom Installations Lawsuit"). In the Custom Installations Lawsuit, Custom Installation has admitted that its application to American contains false information.

41. Upon information and belief, Custom Installations intended to provide American with true, correct and accurate answers to the questions contained on the Application, Questionnaire and Risk Questionnaire, but did not.

42. At the time American and Custom Installations formed their contractual relationship, American intended to sell and issue the Policy to Custom based solely on the information provided by Custom on the Application, Questionnaire and Risk Questionnaire.

43. At the time American and Custom formed the subject contractual relationship, American intended only to provide Custom Installations with workers' compensation coverage that related to the specific type of risk it insured in Pennsylvania and only with workers' compensation insurance coverage of the type it sold in Pennsylvania.

44. American issued the Policy to Custom Installation based on materially false information provided in the Application, Questionnaire and Risk Questionnaire.

Case 4:19-cv-01497-MWB Document 1 Filed 08/28/19 Page 13 of 24

45. If American had known accurate information relating to Custom Installations' business, it would not have issued the Policy to Custom Installations.

46. By virtue of the Agency Agreement, Keystone maintains express and implied contractual obligations to provide accurate information on the clients of its partner agencies to American in making proposals for the issuance of insurance policies. Moreover, Keystone owes professional duties to American to ensure that the information contained in proposals submitted to American is accurate.

47. Keystone breached its contractual and professional duties to American when Ebensburg, its partner agency, submitted materially false information in its proposal for the issuance of a workers' compensation policy to Custom Installations.

48. Ebensburg owed a duty to American to use reasonable care in submitting information on Custom Installations in applying for workers compensation insurance. Ebensburg failed to utilize reasonable care in submitting information to American.

49. Alternative, Ebensburg intentionally and/or recklessly submitted materially false information on Custom Installations to American for the

Case 4:19-cv-01497-MWB Document 1 Filed 08/28/19 Page 14 of 24

purpose of inducing American to issue the Policy, which enabled Ebensburg to earn a commission.

50. Keystone is vicariously liable for the negligent and/or fraudulent misrepresentations of material fact made by its agent Ebensburg.

51. On or about September 8, 2015, less than two months after the effective date of the Policy, Custom Installations' employee, James Scott, Jr. ("Scott") is alleged to have sustained injury while performing roofing work and falling from his work location, which was approximately 25 feet above the ground.

52. Following his injury, Scott made a claim for workers' compensation benefits to American.

53. Based on information available to it at the time of Scott's injury and pursuant to the Policy, America made the following payments on Custom Installations' behalf directly to Scott or on his behalf:

(a) Wage indemnity - $ 10,945.95; and

(b) Medical payments: $ 1,008,268.68.

54. Upon information and belief, Scott may submit additional claims against and argue entitlement to be paid under the Policy.

**Count One**
**(Breach of Contract)**
**American v. Keystone**

55. American incorporates by reference the above paragraphs as if set forth fully herein.

56. The Agency Agreement is a valid and enforceable contract between American and Keystone by which American authorized Keystone to make proposals for the issuance of insurance on behalf of Keystone's clients.

57. Keystone's business is comprised of approximately 300 partner agencies, including Ebensburg. Keystone entered into the Agency Agreement with the express purpose of enabling its partner agencies to submit proposals for insurance to American and other related insurance companies. But for the Agency Agreement, Ebensburg would not be authorized to make proposals for the issuance of insurance policies to American.

58. Keystone authorizes its member agencies, including Ebensburg, to submit proposals to issue insurance policies directly to American.

59. The proposals for the issuance of insurance policies made by Keystone and its partner agencies involve the submission of applications, questionnaires, and risk questionnaires to American, which contain information on the proposed insured to enable American to decide whether it issue a policy or decline to issue a policy.

Case 4:19-cv-01497-MWB Document 1 Filed 08/28/19 Page 16 of 24

60. The Agency Agreement is engrafted with an implied covenant of good faith and fair dealing, which among other things, obligates Keystone and its member agencies to submit accurate information on their clients on the applications, questionnaires, and risk questionnaires, upon which Keystone and its member agencies know American will rely in decided whether it issue insurance policies.

61. Keystone breached its contractual obligations, including its implied covenant of good faith and fair dealing, to American when Ebensburg submitted the Application, the Questionnaire, and the Risk Questionnaire to American containing materially inaccurate information.

62. As a direct and proximate result of Keystone's contractual breaches, American has sustained damages in an amount in excess of $1 million.

63. Under the Agency Agreement, Keystone agrees to indemnify, defend, and hold American harmless against "any and all claims, demands, actions, proceedings, liability, losses, damages, fines and penalties, costs or expenses, including without limitation, attorneys' fees, disbursements, and court costs, made or instituted against or incurred by … [American] and which arise out of any action or inaction of the Agency or any agent or their employees, representatives, in connection with any obligations of the Agency arising out of this Agreement." *See* Agency Agreement, § 4.7 (Exhibit A).

64. Pursuant to the indemnity provision in the Agency Agreement, Keystone is obligated to indemnify American for all damages, including costs and attorneys' fees, relating to its partner agency Ebensburg's submission of material false information in its proposal to issue insurance to Custom Installations.

WHEREFORE, for the foregoing reasons, American requests this Court to enter judgment in its favor and against Keystone for compensatory and consequential damages in excess of $75,000, pre and post judgment interest, costs, and attorneys' fees. American also requests this Court to grant such further relief as it deems to be just and proper.

**Count Two**
**(Professional Negligence)**
**American v. Keystone and Ebensburg**

65. American incorporates by reference the above paragraphs as if set forth fully herein.

66. As insurance brokers, Keystone and Ebensburg owe professional duties to use reasonable care in the submission of information contained in applications, questionnaires, and risk questionnaires to American for the purpose of obtaining insurance policies for its clients and the clients of its approximately 300 partner agencies.

Case 4:19-cv-01497-MWB Document 1 Filed 08/28/19 Page 18 of 24

67. Upon information and belief, Keystone delegated the obligation to submit accurate information to American to its partner agency Ebensburg for its clients.

68. Keystone has a legal duty to American to supervise its partner agencies who it permits to submit proposals to issue insurance to American under the Agency Agreement and touts on its website the steps it takes to bolster its partner agencies, create and manage insurance programs for its member agencies, train agents to become product experts, and provide risk management offerings to improve its partners' ability to attract and retain business.

69. Ebensburg has a legal duty to American use reasonable care to ensure that the information that it places onto applications, questionnaires, and risk questionnaires proposing insurance is accurate and complete.

70. Ebensburg breached its professional duties to American when it submitted materially inaccurate information to American in support of the proposal to issue workers' compensation insurance to Custom Installations.

71. Keystone breached its professional duties owed to American when Ebensburg failed to submit accurate information in support of the proposal to issue workers' compensation insurance to Custom Installations and/or by failing to

use due care in the delegation to and/or supervision of Ebensburg in acting as an insurance agent for American.

72. As a direct and proximate result of Keystone's and Ebensburg's breaches of their respective professional duties, American has sustained damages in an amount in excess of $1 million.

WHEREFORE, for the foregoing reasons, American requests this Court to enter judgment in its favor and against Keystone and Ebensburg for compensatory damages and consequential damages in excess of $75,000, pre and post judgment interest, and costs. American also requests this Court to grant such further relief as it deems to be just and proper.

**Count Three**
**(Negligence Misrepresentation)**
**American v. Ebensburg and Keystone**

73. American incorporates by reference the above paragraphs as if set forth fully herein.

74. In connection with presenting a proposal to American to issue workers' compensation insurance to Custom Installations, Ebensburg prepared and submitted to American the Application, Questionnaire, and Risk Questionnaire, all of which contained information pertaining to Custom Installations' business and the risk to American in issuing a workers' compensation insurance policy.

75.     Ebensburg knew that American would be relying on the accuracy of the information contained in the Application, Questionnaire, and the Risk Questionnaire and submitted these documents to induce American to issue the Policy, for which Ebensburg would receive a commission.

76.     Ebensburg failed to utilize reasonable care to ensure that the information contained in the Application, the Questionnaire, and the Risk Questionnaire was accurate. In fact, the Application, Questionnaire, and the Risk Questionnaire contain materially false information, including the misrepresentations that Custom Installations is not involved in the roofing business, and its employees do not work more than 15 feet above the ground.

77.     Ebensburg was negligent in submitting materially false information to American in the Application, the Questionnaire, and the Risk Questionnaire.

78.     Ebensburg is the actual, apparent, and/or ostensible agent of Keystone, and Keystone is vicariously liable for Ebensburg's misrepresentations.

79.     American does not issue workers' compensation insurance policies to companies engaged in the roofing business, and but for the material misrepresentations in the Application, Questionnaire, and the Risk Questionnaire,

and American's reasonable reliance thereon, American would not have issued the Policy to Custom Installations.

80. Subsequent to issuing the Policy, Scott, a Custom Installations employee, was working on a roof, fell approximately 25 feet, and sustained grave injuries. Scott made a claim for workers' compensation benefits, and to date, American has paid $10,945.95 for wage indemnity and $1,008,268.68 for medical expenses. Upon information and belief, Scott may submit additional claims against and argue entitlement to be paid under the workers' compensation policy.

81. As a direct and proximate result of Ebensburg's negligent misrepresentations of material facts, American has sustained damages in an amount yet to be determined but believed to be well in excess of $1 million.

WHEREFORE, for the foregoing reasons, American requests this Court to enter judgment in its favor and against Ebensburg and Keystone for compensatory and consequential damages in excess of $75,000, pre and post judgment interest, and costs.

## Count Four
## (Fraudulent Misrepresentation)
## American v. Ebensburg and Keystone

82. American incorporates by reference the above paragraphs as if set forth fully herein.

Case 4:19-cv-01497-MWB Document 1 Filed 08/28/19 Page 22 of 24

83. In connection with presenting a proposal to American to issue workers' compensation insurance to Custom Installations, Ebensburg prepared and submitted to American the Application, Questionnaire, and Risk Questionnaire, all of which contained information pertaining to Custom Installations' business and the risk to American in issuing a workers' compensation insurance policy.

84. Ebensburg knew that American would be relying on the accuracy of the information contained in the Application, Questionnaire, and the Risk Questionnaire and submitted these documents to induce American to issue a workers' compensation insurance policy, for which Ebensburg would receive a commission.

85. Ebensburg intentionally and/or recklessly misrepresented material facts concerning Custom Installations' business in the Application, the Questionnaire, and the Risk Questionnaire, including misrepresentation that Custom Installations is not involved in the roofing business, and its employees do not work more than 15 feet above the ground.

86. Ebensburg intentionally and/or recklessly misrepresented material facts to American to induce American to issue the workers' compensation policy to Custom Installations so that Ebensburg could earn a commission to which it would not otherwise be entitled to and so that Ebensburg could otherwise generate income from its relationship with Custom Installations.

Case 4:19-cv-01497-MWB Document 1 Filed 08/28/19 Page 23 of 24

87. Ebensburg is the actual, apparent, and/or ostensible agent of Keystone, and Keystone is vicariously liable for Ebensburg's misrepresentations.

88. American does not issue workers' compensation insurance policies to companies engaged in the roofing business, and but for the material misrepresentations in the Application, Questionnaire, and the Risk Questionnaire, and American's reasonable reliance thereon, American would not have issued the workers' compensation insurance policy to Custom Installations.

89. Subsequent to issuing the workers' compensation policy, Scott, a Custom Installations employee, was working on a roof, fell approximately 25 feet, and sustained grave injuries. Scott made a claim for workers' compensation benefits, and to date, American has paid $10,945.95 for wage indemnity and $1,008,268.68 for medical expenses. Upon information and belief, Scott may submit additional claims against and argue entitlement to be paid under the workers' compensation policy.

90. As a direct and proximate result of Ebensburg's fraudulent misrepresentations of material facts, American has sustained damages in an amount yet to be determined but believed to be well in excess of $1 million.

Case 4:19-cv-01497-MWB Document 1 Filed 08/28/19 Page 24 of 24

91. Ebensburg's actions in misrepresenting material facts to American are so outrageous, intentional, willful, wanton, reckless, grossly negligent that they warrant the imposition of punitive damages.

WHEREFORE, for the foregoing reasons, American requests this Court to enter judgment in its favor and against Ebensburg and Keystone for compensatory and consequential damages in excess of $75,000, punitive damages, pre and post judgment interest, and costs.

**WHITE AND WILLIAMS LLP**

Of Counsel:

BY: ______________________

Konrad R. Krebs (PA #319253)
One Liberty Place | 1650 Market St.
Suite 1800
Philadelphia, PA 19103-7395
krebsk@whiteandwilliams.com
(215) 864-7018
*Attorneys for Plaintiff*
*American Builders Insurance Company*

Thomas B. Fiddler
White and Williams LLP
One Liberty Place | 1650 Market St.
Suite 1800
Philadelphia, PA 19103
(215) 864-7081

Dated: August 28, 2019

Case 4:19-cv-01497-MWB Document 1-1 Filed 08/28/19 Page 1 of 12

**EXHIBIT "A"**

Case 4:19-cv-01497-MWB Document 1-1 Filed 08/28/19 Page 2 of 12

1542 / 1543

RECEIVED
MAY 2 8 2008
BUILDERS INSURANCE GROUP

Builders
Insurance
Group

RECEIVED
MAY 2 8 2008
BUILDERS INSURANCE GROUP

# Agency Agreement

This agreement (this "Agreement") is entered into by and between one or more of Builders Insurance (A Mutual Captive Company), Association Insurance Company, and Vinings Insurance Company (hereinafter referred as the "Insurer(s)") and KEYSTONE INSURERS GROUP (Agency). The Insurers and the Agency are sometimes collectively referred to as the "Parties."

WITNESSETH

**WHEREAS,** Builders Insurance Group, Inc. (the "Company") has entered into an administrative service agreement with the Insurers to provide administrative services in the name of and on behalf of the Insurers;

**WHEREAS,** the Insurer desires to utilize the services of the Agency to solicit proposals for the line of coverage specifically enumerated in the Attachment to this Agreement; and

**WHEREAS,** the Agency is a licensed insurance agent, agency or broker in the respective state.

**NOW, THEREFORE,** in consideration of the mutual promises herein contained, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties do hereby agree as follows:

## I. AUTHORITY AND DUTIES OF THE AGENCY

1.1 Authority to solicit proposals. The Insurer hereby grants to the Agency the authority to solicit, receive and accept proposals for insurance covering such lines of business in such states as the Insurer may, from time to time, authorize to be written, provided that the Agency and the Insurer are duly licensed where such coverage is solicited or accepted in each such state. The Agency's authority shall be limited by the underwriting rules and guidelines of the Insurer and by the terms, conditions, and provisions as set forth in this Agreement.

1.2 Authority and duties with respect to binding coverage. The Agency shall have no authority, actual or apparent; to bind the Insurer to any new or renewal coverage or to otherwise commit the Insurer to insure an applicant without receiving prior written approval from the Company's authorized personnel. Subject to the terms and conditions of this Agreement, and the underwriting rules and guidelines of the Insurer, the Agency, upon release of the premium quote by the Company, may offer coverage through the Insurer, provided, that the Agency has received from the Company an authorized quote prepared subsequent to or upon the Company's underwriting approval, and provided that the coverage offered reflects those terms as set forth in the authorized quotation. Such authorized quotation from the Company to the Agency shall be valid for a period of not more than thirty (30) days from the date of its issue, or for such other period as may be stated in the premium quote or otherwise mandated by applicable law. The Agency shall forward copies of all binders and certificates issued to applicants by the Agency and otherwise notify the Company of all liability accepted not later than three (3) business days following the effective date of coverage. The Agency shall not cancel, non-renew, or attempt to cancel or non-renew any policy, except with the written authority of the Company, the Insurer or the policyholder.

1.3 Premiums and commission. Any and all premiums and return premiums received by the Agency, either before, during or subsequent to the termination of this Agreement, shall be held in a fiduciary capacity as trustee for the Insurer. The Agency shall promptly remit to the Company or the policyholder, respectively, any premium or return premium so held. The Agency shall pay to the Company all amounts due as return commission on cancelled policies or reductions in premiums at the same rate at which commissions were originally retained. As and when reasonably requested by the Company, the Agency shall use its best efforts to collect premium from any policyholder with regard to business placed with the Insurer pursuant to this Agreement and shall assist the Company in obtaining full cooperation and compliance from the policyholder with regard to payroll audits, if any.

1.4 The Agency's Duty to Report. The Agency shall have a duty to report any and all claims against the Insurer under coverage sold by the Agency. The Agency shall promptly report such claims to the Company, but in no event shall such claims be reported more than thirty (30) days after Agency becomes aware of the facts potentially giving rise to a claim. The Agency shall also have a duty to notify the Company of any material change in the business of a policyholder. Such material changes are those that may affect the coverage of the policyholder under the coverage as written by the Insurer. The Agency shall promptly report such material changes to the Company, but in no event shall such material changes be reported more than thirty (30) days after the Agency becomes aware of the changes.

1.5 Advertising. The Agency shall not use the name, trade name, logo, trademark or any other such information of the Company or the Insurer in any advertisement, marketing material, literature or other media without the express prior written consent of the Company or the Insurer.

## II. DUTIES OF BUILDERS INSURANCE GROUP, INC.

2.1 Billing and collection. The Company shall be responsible for generating and mailing premium invoices directly to the policyholder (direct bill), unless the Company notifies the Agency of its election to generate and mail premium invoices otherwise (agency bill). With respect to direct bill policies, a copy of annualized estimated and final audit bills will be mailed to the Agency upon request.

2.2 Commission Schedule. The Company shall compute and pay to the Agency commission in accordance with the Schedule of Commission as set forth in the Attachment to this Agreement, or as otherwise agreed to in writing by the Parties. The Company may, from time to time, revise or modify the Commission Schedule by providing a revised Commission Schedule to Agency by first class mail, fax, email or overnight delivery service, at the most recent address on file with the Company; such revised Commission Schedule to apply to all transactions which occur on or after the effective date set forth in such Commission schedule, which date shall be not less than 30 days after date the revised Commission Schedule is distributed.

2.3 Commission Payment. Commission will be paid based upon the amount collected by the Company from the policyholder, provided that the Company has not resorted to the use of a professional debt collector, attorney or other similar action in efforts to collect the premium, in which case, no commission will be paid to the Agency. No commission will be paid to the Agency with respect to premium subject to any bankruptcy proceeding. Payment shall be mailed to the Agency within thirty (30) days after the end of the calendar month in which the premiums are received and recorded by the Company, less commission on return premium or overpayment.

## III. TERMINATION OR SUSPENSION

3.1 Grounds for termination. This Agreement shall terminate:

a) Automatically and without notice if the Agency's license or authorization to engage in insurance business is terminated, canceled, suspended, revoked or declined renewal by a regulatory authority in any state.

b) Automatically and without notice on the effective date of the sale or transfer of the Agency or a substantial portion of the Agency's business or its consolidation with a successor firm, unless this Agreement is assigned to the buyer, transferee or successor with the prior written consent of the Company.

c) Automatically and without notice, with respect to the Insurer and any corresponding line of business provided for in the Attachment to this Agreement, in the event the service or management agreement between the Company and the Insurer is terminated. Any termination of a service or management agreement between the Company and any one or more Insurers shall not have the effect of terminating this agreement with respect to any other Insurer(s).

d) Immediately upon either party giving written notice to the other in the event of abandonment, fraud, insolvency, gross or willful misconduct or material breach of this Agreement on the part of such other party.

e) Upon either party giving not less than thirty (30) days prior written notice to the other, or such other period as may be required by applicable law. Such notice shall include the date of the notice and the effective date of

Case 4:19-cv-01457-MWB Document 1-1 Filed 08/23/19 Page 4 of 12

termination. Such notice shall be deemed duly given when mailed by certified mail, return receipt requested, to the party at the address provided hereafter.

3.2 Effect of termination. In the event that this Agreement is terminated pursuant to Section 3.1(e), the provisions hereof shall continue until all policies written hereunder have expired and all final audits, billings and retrospective adjustments have been completed, billed, paid, and/or remitted for direct collection of earned premium. However, any reference or implied consent in this Agreement or the Attachment which refers to the Agency's authority to solicit and accept proposals shall be deemed null and void from the effective date of termination.

3.3 Accounting and payment. Not later than five (5) business days after the effective date of the termination of this Agreement, the Agency shall account for and pay to the Company all premiums and other monies or securities collected by the Agency or held for or on behalf of the Company or the Insurer.

3.4 Suspension. If the Agency becomes delinquent in accounting or payment of monies due to the Company or the Insurer, the Company or the Insurer may immediately suspend the Agency, suspend this Agreement in its entirety, or suspend any provision or provisions hereof as deemed necessary in the sole discretion of the Company or the Insurer.

3.5 Ownership of documents and records. In the event of suspension or termination of this Agreement as provided above, the Agency's records and use and control of expirations shall remain the property of the Agency and shall remain in its possession, provided that the Agency has then rendered and continues to render timely accounts and payments of all amounts due the Company and the Insurer. Otherwise, the said records and use and control of expirations of business shall become vested in the Insurer. If, in disposing of such records and expirations, there is a deficiency with respect to debt or money owed to the Company or the Insurer, the Agency shall remain liable for the balance of such indebtedness. Any amount realized in excess of such indebtedness, less expenses, shall be returned to the Agency. All policy forms, manuals, membership agreements, endorsements or other supplies furnished to the Agency by the Company or the Insurer shall at all times remain the property of the Insurer and shall be returned within five (5) days after the effective date of termination or suspension, or immediately upon demand made by the Company or the Insurer.

## IV. GENERAL PROVISIONS

4.1 Rules of construction. Any and all references in this Agreement to the Insurer, line of business, state and Schedule of Commissions shall be deemed to refer to the specific Insurer, line of business, state and Schedule of Commission as enumerated in any and all Attachments to this Agreement, respectively. Wherever used in this Agreement, the singular shall include the plural, and the plural shall include the singular; and any reference to a particular gender shall include each and every other gender. The section headings used herein are provided for convenience only and shall have no bearing on the construction of this Agreement. This Agreement contains the entire agreement with respect to the subject matter hereof and supersedes all previous agreements regarding the same or similar subject matter made between the Parties.

4.2 Independent contractor. The Agency is an independent contractor and not an employee of the Company or the Insurer. The Agency's sole remuneration shall be the commission as set forth in the Attachment to this Agreement. Expenses incurred by the Agency shall be borne solely by the Agency and not by the Company or the Insurer.

4.3 Designation of agent or agency of record. In the event of a dispute as to which agent or agency is authorized to represent an existing or prospective policyholder as the agent of record, the policyholder's written statement designating an agent or agency shall be binding upon the Parties and the Company, provided that, at all times relevant, the designated agent or agency remains duly licensed in the respective state and appointed by the Insurer. Unless otherwise prohibited by law, the Company shall exercise exclusive discretion over whether to recognize an amendment or change to the designation of the agent of record prior to the expiration, termination or renewal of a policy.

4.4 Professional liability. The Company and the Insurer shall not be responsible for the errors and omissions of the Agency. The Agency agrees, warrants and represents that it has obtained and will continue to maintain professional liability insurance in an amount with limits of not less than one million dollars ($1,000,000.00) per claim with an insurer acceptable to the Company and the Insurer. A copy of the policy or a certificate of insurance shall be provided to the Company upon execution of this Agreement, on or about each anniversary thereafter, and at such other times as may be reasonably requested by the Company. Failure to provide a copy of the above listed documentation shall

Case 4:19-cv-01497-MWB Document 1-1 Filed 08/28/19 Page 5 of 12

result in an immediate termination of this Agreement at the option of the Company or the Insurer.

4.5 Governing law and costs of litigation. This Agreement shall be governed in accordance with the law of the state of Georgia. Any action to enforce this agreement may be brought in the District Court of the state of Georgia in Fulton County, or, if in federal court, in the United States District Court for the Northern District of Georgia. In the event of any litigation with regard to the subject matter hereof, the prevailing party shall be entitled to recover costs and reasonable attorneys' fees from the other party.

4.6 Severability. The invalidity or unenforceability of any particular provision of this Agreement shall not affect the validity or enforceability of any other provision hereof; and this Agreement shall be construed in all respects, to the extent possible, as if such invalid or unenforceable provision were omitted or were amended in compliance with the law.

4.7 Indemnification and Hold Harmless With Respect to Builders Insurance Group, Inc. et. al. The Agency shall indemnify, defend, and hold the Company, and its subsidiaries, affiliates, successors, insurers, reinsurers and assignees (including but not limited to the Insurer), as well as their shareholders, directors, officers, employees and agents harmless against and in respect of any and all claims, demands, actions, proceedings, liability, losses, damages, fines and penalties, costs or expenses, including without limitation, attorney's fees, disbursements, and court costs, made or instituted against or incurred by the Company or the Insurer(s) or such other indemnities and which arise, either directly or indirectly, out of any action or inaction of the Agency or any agent, or their employees or representatives, in connection with any obligations of the Agency arising out of this Agreement.

4.8 Hold Harmless With Respect to Insurer. The Agency shall have no claim or cause of action against the Insurer, and the Agent shall look solely to the Company and hold the Insurer harmless for any and all claims, expenses, costs, liabilities, causes of action and damages, including but not limited to extra-contractual damages or losses in excess of policy limits, that the Agency incurs which arise in any manner from actions taken or not taken by the Insurer or the Company.

4.9 Collateral Assignment. Pursuant to the Company's agreement with the Insurer, Builders Insurance Group Inc. has collaterally assigned jointly to the Insurer all rights and remedies it may have now or in the future against any Agency, under any contract between the Company and the Agency, or otherwise, relating in any manner to the policies. Such collateral assignment shall be fully effective and enforceable automatically and immediately if Builders Insurance Group, Inc. defaults in fulfilling any of its obligations to the Insurer. The Agency hereby agrees to be bound by and to comply with such assignment upon notice from the Insurer to the Agency that the assignment has become effective.

4.10 Amendments Deemed Accepted. From time to time the Insurer may make Amendments to this Agreement. Such Amendments will be mailed to the Agency pursuant to the provisions of Section 4.11 of the Agreement. The Agency shall have ninety (90) days to notify the Insurer of their non-acceptance of such Amendments. Should such notice of non-acceptance not be received by the Insurer, the Amendment(s) shall be deemed accepted.

4.11 Notices. Notice to any Party provided pursuant to this Agreement shall be deemed duly given when mailed via United States Postal Service, certified mail, return receipt requested as follows:

If to the Insurer, in care of the Company:

Builders Insurance Group, Inc.: Builders Insurance Group
2410 Paces Ferry Rd. Suite 300
Atlanta, GA 30339-4098
Attention: Agency Services

If to the Agency: ______________________

______________________

______________________

______________________

Either party may change its notice address by mailing notice of the new address to the other party as aforesaid.

1542 / 1543

4.12 Warranty. The Parties, by signing below, warrant that they are authorized to execute this Agreement.

**IN WITNESS WHEREOF,** the Parties have entered into this Agreement on the _______ day of _________________, _________ and it shall become effective on the _______ day of _______________________, _________.

Agency: Keystone Insurers Group
[signature]
Signature:
Lea Ann Hawk
Printed name:
Operations Officer
Title:
05-22-08
Date:

Insurer: Builders Insurance Group
[signature]
Signature:
Tom Maupin
Printed name:
SR VP Marketing
Title:
6/16/08
Date:

Witness
[signature]
Signature:
Holly L VanGilder
Printed name:

Witness
[signature]
Signature:
Ericka Billue
Printed name:

Builders Insurance Group


1542
Builders
Insurance
Group

## BUILDERS INSURANCE GROUP
## 2008 VIRGINIA AGENCY PROFIT SHARING AGREEMENT

This Profit Sharing Agreement (hereinafter referred to as the "Agreement") is by and between you, our Agent (hereinafter referred to as "You" or "Your"), and the member companies of Builders Insurance Group set forth below (hereinafter referred to as "We," "Us," or "Our") that have appointed You as Our licensed representative under applicable state laws and regulations.

### I. PROFIT SHARING AWARD

To be eligible for an Award under this Agreement, You must have:

(i) a minimum combined total of $250,000 of In-Force Premiums with any of the Builders Insurance Group member companies as of the Annual Evaluation Date;
(ii) earned Premiums for the most recent year of at least $125,000;
(iii) an active Agency Agreement at the time of payment of the Award;
(iv) a Loss Ratio of 45% or less for the Experience Period

### II. DEFINITIONS

**A. Agency Tier** (see Exhibit I) The table used to determine Your Profit Sharing Award shall be determined by Your In-Force Premium as of December 31 of Year One of the Experience Period.

**B. Earned Premiums** are calendar-year premiums related to all exposures recorded or estimated during the Experience Period.

**C. Claims Evaluation Date** shall be March 31 for all claims activity occurring during the most recently completed Experience Period.

**D. Experience Period** is the most recently concluded calendar year plus the two preceding calendar years. The most recent year shall be referred to as Year One, the middle year as Year Two and the most distant year as Year Three.

**E. Incurred Losses** include:

1. Direct losses, case reserves and allocated loss adjustment expenses paid during the Experience Period.

2. Change in case reserves during the Experience Period.

3. Other Expenses – Additional costs or charges incurred by Us for:

   - Underwriting charges imposed for any reinsurance facility, joint underwriting association business assumed, or other insurance programs required by statute or some other basis.
   - Special state taxes and assessments or other charges.

Case 4:19-cv-01497-MWB Document 1-1 Filed 08/28/19 Page 3 of 12

**F. In-Force Premiums** include estimated annual premiums for all active policies (workers' compensation, general liability and builders risk) as of the evaluation date and recorded by Us during the Experience Period. In-Force Premiums do not include:

- Premiums for policies written through pools, associations, or syndicates.
- Premiums for policies written in any reinsurance facility, joint underwriting association, or other insurance program required by law.
- Policyholder dividends, expense fees, surcharges, and other like charges.
- Premiums for policies, lines of coverage or plans that We may exclude from this Agreement by amendment.

**G. Loss Ratio** shall be determined dividing your Incurred Losses by your Earned Premiums. **The Loss Ratio is determined from premiums and losses associated with Your workers' compensation and builders risk book of business only.**

Premiums and losses from other lines of business (i.e.: general liability) will not be used in the calculation of Your Loss Ratio until such time as We determine. We will inform you in writing of any change in the Loss Ratio formula.

**H. Premium Growth** shall be determined by dividing Your In-Force Premium (workers compensation, general liability and builders risk) as of December 31 of Year One of the Experience Period by Your In-Force Premium (workers compensation, general liability and builders risk) as of December 31 of Year Two of the Experience Period.

**I. Settlement Date** we will endeavor to make payment no later than April 30 following the end of the most recent Experience Period.

**J. Three-Year Loss Ratio** shall be determined by dividing Your Incurred Losses by Your Earned Premiums for the same period. **The Three-Year Loss Ratio is determined from Your workers' compensation book of business and your builders risk business only.** Your Three-Year Loss Ratio and Your Premium Growth in the workers' compensation, general liability and builders risk lines of business shall be used to determine Your Profit Sharing Award from the appropriate table in Exhibit I.

**K. Member Companies:** This agreement applies to business written in any of the following Builders Insurance Group member companies, Builders Insurance (A Mutual Captive Company), Association Insurance Company and Vinings Insurance Company.

Case 4:19-cv-01497-MWB Document 1-1 Filed 08/28/19 Page 9 of 12

## III. AGENCY INCENTIVE FORMULA

**A.** The applicable Profit Sharing percentage (refer to Exhibit I), as determined by Your Three-Year Loss Ratio (determined by your workers' compensation and builders risk losses only) and Your In Force Premium growth (workers' compensation, general liability and builders risk), shall be applied to Your In-Force Premium as of December 31 of Year One. 2008

**B.** For years in which Your In-Force Premium does not meet or exceed $250,000 on December 31, You will not be eligible for a Profit Sharing Award. However, the experience (premium and losses) from years in which Your In-Force Premiums were below $250,000 will be included in the calculation of Your Agency Incentive Payment in subsequent years.

## IV. LARGE LOSS LIMITATION

To mitigate the adverse effects of any single loss on Your Agency Incentive Award, any loss or single occurrence charged to Your account shall be limited as follows:

**A. Year One Losses:** Any single Incurred Loss (occurring in Year One) shall be limited to Our per-occurrence reinsurance retention level for the year in which the loss occurred.

**B. Year Two and Year Three Losses:** Any single Incurred Loss (occurring in Year Two or Year Three) shall be limited to $100,000.

## V. AGENT OF RECORD TRANSACTIONS

History (premium and losses) on business moved from one agency to another by an agent of record letter will remain with the original agent for the period the original agent was recognized in our records as the agent of record. The new agent will be held accountable for the premium and losses following our recognition of the new agent as the agent of record.

## VI. TERMINATION

Upon the termination of Your Agency Agreement, this Agreement shall also terminate without further notice. Following termination of Your Agency Agreement, no Profit Sharing Awards shall be earned, due or paid for any Experience Period.

## VII. REQUIREMENTS AND CONDITIONS

**A.** We expressly reserve the right to charge costs in any Experience Period for expenses incurred with respect to prior Experience Periods.

**B.** Unless stated otherwise in this Agreement, Your Earned Premiums and Incurred Losses for all states in which You write business will be combined for purposes of determining eligibility and making calculations under this Agreement.



C. The combining of agencies under common ownership or control for the purpose of qualifying for the Profit Sharing Award shall be done at Our discretion.

D. All information required by this Agreement shall be computed by Us from Our records in accordance with Our usual accounting and statistical methods and procedures and all calculations shall be final and uncontestable.

E. We shall furnish You with a statement providing information used in the Agency Incentive Award calculations.

F. In signing this Agreement, you expressly agree that you understand its provisions and the calculation and payment terms. The equitable administration and interpretation of this Agreement is at Our sole discretion.

G. From time to time We may introduce new products. Any new products offered by Us and sold by You are not automatically included in this Agreement unless We inform you in writing of such inclusion.

## VIII. TERM OF AGREEMENT

This Agreement is effective on the date indicated below and shall apply to experience periods beginning on or after stated effective date and will remain in effect until terminated or modified by Us. We reserve the right to modify this agreement retroactively up to 150 days after the inception of the most recent Experience Period.

The undersigned herby agrees to the terms and conditions of the Builders Insurance Group Profit Sharing Agreement.

**Builders Insurance Group**

By [signature] Date 6/16/08

Printed Name TOM MAUPIN Title SR VP MARKETING

**Agency Name** Keystone Insurers Group, Inc

By [signature] Date 05-22-08

Printed Name Lea Ann Hawk Title Operations Officer

**EXHIBIT I**

**TIER ONE - Agency Volume of $250,000 to $999,999 (as of December 31 of Year Two of the experience period).**

| IN FORCE PREMIUM GROWTH | Decrease of 20% or Greater | Decrease of 19.9% to 7.5% | Decrease of 7.4% to Increase of 4.9% | Increase of 5% to 14.9% | Increase of 15% to 24.9% | Increase of 25% or Greater |
|---|---|---|---|---|---|---|
| THREE- YEAR LOSS RATIO | | | | | | |
| Greater than 45% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 36.1 to 45% | 0.00% | 0.25% | 0.50% | 0.65% | 0.80% | 1.00% |
| 27.1 to 36% | 0.00% | 0.75% | 1.00% | 1.25% | 1.50% | 1.75% |
| 18.1 to 27% | 0.00% | 1.25% | 1.50% | 2.00% | 2.25% | 2.75% |
| 9.1% to 18% | 0.00% | 1.75% | 2.25% | 2.75% | 3.25% | 4.00% |
| Less than 9% | 0.00% | 2.50% | 3.00% | 3.50% | 4.00% | 5.00% |

**TIER TWO - Agency Volume between $1,000,000 and $1,999,999 (as of December 31 of Year Two of the experience period).**

| IN FORCE PREMIUM GROWTH | Decrease Of 17.5% or Greater | Decrease of 17.4% to 5% | Decrease of 4.9 % to Increase of 4.9% | Increase 5% to 12.4% | Increase of 12.5% to 19.9% | Increase of 20% or Greater |
|---|---|---|---|---|---|---|
| THREE-YEAR LOSS RATIO | | | | | | |
| Greater than 45% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 36.1 to 45% | 0.00% | 0.25% | 0.50% | 0.65% | 0.80% | 1.00% |
| 27.1% to 36% | 0.00% | 0.75% | 1.00% | 1.25% | 1.50% | 1.75% |
| 18.1% to 27% | 0.00% | 1.25% | 1.50% | 2.00% | 2.25% | 2.75% |
| 9.1 to 18% | 0.00% | 1.75% | 2.25% | 2.75% | 3.25% | 4.00% |
| Less than 9% | 0.00% | 2.50% | 3.00% | 3.50% | 4.00% | 5.00% |

**TIER THREE - Agency Volume greater than $2,000,000 (as of December 31 of Year Two of the experience period).**

| IN FORCE PREMIUM GROWTH | Decrease of 15% or Greater | Decrease of 14.9% to 7.5% | Decrease of 7.4% to 0.1% | Increase of 0% to 7.4% | Increase of 7.5% to 14.9% | Increase of 15% or Greater |
|---|---|---|---|---|---|---|
| **THREE-YEAR LOSS RATIO** | | | | | | |
| Greater than 45% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 36.1 to 45% | 0.00% | 0.25% | 0.50% | 0.65% | 0.80% | 1.00% |
| 27.1 to 36% | 0.00% | 0.75% | 1.00% | 1.25% | 1.50% | 1.75% |
| 18.1 to 27% | 0.00% | 1.25% | 1.50% | 2.00% | 2.25% | 2.75% |
| 9.1 to 18% | 0.00% | 1.75% | 2.25% | 2.75% | 3.25% | 4.00% |
| Less than 9% | 0.00% | 2.50% | 3.00% | 3.50% | 4.00% | 5.00% |

## Phase-in Factors

**Year One:** The first calculation of the amount indicated by the Profit Sharing Formula shall be adjusted through the application of a factor of **.33**

**Year Two:** The second calculation of the amount indicated by the Profit Sharing Formula shall be adjusted through the application of a factor of **.67**

**Year Three and Later:** The third and subsequent calculations of the amount indicated by the Profit Sharing Formula shall be paid at 100% of the indicated amount.

Phase-in status for Agents, who have participated in Our Profit Sharing Agreement under a previous version of this agreement, shall be "Grandfathered" or "carried-over" from the previous agreement.

# EXHIBIT "B"

07/20/2015 15:56 814/493219 PAGE 02/05
JUL. 20. 2015 10:58AM EBENSBURG INSURANCE No. 2653 P. 2

ACORD

# WORKERS COMPENSATION APPLICATION

DATE (MM/DD/YYYY) 07/17/2015

AGENCY NAME AND ADDRESS: EBENSBURG INSURANCE AGENCY, P.O. BOX 60

COMPANY: Association Insurance Co.
UNDERWRITER: JEAN BYERS
APPLICANT NAME: CUSTOM INSTALLATIONS CONTRACTING SERVICES INC
OFFICE PHONE: 814-948-7050
MAILING ADDRESS (including ZIP + 4 or Canadian Postal code): 413 JUNIPER ST, NORTHERN CAMBRIA, PA 15714
YRS IN BUS: 4
NAICS: 238130
PRODUCER / CS REPRESENTATIVE NAME / OFFICE PHONE / MOBILE PHONE / FAX / E-MAIL ADDRESS
CORPORATION (checked)
CODE / SUB CODE
AGENCY CUSTOMER ID: 0001600
FEDERAL EMPLOYER ID: 562537083

## BILLING/AUDIT INFORMATION

QUOTE (checked) | ISSUE POLICY | BOUND | ASSIGNED RISK (Attach ACORD 133)
BILLING PLAN: AGENCY BILL | DIRECT BILL (checked)
PAYMENT PLAN: ANNUAL | SEMI-ANNUAL | QUARTERLY | % DOWN: 25%DOWN/INST. 10/YR (checked)
AUDIT: AT EXPIRATION (checked) | SEMI-ANNUAL | QUARTERLY | MONTHLY

## LOCATIONS

| LOC # | STREET, CITY, COUNTY, STATE, ZIP |
|---|---|
| | *** See Schedule of Workplaces *** |

## POLICY INFORMATION

PROPOSED EFF DATE: 07/20/2015 | PROPOSED EXP DATE: 07/20/2016 | NORMAL ANNIVERSARY RATING DATE: 07/20/2015

PART 1 - WORKERS COMPENSATION (STATES): PA
PART 2 - EMPLOYER'S LIABILITY: $100,000 EACH ACCIDENT; $500,000 DISEASE-POLICY LIMIT; $100,000 DISEASE-EACH EMPLOYEE
PART 3 - OTHER STATES INS: AL,GA,FL,IN,MD,MS,NC,OK,SC,TN,
DEDUCTIBLES: MEDICAL / INDEMNITY; AMOUNT: $0
OTHER COVERAGES: U.S.L.&H. / VOLUNTARY COMP / FOREIGN COV / MANAGED CARE OPTION
DIVIDEND PLAN/SAFETY GROUP
ADDITIONAL COMPANY INFORMATION
SPECIFY ADDITIONAL COVERAGES / ENDORSEMENTS

## TOTAL ESTIMATED ANNUAL PREMIUM - ALL STATES

| TOTAL ESTIMATED ANNUAL PREMIUM ALL STATES | TOTAL MINIMUM PREMIUM ALL STATES | TOTAL DEPOSIT PREMIUM ALL STATES |
|---|---|---|
| $ 5,953 | $ | $ |

## CONTACT INFORMATION

| TYPE | NAME | OFFICE PHONE | MOBILE PHONE | E-MAIL |
|---|---|---|---|---|
| INSPECTION | BERNIE DOSPOY | | | KURT.DEYULIS@EBENSBURGINS. |
| ACCTNG RECORD | | | | |
| CLAIMS INFO | | | | |

## INDIVIDUALS INCLUDED/EXCLUDED

PARTNERS, OFFICERS, RELATIVES (Must be employed by business operations) TO BE INCLUDED OR EXCLUDED (Remuneration/Payroll to be included must be part of rating information section.)

| STATE | LOC # | NAME | DATE OF BIRTH | TITLE/RELATIONSHIP | OWNERSHIP % | DUTIES | INC/EXC | CLASS CODE | REMUNERATION/PAYROLL |
|---|---|---|---|---|---|---|---|---|---|
| PA | 00001 | MICHELLE A RAGLE | | PRESIDENT | 100 | Officer | Excluded | | |
| PA | 00001 | MICHAEL P MICHKO | | SECRETARY | 0 | Officer | Exc. | | |
| PA | 00001 | BERNARD DOSPOY | | TREASURER | 0 | Officer | Included | | |
| | | | | | | | | | |

© 1980-2007 ACORD CORPORATION. All rights reserved.
ACORD 130 (2007/11)
The ACORD name and logo are registered marks of ACORD

Case 4:19-cv-01497-MWB Document 1-2 Filed 08/28/19 Page 3 of 5

STATE RATING SHEET # ____ OF ____ SHEETS AGENCY CUSTOMER ID: ____

STATE RATING WORKSHEET

FOR MULTIPLE STATES, ATTACH AN ADDITIONAL PAGE 2 OF THIS FORM

RATING INFORMATION - STATE:

| LOC # | CLASS CODE | DESCR CODE | CATEGORIES, DUTIES, CLASSIFICATIONS | # EMPLOYEES FULL TIME | # EMPLOYEES PART TIME | SIC | NAICS | ESTIMATED ANNUAL REMUNERATION / PAYROLL | RATE | ESTIMATED ANNUAL MANUAL PREMIUM |
|---|---|---|---|---|---|---|---|---|---|---|
| | | *** | See Schedule of Operations | *** | | | | | | |

PREMIUM

| STATE | FACTOR | FACTORED PREMIUM | | FACTOR | FACTORED PREMIUM |
|---|---|---|---|---|---|
| TOTAL | | $ 5,237 | | | |
| INCREASED LIMITS | | $ 0 | SCHEDULE RATING | | $ 0 |
| DEDUCTIBLE | | $ 0 | COPAP | | |
| | | | STANDARD PREMIUM | | |
| EXPERIENCE OR MERIT MODIFICATION | | $ 0 | PREMIUM DISCOUNT | 0% | $ 0 |
| | | | EXPENSE CONSTANT | | $ 250 |
| ASSIGNED RISK SURCHARGE | | | TAXES / ASSESSMENTS | | |
| ARAP | | | | | |

| TOTAL ESTIMATED ANNUAL PREMIUM | MINIMUM PREMIUM | DEPOSIT PREMIUM |
|---|---|---|
| 5,363 | | |

REMARKS

PRIOR CARRIER INFORMATION/LOSS HISTORY

PROVIDE INFORMATION FOR THE PAST 5 YEARS AND USE THE REMARKS SECTION FOR LOSS DETAILS — LOSS RUN ATTACHED

| YEAR | CARRIER | ANNUAL PREMIUM | MOD | # CLAIMS | AMOUNT PAID | RESERVE |
|---|---|---|---|---|---|---|
| Expiring Year | SWIF | $ 1 | 0 | 0 | $ 0 | $ 0 |
| 1st Prior Year | SWIF | $ 1 | 0 | 0 | $ 0 | $ 0 |
| 2nd Prior Year | SWIF | $ 1 | 0 | 1 | $ 436 | $ 0 |
| 3rd Prior Year | SWIF | $ 1 | 0 | 0 | $ 0 | $ 0 |

## NATURE OF BUSINESS/DESCRIPTION OF OPERATIONS

GIVE COMMENTS AND DESCRIPTIONS OF BUSINESS, OPERATIONS AND PRODUCTS: MANUFACTURING - RAW MATERIALS, PROCESSES, PRODUCT, EQUIPMENT; CONTRACTOR - TYPE OF WORK, SUB-CONTRACTS; MERCANTILE - MERCHANDISE, CUSTOMERS, DELIVERIES; SERVICE - TYPE, LOCATION; FARM - ACREAGE, ANIMALS, MACHINERY, SUB-CONTRACTS.

COMMERCIAL REMODELING

## GENERAL INFORMATION

| EXPLAIN ALL "YES" RESPONSES | YES | NO |
|---|---|---|
| DOES APPLICANT OWN, OPERATE OR LEASE AIRCRAFT/WATERCRAFT? | ☐ | ☒ |
| DO/HAVE PAST, PRESENT OR DISCONTINUED OPERATIONS INVOLVE(D) STORING, TREATING, DISCHARGING, APPLYING, DISPOSING, OR TRANSPORTING OF HAZARDOUS MATERIAL? (e.g. landfills, wastes, fuel tanks, etc) | ☐ | ☒ |
| ANY WORK PERFORMED UNDERGROUND OR ABOVE 15 FEET? | ☐ | ☒ |
| ANY WORK PERFORMED ON BARGES, VESSELS, DOCKS, BRIDGES OVER WATER? | ☐ | ☒ |
| IS APPLICANT ENGAGED IN ANY OTHER TYPE OF BUSINESS? | ☐ | ☒ |
| ARE SUB-CONTRACTORS USED? (If "YES", give % of work subcontracted) | ☐ | ☒ |
| ANY WORK SUBLET WITHOUT CERTIFICATES OF INSURANCE ? (If YES, payroll for this work must be included in the State Rating Worksheet on Page 2) | ☐ | ☒ |
| IS A WRITTEN SAFETY PROGRAM IN OPERATION? | ☐ | ☒ |
| ANY GROUP TRANSPORTATION PROVIDED? | ☐ | ☒ |
| ANY EMPLOYEES UNDER 16 OR OVER 60 YEARS OF AGE? | ☐ | ☒ |
| ANY SEASONAL EMPLOYEES? | ☐ | ☒ |



GENERAL INFORMATION

| EXPLAIN ALL "YES" RESPONSES | YES | NO |
|---|---|---|
| IS THERE ANY VOLUNTEER OR DONATED LABOR? (If "YES", please specify) | ☐ | ☒ |
| ANY EMPLOYEES WITH PHYSICAL HANDICAPS? | ☐ | ☒ |
| DO EMPLOYEES TRAVEL OUT OF STATE? (If "YES", indicate state(s) of travel and frequency) | ☐ | ☒ |
| ARE ATHLETIC TEAMS SPONSORED? | ☐ | ☒ |
| ARE PHYSICALS REQUIRED AFTER OFFERS OF EMPLOYMENT ARE MADE? | ☐ | ☒ |
| ANY OTHER INSURANCE WITH THIS INSURER? | ☐ | ☒ |
| ANY PRIOR COVERAGE DECLINED/CANCELLED/NON-RENEWED IN THE LAST THREE (3) YEARS? (Not applicable in MO) | ☐ | ☒ |
| ARE EMPLOYEE HEALTH PLANS PROVIDED? | ☐ | ☒ |
| DO ANY EMPLOYEES PERFORM WORK FOR OTHER BUSINESSES OR SUBSIDIARIES? | ☐ | ☒ |
| DO YOU LEASE EMPLOYEES TO OR FROM OTHER EMPLOYERS? | ☐ | ☒ |
| DO ANY EMPLOYEES PREDOMINANTLY WORK AT HOME? If "YES", # of Employees: | ☐ | ☒ |
| ANY TAX LIENS OR BANKRUPTCY WITHIN THE LAST FIVE (5) YEARS? (If "YES", please specify) | ☐ | ☒ |
| ANY UNDISPUTED AND UNPAID WORKERS COMPENSATION PREMIUM DUE FROM YOU OR ANY COMMONLY MANAGED OR OWNED ENTERPRISES? IF YES, EXPLAIN INCLUDING ENTITY NAME(S) AND POLICY NUMBER(S). | ☐ | ☒ |
| | ☐ | ☐ |

REMARKS (Attach additional sheets if more space is required)

APPLICABLE IN TENNESSEE AND VERMONT: IT IS A CRIME TO KNOWINGLY PROVIDE FALSE, INCOMPLETE OR MISLEADING INFORMATION TO ANY PARTY TO A WORKERS COMPENSATION TRANSACTION FOR THE PURPOSE OF COMMITTING FRAUD. PENALTIES INCLUDE IMPRISONMENT, FINES AND DENIAL OF INSURANCE BENEFITS.

ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR ANOTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME AND SUBJECTS THE PERSON TO CRIMINAL AND [NY: SUBSTANTIAL] CIVIL PENALTIES. (Not applicable in CO, FL, HI, MA, NE, OH, OK, OR, TN or VT; in CO, LA, ME, VA and WA, insurance benefits may also be denied)

| APPLICANT'S SIGNATURE (Must be Officer, Owner or Partner) | DATE | PRODUCER'S SIGNATURE | NATIONAL PRODUCER NUMBER |
|---|---|---|---|
| Michael F. Beddick Corp. Sec. | 7/20/2015 | | |

# EXHIBIT "C"

 Case 3:15-cv-00295-KRG Document 1-3 Filed 11/16/15 Page 2 of 3

Builders Insurance Group

eQuotes

## Underwriter Questionnaire

Agent: KURT DEYUL IS Agency: EBENSBURG INSURANCE AGENCY

Carrier: Association Insurance Co. Quote/Policy No: WCV-0196284-00

State: PA Status: Bound/Issued Insured: CUSTOM INSTALLATIONS CONTRACTING SERVICES INC

| | Questions |
|---|---|
| 1 | DOES APPLICANT OWN, OPERATE OR LEASE AIRCRAFT/WATERCRAFT?<br>No |
| 2 | DO/HAVE PAST, PRESENT OR DISCONTINUED OPERATIONS INVOLVE(D) STORING, TREATING, DISCHARGING, APPLYING, DISPOSING, OR TRANSPORTING OF HAZARDOUS MATERIAL? (e.g. landfills, wastes, fuel tanks, etc)<br>No |
| 3 | ANY WORK PERFORMED UNDERGROUND OR ABOVE 15 FEET?<br>No |
| 3.1 | What is the maximum height?<br>15FT |
| 3.2 | What is the maximum depth if any work is performed underground?<br>0 |
| 4 | ANY WORK PERFORMED ON BARGES, VESSELS, DOCKS, BRIDGES OVER WATER?<br>No |
| 5 | IS APPLICANT ENGAGED IN ANY OTHER TYPE OF BUSINESS?<br>No |
| 6 | ARE SUB-CONTRACTORS USED? (If "YES", give % of work subcontracted)<br>No |
| 7 | ANY WORK SUBLET WITHOUT CERTIFICATES OF INSURANCE ? (If YES, payroll for this work must be included in the State Rating Worksheet on Page 2)<br>No |
| 7.1 | Does the insured have a diary system to monitor certificate of insurance?<br>No |
| 7.2 | Or alternatively do they check certificates of insurance prior to the start of the job?<br>Yes |
| 8 | IS A WRITTEN SAFETY PROGRAM IN OPERATION?<br>No |
| 9 | ANY GROUP TRANSPORTATION PROVIDED?<br>No |
| 10 | ANY EMPLOYEES UNDER 16 OR OVER 60 YEARS OF AGE?<br>No |
| 11 | ANY SEASONAL EMPLOYEES?<br>No |
| 12 | IS THERE ANY VOLUNTEER OR DONATED LABOR? (If "YES", please specify)<br>No |
| 13 | ANY EMPLOYEES WITH PHYSICAL HANDICAPS?<br>No |

| # | Question / Answer |
|---|---|
| 14 | DO EMPLOYEES TRAVEL OUT OF STATE? (If "YES", indicate state(s) of travel and frequency)<br>No |
| 15 | ARE ATHLETIC TEAMS SPONSORED?<br>No |
| 16 | ARE PHYSICALS REQUIRED AFTER OFFERS OF EMPLOYMENT ARE MADE?<br>No |
| 17 | ANY OTHER INSURANCE WITH THIS INSURER?<br>No |
| 18 | ANY PRIOR COVERAGE DECLINED/ CANCELLED/NON-RENEWED IN THE LAST THREE (3) YEARS? (Not applicable in MO)<br>No |
| 19 | ARE EMPLOYEE HEALTH PLANS PROVIDED?<br>No |
| 20 | DO ANY EMPLOYEES PERFORM WORK FOR OTHER BUSINESSES OR SUBSIDIARIES?<br>No |
| 21 | DO YOU LEASE EMPLOYEES TO OR FROM OTHER EMPLOYERS?<br>No |
| 22 | DO ANY EMPLOYEES PREDOMINANTLY WORK AT HOME? If "YES", # of Employees:<br>No |
| 23 | ANY TAX LIENS OR BANKRUPTCY WITHIN THE LAST FIVE (5) YEARS? (If "YES", please specify)<br>No |
| 24 | ANY UNDISPUTED AND UNPAID WORKERS COMPENSATION PREMIUM DUE FROM YOU OR ANY COMMONLY MANAGED OR OWNED ENTERPRISES? IF YES, EXPLAIN INCLUDING ENTITY NAME(S) AND POLICY NUMBER(S).<br>No |

# EXHIBIT "D"

 Case 4:19-cv-01497-MWB Document 1-4 Filed 08/28/19 Page 2 of 2

Builders Insurance Group

eQuotes

## Risk Questionnaire

Agent: KURT DEYULIS Agency: EBENSBURG INSURANCE AGENCY

Carrier: Association Insurance Co. Quote/Policy No: WCV-0196284-00

State: PA Status: Bound/Issued Insured: CUSTOM INSTALLATIONS CONTRACTING SERVICES INC

| | Questions |
|---|---|
| 1. | Any exterior work above 3 stories?<br>No |
| 2. | Are OSHA required fall protection systems such as guardrails, personal fall arrest systems or safety nets being used when working above 6 feet?<br>Yes |
| 3. | Does the operation involve fire/water restoration?<br>No |
| 4. | Is the roofing performed by the Insureds own employees?<br>No |
| 5. | Is there any wrecking or demolition work?<br>No |

Case 4:19-cv-01497-MWB Document 1-5 Filed 08/28/19 Page 1 of 1

JS 44 (Rev. 08/18)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

American Builders Insurance Company
2410 Paces Ferry Road, SE
Atlanta, GA

(b) County of Residence of First Listed Plaintiff ______
*(EXCEPT IN U.S. PLAINTIFF CASES)*

(c) Attorney's *(Firm Name, Address, and Telephone Number)*

## DEFENDANTS

Keystone Insurance Group, Inc.
1995 Point Township Drive
Northumberland, PA

Ebensburg Insurance Agency
129 E. High Street, P.O. Box 90
Ebensburg, PA

County of Residence of First Listed Defendant Northumberland
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

Unknown

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1 U.S. Government Plaintiff
☐ 3 Federal Question *(U.S. Government Not a Party)*
☐ 2 U.S. Government Defendant
☒ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☒ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

**CONTRACT**
☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)
☐ 153 Recovery of Overpayment of Veteran's Benefits
☐ 160 Stockholders' Suits
☒ 190 Other Contract
☐ 195 Contract Product Liability
☐ 196 Franchise

**REAL PROPERTY**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**TORTS**

PERSONAL INJURY
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers' Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Personal Injury - Medical Malpractice

PERSONAL INJURY
☐ 365 Personal Injury - Product Liability
☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
☐ 440 Other Civil Rights
☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/ Accommodations
☐ 445 Amer. w/Disabilities - Employment
☐ 446 Amer. w/Disabilities - Other
☐ 448 Education

**PRISONER PETITIONS**
Habeas Corpus:
☐ 463 Alien Detainee
☐ 510 Motions to Vacate Sentence
☐ 530 General
☐ 535 Death Penalty
Other:
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition
☐ 560 Civil Detainee - Conditions of Confinement

**FORFEITURE/PENALTY**
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 690 Other

**LABOR**
☐ 710 Fair Labor Standards Act
☐ 720 Labor/Management Relations
☐ 740 Railway Labor Act
☐ 751 Family and Medical Leave Act
☐ 790 Other Labor Litigation
☐ 791 Employee Retirement Income Security Act

**IMMIGRATION**
☐ 462 Naturalization Application
☐ 465 Other Immigration Actions

**BANKRUPTCY**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
☐ 820 Copyrights
☐ 830 Patent
☐ 835 Patent - Abbreviated New Drug Application
☐ 840 Trademark

**SOCIAL SECURITY**
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
☐ 870 Taxes (U.S. Plaintiff or Defendant)
☐ 871 IRS-Third Party 26 USC 7609

**OTHER STATUTES**
☐ 375 False Claims Act
☐ 376 Qui Tam (31 USC 3729(a))
☐ 400 State Reapportionment
☐ 410 Antitrust
☐ 430 Banks and Banking
☐ 450 Commerce
☐ 460 Deportation
☐ 470 Racketeer Influenced and Corrupt Organizations
☐ 480 Consumer Credit
☐ 485 Telephone Consumer Production Act
☐ 490 Cable/Sat TV
☐ 850 Securities/Commodities/ Exchange
☐ 890 Other Statutory Actions
☐ 891 Agricultural Acts
☐ 893 Environmental Matters
☐ 895 Freedom of Information Act
☐ 896 Arbitration
☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
☐ 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from Another District *(specify)*
☐ 6 Multidistrict Litigation - Transfer
☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing ***(Do not cite jurisdictional statutes unless diversity)***:
28 U.S.C. §1332(a)(1)

Brief description of cause:
Breach of contract; professional negligence; misrepresentations

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

**DEMAND $ 75,000+**

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):* JUDGE ______ DOCKET NUMBER ______

DATE 8/28/19

SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT # ______ AMOUNT ______ APPLYING IFP ______ JUDGE ______ MAG. JUDGE ______

1685278v.2