EXHIBIT "1"

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| REPUBLIC FRANKLIN INSURANCE COMPANY, | : | CIVIL ACTION NO.: |
| | : | |
| | : | COMPLAINT |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| EBENSBURG INSURANCE AGENCY, KEYSTONE INSURERS GROUP, INC., and AMERICAN BUILDERS INSURANCE COMPANY, f/n/a ASSOCIATION INSURANCE COMPANY, | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| Defendants. | :: | |

## **COMPLAINT FOR DECLARATORY JUDGMENT**

Plaintiff, Republic Franklin Insurance Company ("Republic Franklin"), by and through its undersigned counsel, Goldberg Segalla, LLP, alleges the following in support of its Complaint for Declaratory Judgment:

1.     This is an insurance coverage action in which Republic Franklin seeks a declaration of its obligations relating to an Insurance Agents and Brokers Errors and Omissions Policy that Republic Franklin issued to its named insured, Carl DeYulis dba Ebensburg Insurance Agency ("Ebensburg") and putative additional insured Keystone Insurers Group, Inc. ("Keystone").

2.     Republic Franklin seeks a declaration that it is not required to defend or indemnify Ebensburg and Keystone in connection with a lawsuit titled *American*

*Builders Ins. Co. v. Keystone Insurers Group, Inc. and Ebensburg Insurance Agency*, docket number 4:19-cv-01497-MWB, currently pending in the District Court for the Middle District of Pennsylvania (the "Underlying Action").

3.     Republic Franklin is entitled to declaratory relief because Ebensburg had knowledge of the facts and circumstances set forth in the Underlying Action prior to the inception of the Republic Franklin policy at issue in this Complaint when Ebensburg employees were served with subpoenas and gave testimony regarding these facts and circumstances. Despite this knowledge, of which Ebensburg's owner was expressly aware, and the knowledge that such facts and circumstances set forth an alleged wrongful act likely to result in a claim, Ebensburg failed to give notice to Republic Franklin until it was served with the complaint in the Underlying Action in August of 2019.

4.     Keystone also failed to give timely notice, and is otherwise bound by Ebensburg's late notice by virtue of the terms and conditions in the Republic Franklin policy.

5.     For the reasons set forth below, Republic Franklin is entitled to a declaration, pursuant to Pa.R.C.P. 1601 *et seq.* and the Declaratory Judgment Act, 42 Pa.C.S.A. § 7531 *et seq.*, as to its rights and obligations under the Policy.

## THE PARTIES

6.     Plaintiff Republic Franklin is an Ohio corporation duly authorized to issue insurance policies in the Commonwealth of Pennsylvania.

7.     Defendant Ebensburg is a Pennsylvania corporation and maintains a principal of business at 129 E. High Street, P.O. Box 90, Ebensburg, Pennsylvania. Ebensburg is an insurance agency.

8.     Defendant Keystone is a Pennsylvania corporation and maintains a principal place of business at 1995 Point Township Drive, Northumberland, Pennsylvania.

9.     Defendant American Builders Insurance Company, f/n/a Association Insurance Company ("American") is a corporation organized and existing under the laws of the State of Delaware, with a principal place of business at 2410 Paces Ferry Road, SE, Atlanta, Georgia.  Defendant American is named as an interested party only, so that it may be bound by any judgments entered in this action.

## JURISDICTION AND VENUE

10.     This Court has personal jurisdiction over the defendants, Ebensburg and Keystone because both are Pennsylvania corporations and regularly conduct business in the Commonwealth.

11.    This Court has personal jurisdiction over the defendant, American because it was duly licensed to and did issue the policy of insurance in the Commonwealth giving rise to the Underlying Action, which is venued in this Court.

12.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) by reason of the diversity of citizenship between the plaintiff and the defendants and the amount in controversy exceeding $75,000, exclusive of interest and costs.

13.    Venue is proper in the United States District Court for the Middle District of Pennsylvania pursuant to 28 U.S.C. § 1391(b) because Keystone maintains business offices in this district and a substantial part of the events forming the basis of the Underlying Action occurred in this district, including the fact that it is the venue for the underlying *American Builders* action which was tendered to Republic Franklin for defense and indemnity of both Ebensburg and Keystone.

## FACTUAL BACKGROUND

### A.    The Republic Franklin Policy

14.    Republic Franklin issued an Insurance Agents and Brokers Errors and Omissions Policy, bearing policy number 5171558 EO and with effective dates of September 1, 2019 to September 1, 2020, to Ebensburg.  A true and correct copy of the Policy is attached hereto as Exhibit A.

15.    The Policy, in Section II – Coverage, contains the following Insuring Agreement:

4

## SECTION II - COVERAGE

### 1. Insuring Agreement

**a.** We will pay on behalf of the insured all loss" to which this insurance applies.

We will have the right and the duty to defend the insured against any "suit" seeking such "loss" even if the allegations of the "suit" are groundless, false, or fraudulent. However, we will have no duty to defend an insured against any "suit" to which this insurance does not apply. We have the right, but not the duty, to appeal any judgment.

***

**b.** This insurance applies only to "wrongful acts" which take place:

**(1)**     In the "coverage territory";

**(2)**     During the "policy period" and "claim" is first made against any insured during the "policy period" or any Extended Reporting Period provided; or

**(3)**     Prior to the "policy period", but on or after the Retroactive Date, if any, shown in the Declarations for this policy, provided that prior to the effective date of this policy:

    **(a)**     The insured did not give notice to any prior insurer of such "wrongful act";

    **(b)**     The insured had no knowledge that such "wrongful act" was likely to give rise to a "claim" hereunder; and

    **(c)**     The "claim" is first made against any insured during the "policy period" or any Extended Reporting Period provided.

Id.

16.     The Policy, in Section IV – Who Is An Insured, defines an Insured as:

## SECTION IV - WHO IS AN INSURED

Each of the following is an insured to the extent set forth below:

1.  The individual, partnership, corporation or limited liability company designated as the Named Insured in the Declarations;

2.  Your executive officers or directors, but only with respect to their duties as your officers and directors;

3.  Your partners or members, but only with respect to the conduct of your business;

4.  Your employees (regular, leased, or temporary) or managers, but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business; ....

Id.

17.     The Policy includes an endorsement entitled "Additional Insured – Designated Person or Entity", with an effective date of 9/1/2018. The Additional Insured endorsement names Keystone in the Schedule and provides, in pertinent part:

**II.**   **Section IV - Who Is An Insured** is amended to include as an additional insured        the person or entity shown in the Schedule above, but only with respect to liability for "loss" caused, in whole or in part, by your "wrongful acts" or the "wrongful acts" of those acting on your behalf. ....

\*\*\*

**III.**   With respect to the insurance provided by this endorsement, the following exclusion applies in addition to those in SECTION III - EXCLUSIONS of the policy.

This insurance does not apply to:

> Any "claim" for, or arising out of a "wrongful act"
> which any insured knew of before the effective date
> of this endorsement.

Id.

18.    The Policy, in Section III – Exclusions, includes the Intentional,

Fraudulent, Criminal or Malicious Acts Exclusion, which states:

> ## SECTION III - EXCLUSIONS
>
> This insurance does not apply to any "claim" directly or
> indirectly, in whole or in part, arising out of, involving,
> resulting from, or caused by any of the following:
>
> ### 1.   Intentional, Fraudulent, Criminal Or Malicious Acts
>
> Any intentional, criminal, fraudulent, dishonest,
> malicious, knowing or willful conduct committed or
> alleged to have been committed by or at the direction
> of any insured. If a "suit" is brought against an insured
> alleging both "wrongful acts" within the coverage of
> the policy and intentional, criminal, fraudulent,
> dishonest, malicious, knowing or willful conduct, then
> we will defend the insured in the trial court, but we
> shall not have any liability for any judgment for
> intentional, criminal, fraudulent, dishonest, malicious,
> knowing or willful conduct nor shall we have any
> further obligation to defend after judgment in the trial
> court.
>
> This exclusion applies only to insureds who are alleged
> to have participated in, obtained a financial benefit
> from, acted with knowledge of, acquiesced to, or
> disregarded such conduct.

Id.

19.    The Policy, in Section I – Definitions, contains the following relevant

definitions:

## SECTION I - DEFINITIONS

\*\*\*

**2.** "Claim" means a written demand or written notice, including service of a subpoena, "suit" or demand for arbitration, received by one or more insureds which alleges a "wrongful act" or asks for money or services.

\*\*\*

**8.** "Loss" means any amount which an insured becomes legally obligated to pay as damages for any "claim" arising out of a "wrongful act" to which this insurance applies and shall include judgments and settlements. "Loss" shall include punitive or exemplary damages only to the extent that such damages are insurable under the law pursuant to which the policy shall be construed. ....

\*\*\*

**13.** "Wrongful act" means any negligent act, negligent error, negligent omission, or "personal injury" committed by an insured in the lawful performance of their duties for you.

Id.

## B. **Facts Giving Rise To The Underlying Action**

20. On November 11, 2015, Karen Ligda, an employee of Ebensburg, received a copy of a reservation of rights letter issued by American to its named insured, Custom Installations, identifying potential fraud in the workers' compensation insurance application for Custom Installations (the "Application") and reserving American's right to deny coverage. A copy of the November 11, 2015 Correspondence is attached hereto as Exhibit B.

21.    Ebensburg did not notify Republic Franklin about the facts and circumstances set forth in the reservation of rights letter.

22.    Thereafter, on November 16, 2015, due to alleged misrepresentations of material fact and potential fraud in the Application, American commenced a lawsuit against Custom Installations for rescission of the policy and for fraud (the "Custom Installations Lawsuit").

23.    Ebensburg did not notify Republic Franklin about the Custom Installations Lawsuit, which was marked as closed on June 23, 2020.

24.    As part of the discovery process in the Customs Installations Lawsuit, a subpoena *duces tecum* was served on Kurtis DeYulis of Ebensburg (the "DeYulis Subpoena") on or about October 2017. A copy of the DeYulis Subpoena is attached hereto as Exhibit C.

25.    Ebensburg did not notify Republic Franklin about the DeYulis Subpoena.

26.    As part of the discovery process in the Customs Installations Lawsuit, a subpoena *duces tecum* was served on Karen Ligda of Ebensburg (the "Ligda Subpoena") on or about October 2017. A copy of the Ligda Subpoena is attached hereto as Exhibit D.

27.    Ebensburg did not notify Republic Franklin about the Ligda Subpoena.

28.   The deposition of DeYulis took place on November 7, 2017.  A copy of the DeYulis deposition cover page is attached hereto as Exhibit E.

29.   Ebensburg did not notify Republic Franklin about the DeYulis deposition.

30.   The deposition of Ligda took place on November 7, 2017.  A copy of the Ligda deposition cover page is attached hereto as Exhibit F.

31.   Ebensburg did not notify Republic Franklin about the Ligda deposition.

## C.   **The Underlying Action**

32.   On August 28, 2019, American commenced the Underlying Action by filing a Complaint (the "Underlying Complaint") against Keystone and Ebensburg. A copy of the Underlying Complaint is attached hereto as Exhibit G.

33.   The Underlying Complaint generally alleges that in 2015, Ebensburg and/or Keystone prepared the Application on behalf of Custom Installations and that the Application contained fraudulent misrepresentations of material fact.

34.   The Underlying Complaint further alleges that Keystone is vicariously liable for the negligent and/or fraudulent misrepresentations of material fact made by Ebensburg.

35.   The Underlying Compliant also alleges that American relied on certain representations in the Application to its detriment and seeks recovery in excess of

$1,000,000 in payments it made on a claim submitted by an employee of Custom Installations.

36. The Underlying Complaint includes the following claims for relief: Breach of Contract against Keystone (Count I); Professional Negligence against Keystone and Ebensburg (Count II); Negligent Misrepresentation against Keystone and Ebensburg (Count III); and Fraudulent Misrepresentation against Keystone and Ebensburg (Count IV).

37. The Underlying Complaint was served on Ebensburg on September 9, 2019, and notice of the lawsuit was provided to Republic Franklin via a Notice of Loss.

38. In the Notice of Loss, Ebensburg falsely asserted that the alleged errors and material misrepresentations of fact in the Application were discovered on September 9, 2019 when the Underlying Complaint was served.

39. On October 1, 2019, Republic Franklin issued Reservation of Rights letters to Ebensburg and Keystone advising that it would provide a defense to Ebensburg pending a coverage investigation into Ebensburg's failure to provide timely notice of the facts and circumstances in the Underlying Action to Republic Franklin. A copy of the October 1, 2019 Correspondence to Ebensburg is attached hereto as Exhibit H. A copy of the October 1, 2019 Correspondence to Keystone is attached hereto as Exhibit I.

## COUNT I – DECLARATORY JUDGMENT
## Late Notice By Ebensburg

40.    Republic Franklin repeats and re-alleges its allegations in paragraphs 1 through 39 of the Complaint as set forth at length herein.

41.    Pursuant to the Policy's Insuring Agreement, this insurance applies only to "wrongful acts" which take place prior to the "policy period" provided that prior to the effective date of this policy the insured had no knowledge that such "wrongful act" was likely to give rise to a "claim" hereunder. See Exhibit A.

42.    Based on the facts outlined above, Ebensburg was aware of facts and circumstances that were likely to give rise to a "claim" when, on November 11, 2015, it received a copy of the reservation of rights letter reserving American's right to deny coverage to Custom Installations due to material misrepresentations of fact and fraud in the Application, which was completed by Ebensburg.

43.    Based on the facts outlined above, Ebensburg was aware of facts and circumstances that were likely to give rise to a "claim" when, on or about October 2017, it received the DeYulis Subpoena and the Ligda Subpoena in connection with the Custom Installations Lawsuit.

44.    Based on the facts outlined above, Ebensburg was aware of facts and circumstances that were likely to give rise to a "claim" when, on November 7, 2017, DeYulis and Ligda were both deposed in connection with the Custom Installations Lawsuit.

45.     Because Ebensburg was aware of facts and circumstances that were likely to give rise to a "claim" prior to the inception of the Policy, the Policy does not provide coverage for the Underlying Action.

WHEREFORE, Plaintiff Republic Franklin Insurance Company respectfully requests that this Court declare that:

a.     Republic Franklin Insurance Company has no duty to defend Ebensburg Insurance Agency and Keystone Insurers Group in the lawsuit *American Builders Ins. Co. v. Keystone Insurers Group, Inc. and Ebensburg Insurance Agency*, docket number 4:19-cv-01497-MWB, in the District Court for the Middle District of Pennsylvania.

## COUNT II – DECLARATORY JUDGMENT
### Late Notice by Keystone

46.     Republic Franklin repeats and re-alleges its allegations in paragraphs 1 through 45 of the Complaint as set forth at length herein.

47.     Defendant, Keystone tendered the Underlying Action to Republic Franklin as a putative additional insured on the Policy.

48.     The Underlying Complaint alleges that Keystone is vicariously liable for Ebensburg's negligent or intentional misrepresentation of facts on the Application.

49.     The Republic Franklin policy Additional Insured endorsement has an effective date of September 1, 2018 and excludes any "claim" for, or arising out, of

13

a "wrongful act" which any insured knew of before the effective date of th(e) endorsement" (the "Effective Date Exclusion"). See Exhibit A.

50. Ebensburg was aware of facts and circumstances that were likely to give rise to a "claim" prior to September 1, 2018.

51. Ebensburg was "any insured" as that term appears in the Policy.

52. Upon information and belief, Keystone was independently aware of facts and circumstances that were likely to give rise to a "claim" prior to September 1, 2018.

53. By its terms, the Effective Date Exclusion applies to bar coverage for Keystone in connection with the Underlying Lawsuit.

WHEREFORE, Plaintiff Republic Franklin Insurance Company respectfully requests that this Court declare that:

a. Republic Franklin Insurance Company has no duty to defend Ebensburg Insurance Agency and Keystone Insurers Group in the lawsuit *American Builders Ins. Co. v. Keystone Insurers Group, Inc. and Ebensburg Insurance Agency*, docket number 4:19-cv-01497-MWB, in the District Court for the Middle District of Pennsylvania.

## COUNT III – DECLARATORY JUDGMENT
### Intentional, Fraudulent, Criminal Or Malicious Acts

54. Republic Franklin repeats and re-alleges its allegations in paragraphs 1 through 53 of the Complaint as set forth at length herein.

14

55.    The Underlying Complaint alleges that Ebensburg intentionally submitted false information to American for the purpose of inducing American to issue a policy of insurance to Custom Installations and to earn a commission.

56.    To the extent Ebensburg engaged in, or directed its employee or agent to engage in, intentional, fraudulent, knowing or willful conduct, such conduct does not fall within the Policy's definition of "wrongful act," and therefore this insurance would not apply on behalf of Ebensburg or Keystone to the allegations in the Underlying Action.

57.    To the extent Ebensburg engaged in, or directed its employee or agent to engage in, intentional, fraudulent, knowing or willful conduct, the Intentional, Fraudulent, Criminal or Malicious Acts Exclusion applies to bar coverage for the Underlying Action for Ebensburg and Keystone.

WHEREFORE, Plaintiff Republic Franklin Insurance Company respectfully requests that this Court declare that:

a.    Republic Franklin Insurance Company has no duty to defend Ebensburg Insurance Agency and Keystone Insurers Group in the lawsuit *American Builders Ins. Co. v. Keystone Insurers Group, Inc. and Ebensburg Insurance Agency*, docket number 4:19-cv-01497-MWB, in the District Court for the Middle District of Pennsylvania.

Respectfully submitted,

**GOLDBERG SEGALLA LLP**
/s/ *Eric A. FitzgeraldT*
Eric A. Fitzgerald, Esquire
Attorney ID No.: 72590
Hillary N. Ladov, Esquire
Attorney ID No.: 315833
1700 Market Street, Suite 1418
Philadelphia, PA 19103
267-519-6800
efitzgerald@goldbergsegalla.com
hladov@goldbergsegalla.com
*Attorneys for Plaintiff*
*Republic Franklin Insurance Company*

DRAFT 9/17/2020

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| REPUBLIC FRANKLIN INSURANCE COMPANY, | : | CIVIL ACTION NO.: |
| | : | |
| | : | COMPLAINT |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| EBENSBURG INSURANCE AGENCY and KEYSTONE INSURERS GROUP, INC., | : | |
| | : | |
| | : | |
| Defendants. | : | |

I, Hillary N. Ladov, Esquire, hereby certify that a copy of the foregoing Complaint for Declaratory Judgment has been served on all parties.

Date: September 24,20202

**GOLDBERG SEGALLA LLP**

*/s/ Hillary N. Ladov*

Eric A Fitzgerald, Esquire

Hillary N. Ladov, Esquire

*Attorneys for Plaintiff*

*Republic Franklin Insurance*

*Company*

# EXHIBIT "A"

**UTICA NATIONAL INSURANCE GROUP**

ISSUED BY
Utica National Insurance Group
Republic Franklin Insurance Company
P.O. Box 530, Utica, New York 13503
Telephone: (315) 734-2000

INSURANCE AGENTS AND BROKERS
ERRORS AND OMISSIONS LIABILITY POLICY

**CLAIMS-MADE BASIS**

Renewal

**DECLARATIONS**

| **NAMED INSURED AND MAILING ADDRESS** | **LOCATION ADDRESS** |
|---|---|
| Carl DeYulis dba Ebensburg Insurance Agency<br>PO Box 90<br>Ebensburg, PA 15931 | See Attached 14-E-0001 |

AT 12:01 A.M. STANDARD TIME AT THE ADDRESS OF THE INSURED AS STATED HEREIN. IN RETURN FOR PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.

| POLICY NUMBER | POLICY PERIOD FROM | TO | PRIOR POLICY NO | |
|---|---|---|---|---|
| 5171558  EO | 09-01-2019 | 09-01-2020 | 5171558 EO | |

**BASIC POLICY COVERAGE**

**LIMITS OF LIABILITY**

| | | |
|---|---|---|
| LEGAL LIABILITY | $ 7,000,000 | EACH LOSS |
| | $ 8,000,000 | AGGREGATE |
| INSURED'S DEDUCTIBLE AMOUNT | $ 15,000 | EACH LOSS |
| | $ 45,000 | AGGREGATE |

DEDUCTIBLE APPLIES TO:  [X] LOSS ONLY
[ ] LOSS AND LITIGATION EXPENSE

**PREMIUMS**

| | | |
|---|---|---|
| BASIC POLICY PREMIUM | $ ▮ | |
| REAL ESTATE AGENTS AND BROKERS PREMIUM | $ ▮ | (See attached endorsement for details) |
| MUTUAL FUND AND VARIABLE ANNUITY PREMIUM | $ ▮ | (See attached endorsement for details) |
| EMPLOYMENT-RELATED PRACTICES PREMIUM | $ ▮ | (See attached endorsement for details) |
| OTHER | $ ▮ | |
| **TOTAL POLICY PREMIUM** | $ ▮ | |
| | $ | |

**RETROACTIVE DATE**

This insurance does not apply to loss, whenever occurring, from "wrongful acts" which took place before the Retroactive Date, if any, shown   NONE

Enter Date or "None" if no Retroactive Date applies

**OPTIONAL EXTENDED REPORTING PERIOD PREMIUM**

In Section VII - EXTENDED REPORTING PERIODS, we agree to provide an Optional Extended Reporting Period under certain conditions. The premium for such an Optional Extended Reporting Period is determined as shown in paragraph **5.** of Section VII.

**FORMS AND ENDORSEMENTS** APPLYING TO AND MADE PART OF THIS POLICY AT TIME OF ISSUE:

BY  *Shannon C Peck*

COMPANY OFFICER
SHANNON PECK

COUNTERSIGNED AT:  UTICA, NY
DATE:  August 16, 2019

THESE DECLARATIONS AND THE COVERAGE FORM(S) AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY.

14-D-EOA Ed. 09-2012     SEE OVER FOR IMPORTANT CLAIMS-MADE COVERAGE NOTICE     Page 1 of 2

BILLING NO.  202300873  PREMIUM AMOUNT TO BE REFLECTED ON NEXT BILLING NOTICE     Agent # E0305

> The policy which provides Insurance Agents and Brokers Errors and Omissions
> Liability Coverage applies on a claims-made basis.

The following provides a general description of this coverage and is subject to the terms and provisions of the actual policy.

**A.** The policy, subject to its terms and conditions, provides full prior acts coverage if no Retroactive Date is entered in the Declarations. If a Retroactive Date is entered in the Declarations, the policy will not apply to loss from "wrongful acts" which took place before the Retroactive Date. The policy will not apply to loss from "wrongful acts" which take place after the expiration of the policy period.

**B.** The policy will apply to losses from "wrongful acts" which take place on or after the Retroactive Date, if any, but before the beginning of the policy period only if the insured did not know of the "wrongful acts" before the beginning of the policy period and if any claim is made according to **D.** below.

**C.** The policy will not apply to any loss for which claim is first made after the expiration of the policy period or any Automatic or Optional Extended Reporting Period described in the Extended Reporting Period Section of the policy.

**D.** The policy will apply only to claims which are first made:
   **1.** During the policy period;
   **2.** During the sixty day Automatic Extended Reporting Period described in the Extended Reporting Period Section of the policy; or
   **3.** During the Optional Extended Reporting Periods of 12 months to 120 months duration, described in the Extended Reporting Period Section of the policy. Such Optional Extended Reporting Period must be requested by the insured in writing, within sixty days after the date of termination of coverage or thirty days after the date of mailing by us of notice to the named insured advising of premiums for and provisions of Optional Extended Reporting Periods, in order to allow claims to be made against the policy coverage after the expiration of any Automatic Extended Reporting Period.

**E.** We will send you a written notice within thirty days after any termination of coverage of costs for and provisions of Extended Reporting Periods.

**F.** For the first three years of claims-made coverage, premiums will be comparatively lower than for occurrence coverage, and will increase for each renewal of those policies. Claims-made prices will still be somewhat lower than occurrence prices for mature accounts (in their fourth or later years). The purchase of Optional Extended Reporting Periods, as described above, requires additional premium payments.



**Utica National Insurance Group**

Insurance that starts with you.

Utica Mutual Insurance Company and its affiliated companies, New Hartford, N.Y. 13413

14-D-EOA  Ed. 09-2012

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# POLICY CHANGES/EXTENSION SCHEDULE

This Endorsement forms a part of the policy numbered below:

Policy Change
Number _____

| Named Insured and Mailing Address | Policy Number |
|---|---|
| Carl DeYulis dba Ebensburg Insurance Agency<br>PO Box 90<br>Ebensburg, PA 15931 | 5171558 EO |
| | Policy Changes Effective |
| | 09-01-2019 |
| | Company |
| | Utica Mutual Insurance Company |

IT IS AGREED THAT for any box in Part A marked X, the policy is amended as stated in Part B.

**PART A.**

| | | |
|---|---|---|
| ☐ NAME CHANGE | ☐ ADDING LOCATION(S) | ☐ CHANGING STAFF |
| ☐ ADDRESS CHANGE | ☐ DELETING LOCATION | ☐ VOIDING ENDORSEMENT |
| ☐ AMENDING PREMIUM | ☐ ADDING MUTUAL FUNDS | ☐ ADDING REAL ESTATE |
| ☐ ADDING ADDITIONAL INSURED | ☐ DELETING MUTUAL FUNDS | ☐ DELETING REAL ESTATE |
| ☐ DELETING ADDITIONAL INSURED | ☐ MUTUAL FUNDS - ADDING SOLICITOR | ☐ REAL ESTATE - ADDING SOLICITOR |
| ☐ AMENDING LIMIT OF LIABILITY | ☐ MUTUAL FUNDS - DELETING SOLICITOR | ☐ REAL ESTATE - DELETING SOLICITOR |
| ☐ AMENDING DEDUCTIBLE | ☐ EXCLUSION OF DUPLICATE COVERAGE | ☐ |

**PART B.**

**FORMS AND ENDORSEMENTS** APPLYING TO AND MADE PART OF THIS POLICY AT TIME OF ISSUE:

| | |
|---|---|
| PA 14DEOA Ed. 09/2012 | PA 14E0001 Ed. 01/1991 |
| PA 14E0014 Ed. 10/1998 | PA 14E0061 Ed. 09/2012 |
| PA 14E0066 Ed. 10/1998 | PA 14E0095 Ed. 12/1998 |
| PA 14E0131 Ed. 07/1998 | PA 14E1097 Ed. 07/2008 |
| PA 14E1115 Ed. 06/2014 | PA 14L0054 Ed. 09/2012 |
| PA 14L0064 Ed. 09/2014 | PA 14PEOA Ed. 09/2012 |
| PA 8E2761 Ed. 07/1998 | PA 8L936 Ed. 11/2008 |
| PA 8L1655 Ed. 12/1998 | PA 14E1129 Ed. 07/2019 |

| PREMIUM ADJUSTMENT | |
|---|---|
| ADDITIONAL PREMIUM | RETURN PREMIUM |

*Sharon C Peck*

Authorized Representative Signature

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# POLICY CHANGES/EXTENSION SCHEDULE

This Endorsement forms a part of the policy numbered below:

Policy Change
Number _____

| Named Insured and Mailing Address | Policy Number |
|---|---|
| Carl DeYulis dba Ebensburg Insurance Agency | 5171558 EO |
| PO Box 90 | Policy Changes Effective |
| Ebensburg,PA 15931 | 09-01-2019 |
| | Company |
| | Utica Mutual Insurance Company |

IT IS AGREED THAT for any box in Part A marked X, the policy is amended as stated in Part B.

**P A R T   A.**

| | | |
|---|---|---|
| ☐ NAME CHANGE | ☐ ADDING LOCATION(S) | ☐ CHANGING STAFF |
| ☐ ADDRESS CHANGE | ☐ DELETING LOCATION | ☐ VOIDING ENDORSEMENT |
| ☐ AMENDING PREMIUM | ☐ ADDING MUTUAL FUNDS | ☐ ADDING REAL ESTATE |
| ☐ ADDING ADDITIONAL INSURED | ☐ DELETING MUTUAL FUNDS | ☐ DELETING REAL ESTATE |
| ☐ DELETING ADDITIONAL INSURED | ☐ MUTUAL FUNDS - ADDING SOLICITOR | ☐ REAL ESTATE - ADDING SOLICITOR |
| ☐ AMENDING LIMIT OF LIABILITY | ☐ MUTUAL FUNDS - DELETING SOLICITOR | ☐ REAL ESTATE - DELETING SOLICITOR |
| ☐ AMENDING DEDUCTIBLE | ☐ EXCLUSION OF DUPLICATE COVERAGE | ☐ |

**P A R T   B.**

**LOCATION SCHEDULE:**

**It is hereby understood and agreed that the following location(s) are covered under the above mentioned policy.**

129 E High St
Ebensburg, PA 15931

720 E. 9th Street
Bellwood, PA 16617

**All other terms and conditions remain the same.**

| PREMIUM ADJUSTMENT | |
|---|---|
| ADDITIONAL PREMIUM | RETURN PREMIUM |

*Shenon C Peck*

Authorized Representative Signature

14-E-0001  Ed. 01-91

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# POLICY CHANGES/EXTENSION SCHEDULE

Policy Change
Number _____

This Endorsement forms a part of the policy numbered below:

| | |
|---|---|
| Named Insured and Mailing Address<br>Carl DeYulis dba Ebensburg Insurance Agency<br>PO Box 90<br>Ebensburg, PA 15931 | Policy Number<br>5171558 EO<br>Policy Changes Effective<br>09-01-2019<br>Company<br>Utica Mutual Insurance Company |

IT IS AGREED THAT for any box in Part A marked X, the policy is amended as stated in Part B.

| P | | | | | |
|---|---|---|---|---|---|
| **A** | ☐ NAME CHANGE | ☐ ADDING LOCATION(S) | ☐ CHANGING STAFF | | |
| **R** | ☐ ADDRESS CHANGE | ☐ DELETING LOCATION | ☐ VOIDING ENDORSEMENT | | |
| **T** | ☐ AMENDING PREMIUM | ☐ ADDING MUTUAL FUNDS | ☐ ADDING REAL ESTATE | | |
| | ☐ ADDING ADDITIONAL INSURED | ☐ DELETING MUTUAL FUNDS | ☐ DELETING REAL ESTATE | | |
| | ☐ DELETING ADDITIONAL INSURED | ☐ MUTUAL FUNDS - ADDING SOLICITOR | ☐ REAL ESTATE - ADDING SOLICITOR | | |
| **A.** | ☐ AMENDING LIMIT OF LIABILITY | ☐ MUTUAL FUNDS - DELETING SOLICITOR | ☐ REAL ESTATE - DELETING SOLICITOR | | |
| | ☐ AMENDING DEDUCTIBLE | ☐ EXCLUSION OF DUPLICATE COVERAGE | ☐ | | |

**P**
**A**
**R**
**T**

**B.**

**NAMED INSUREDS:**

**It is hereby understood and agreed that the named insured is to read as follows :**

Carl DeYulis dba Ebensburg Insurance Agency

EIA Insurers Group, LLC

Ebensburg Insurance Agency dba D B Mackey Insurance Agency

**All other terms and conditions remain the same.**

---

**PREMIUM ADJUSTMENT**

| ADDITIONAL PREMIUM | RETURN PREMIUM |
|---|---|
| | |
| | *Shawna C Peck* |
| | Authorized Representative Signature |

14-E-0001  Ed. 01-91

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# PENNSYLVANIA CHANGES - AMENDATORY ENDORSEMENT

(For attachments to Insurance Agents and Brokers Errors and Omissions Liability Policy)
(Claims-Made Policy)

**A.** Condition **5.** Cancellation, (SECTION **VI**) is replaced by the following:

**5. Cancellation.**

**a.** The first Named Insured shown in the Declarations may cancel this policy by writing or giving notice of cancellation.

**b. CANCELLATION OF POLICIES IN EFFECT FOR LESS THAN 60 DAYS**

We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least 30 days before the effective date of cancellation.

**c. CANCELLATION OF POLICIES IN EFFECT FOR 60 DAYS OR MORE**

If this policy has been in effect for 60 days or more or if this policy is a renewal of a policy we issued, we may cancel this policy only for one or more of the following reasons:

**(1)** You have made a material misrepresentation which affects the insurability of the risk. Notice of cancellation will be mailed or delivered at least 15 days before the effective date of cancellation.

**(2)** You have failed to pay a premium when due, whether the premium is payable directly to us or our agents or indirectly under a premium finance plan or extension of credit. Notice of cancellation will be mailed at least 15 days before the effective date of cancellation.

**(3)** A condition, factor or loss experience material to insurability has changed substantially or a substantial condition, factor, or loss experience material to insurability has become known during the policy period. Notice of cancellation will be mailed or delivered at least 60 days before the effective date of cancellation.

**(4)** Loss of reinsurance or a substantial decrease in reinsurance has occurred, which loss or decrease, at the time of cancellation, shall be certified to the Insurance Commissioner as directly affecting in-force policies. Notice of cancellation will be mailed or delivered at least 60 days before the effective date of cancellation.

**(5)** Material failure to comply with policy terms, conditions or contractual duties. Notice of cancellation will be mailed or delivered at least 60 days before the effective date of cancellation.

**(6)** Other reasons that the Insurance Commissioner may approve. Notice of cancellation will be mailed or delivered at least 60 days before the effective date of cancellation.

This policy may also be cancelled from inception upon discovery that the policy was obtained through fraudulent statements, omissions or concealment of facts material to the acceptance of the risk or to the hazard assumed by us.

**d.** We will mail or deliver our notice to the first Named Insured's last mailing address known to us. Notice of cancellation will state the specific reasons for cancellation.

**e.** Notice of cancellation will state the effective date of cancellation. The "policy period" will end on that date.

**f.** If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata and will be returned within 10 business days after the effective date of cancellation. If the first Named Insured cancels, the refund may be less than pro

rata and will be returned within 30 days after the effective date of cancellation. The cancellation will be effective even if we have not made or offered a refund.

  **g.** If notice is mailed, it will be by registered or first class mail. Proof of mailing will be sufficient proof of notice.

**B.** The following is added and supersedes any provision to the contrary:

**Nonrenewal or Renewal Premium Increases.**

  **a.** If we decide not to renew this policy, we will mail or deliver written notice of nonrenewal, stating the specific reasons for nonrenewal, to the first Named Insured at least 60 days before the expiration date of the policy.

  **b.** If we increase your renewal premium, we will mail or deliver to the first Named Insured:

    **(1)** Written notice of our intent to increase the premium at least 30 days before the effective date of the premium increase; and

    **(2)** An estimate of the increase at least 30 days before the effective date of premium increase.

  **c.** Any notice of nonrenewal or renewal premium increase will be mailed or delivered to the first Named Insured's last known address. If notice is mailed, it will be by registered or first class mail. Proof of mailing will be sufficient proof of notice.

**C.** Condition **8.,** Your Right to "Claim" and "Wrongful Act" Information, (SECTION VI) is replaced by the following:

  **8. Your Right to "Claim" and "Wrongful Act" Information.**

    **a.** When we cancel or nonrenew:

    Midterm cancellation or nonrenewal notices shall state that, at the insured's request, we shall provide "claim" and "wrongful act" information to the insured for the lesser of:

    **(1)** At least three years; or

    **(2)** The period of time during which we have provided coverage to the insured.

    This information shall contain:

    **(a)** Information on closed "claims," including the date and description of "wrongful acts" and the amounts of payments, if any.

    **(b)** Information on open "claims," including the date and description of "wrongful acts" and the amount of reserves, if any.

    **(c)** Information on notices of "wrongful acts" including the date and description of "wrongful acts" and the amount of reserves, if any.

    The insured's written request for information must be made within 10 days of the insured's receipt of the midterm cancellation or nonrenewal notice. We have 30 days from the date of receipt of the insured's written request to provide the requested information.

    **b.** In other circumstances:

    If we receive a written request from the first Named Insured within 60 days after the end of the "policy period," we will provide the first Named Insured, within 45 days of the receipt of the request, the following information relating to this and any other Insurance Agents and Brokers Errors and Omissions Liability claims-made policy we have issued to you during the previous three years:

    **(1)** A list or other record of each "wrongful act" not previously reported to any other insurer, of which we were notified in accordance with paragraph **1.a.** of this Section. We will include the date and brief description of the "wrongful act" if that information was in the notice we received.

    **(2)** A summary by policy year, of payments made and amounts reserved, stated separately, under the applicable Aggregate Limit.

    Amounts reserved are based on our judgment. They are subject to change and should not be regarded as ultimate settlement values.

    We compile "claim" and "wrongful act" information for our own business purposes and exercise reasonable care in doing so. In providing this information to the first Named Insured, we make no representations or warranties to insureds, insurers, or others to whom this information is furnished by or on behalf of any insured. Cancellation or nonrenewal will be effective even if we inadvertently provide inaccurate or incomplete information.

 Includes copyrighted material of Insurance Services Office, Inc.,   14-E-0014  Ed. 10-98 with its permission.

**D.** Under paragraph **5.,** Available Options, (SECTION **VII**) in the event of cancellation or nonrenewal of the policy, the Optional Extended Reporting Period is amended to become effective on the date the policy is terminated if the insured purchases the Optional Extended Reporting Period at any time within the 60-day Automatic Extended Reporting Period.

**E.** Part **6.a.** of SECTION **VII** - EXTENDED REPORTING PERIODS is replaced by the following:

    **a.** We will notify you in writing within (30) days of the date of "termination of coverage" of the premium for and provisions of the Extended Reporting Period.

POLICY NUMBER: 5171558  EO

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED - DESIGNATED PERSON OR ENTITY

**(For attachment to Insurance Agents and Brokers Errors and Omissions Liability Policy)**
**(Claims-Made Policy)**

**SCHEDULE\***

I.   Effective Date: 09-01-2018

    (If no date entered, coverage is effective from policy inception.)

    Additional Premium       $ 0

| Name Of Additional Insured Person Or Entity: | Address: |
|---|---|
| Keystone Insurers Group | 1995 Point Township Drive<br><br>Northumberland<br>Pennsylvania<br>17857 |

*Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

II.  **Section IV - Who Is An Insured** is amended to include as an additional insured the person or entity shown in the Schedule above, but only with respect to liability for "loss" caused, in whole or in part, by your "wrongful acts" or the "wrongful acts" of those acting on your behalf. However:
  A. The insurance afforded to such additional insured only applies to the extent permitted by law; and
  B. If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will be the lesser of:
    1. The amount of insurance required by the contract or agreement; or
    2. The applicable Limits of Liability shown in the Declarations.
  This endorsement shall not increase the applicable Limits of Liability shown in the Declarations.
III. With respect to the insurance provided by this endorsement, the following exclusion applies in addition to those in SECTION III - EXCLUSIONS of the policy.
  This insurance does not apply to:
  Any "claim" for, or arising out of a "wrongful act" which any insured knew of before the effective date of this endorsement.

POLICY NUMBER: 5171558 EO

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED - DESIGNATED PERSON OR ENTITY

**(For attachment to Insurance Agents and Brokers Errors and Omissions Liability Policy)**
**(Claims-Made Policy)**

**SCHEDULE\***

I.   Effective Date: 09-01-2018

(If no date entered, coverage is effective from policy inception.)

Additional Premium          $ 0

| Name Of Additional Insured Person Or Entity: | Address: |
|---|---|
| James Laverick Insurance | 301 Myers Street<br><br>Ebensburg<br>Pennsylvania<br>15931 |

*Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

II.  **Section IV - Who Is An Insured** is amended to include as an additional insured the person or entity shown in the Schedule above, but only with respect to liability for "loss" caused, in whole or in part, by your "wrongful acts" or the "wrongful acts" of those acting on your behalf. However:
   A.  The insurance afforded to such additional insured only applies to the extent permitted by law; and
   B.  If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will be the lesser of:
      1.  The amount of insurance required by the contract or agreement; or
      2.  The applicable Limits of Liability shown in the Declarations.
   This endorsement shall not increase the applicable Limits of Liability shown in the Declarations.

III. With respect to the insurance provided by this endorsement, the following exclusion applies in addition to those in SECTION III - EXCLUSIONS of the policy.
   This insurance does not apply to:
   Any "claim" for, or arising out of a "wrongful act" which any insured knew of before the effective date of this endorsement.

POLICY NUMBER: 5171558  EO

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED - DESIGNATED PERSON OR ENTITY

**(For attachment to Insurance Agents and Brokers Errors and Omissions Liability Policy)**
**(Claims-Made Policy)**

**SCHEDULE***

I.   Effective Date: 09-01-2018

(If no date entered, coverage is effective from policy inception.)

Additional Premium           $ 0

| Name Of Additional Insured Person Or Entity: | Address: |
|---|---|
| Confidential Insurance Consulting / Carol Myers | 724 North Spruce Street<br><br>Ebensburg<br>Pennsylvania<br>15931 |
| *Information required to complete this Schedule, if not shown above, will be shown in the Declarations. | |

II.  **Section IV - Who Is An Insured** is amended to include as an additional insured the person or entity shown in the Schedule above, but only with respect to liability for "loss" caused, in whole or in part, by your "wrongful acts" or the "wrongful acts" of those acting on your behalf. However:

   **A.** The insurance afforded to such additional insured only applies to the extent permitted by law; and

   **B.** If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will be the lesser of:

   **1.** The amount of insurance required by the contract or agreement; or

   **2.** The applicable Limits of Liability shown in the Declarations.

   This endorsement shall not increase the applicable Limits of Liability shown in the Declarations.

III. With respect to the insurance provided by this endorsement, the following exclusion applies in addition to those in SECTION III - EXCLUSIONS of the policy.

   This insurance does not apply to:

   Any "claim" for, or arising out of a "wrongful act" which any insured knew of before the effective date of this endorsement.

14-E-0061 Ed. 09-2012          Includes copyrighted material of Insurance Services Office, Inc.,          Page 1 of 1
                                                     with its permission.
                                         Copyright, Utica Mutual Insurance Company, 2012.

POLICY NUMBER: 5171558 EO

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# PRIOR ACTS LIMITATION ENDORSEMENT

**(For attachment to Insurance Agents and Brokers Errors and Omissions Liability Policy)**
**(Claims-Made Policy)**

### SCHEDULE

I.   Effective Date:
     (If no date entered, coverage is effective from policy inception.)

DESIGNATED PERSON OR ENTITY:                    RETROACTIVE DATE:

D B Mackey Insurance Agency                         07-01-2015

II.  It is agreed that such insurance as is afforded by this policy for any Designated Person or Entity listed in the Schedule above is subject to the retroactive date shown for that person or entity.
     Such insurance applies only to "wrongful acts" which take place on or after the retroactive date shown in **I.** above.

14-E-0066 Ed. 10-98

POLICY NUMBER: 5171558 EO

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CONTINGENT CATASTROPHE EXTRA EXPENSE COVERAGE

**(For attachment to Insurance Agents and Brokers Errors and Omissions Liability Policy)**

**(Claims-made Policy)**

### SCHEDULE

I.   Effective Date:    09-01-2019

(If no date entered, coverage is effective from policy inception.)

Additional Premium                    ▇▇▇▇▇

| **COVERAGE** | **LIMITS OF LIABILITY** | |
|---|---|---|
| CATASTROPHE CLAIM | $ 10,000 | EACH CATASTROPHE |
| EXPENSE COVERAGE: | $ 25,000 | AGGREGATE |

**DEDUCTIBLE AMOUNT:**        $ 500 each catastrophe

With respect to the insurance afforded by this endorsement, the Limits of Liability and Deductible Amount stated herein apply in lieu of, and not in addition to, any Limits of Liability and Deductible Amount stated in the policy Declarations.

II.   In consideration of the additional premium shown in the Declarations or Schedule above, it is agreed that the policy includes coverage subject to the policy terms and the additional provisions below for your actual extra expenses necessarily incurred in the providing of professional services covered by this policy but only if such extra expenses:

A.   Are a result of an event declared a catastrophe by the Property Claims Services (PCS). As used in this endorsement, catastrophe, regardless of any other cause or event that contributes concurrently or in any sequence to the loss does not include, whether directly or indirectly:

1.   Seizure or destruction of property by order of governmental authority, unless the insurance needs of your customers were the result of acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread;

2.   Nuclear reaction or radiation, or radioactive contamination, however caused, unless the insurance needs of your customers were the result of ensuing fire; and

3.   a.   War, including undeclared or civil war;

b.   Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

c.   Insurrection, rebellion, revolution, usurped power, or any action taken by governmental authority in hindering or defending against any of these;

whether or not declared catastrophes by the Property Claim Services.

B.   Are incurred between the beginning date of the catastrophe and 45 days after the catastrophe began.

14-E-0095 Ed. 12-98                                                         Page 1 of 2

C. Are attributed to the assisting in the processing of insurance claims for your customers who have been affected by the catastrophe. Extra Expense under this endorsement, does not include actual payments, whether in whole or in part, for claims to your customers.

D. Are over and above the expenses you would have incurred in the providing of professional services for the same period had no catastrophe occurred.

E. Are not to continue your normal business operations due to physical loss or damage to your property.

F. Are not paid for by other insurance, except for other insurance that is written subject to the same terms, conditions and provisions of this endorsement.

III. A. The Limits of Liability shown in the Schedule above and the rules below determine the most we will pay regardless of the number of:

1. Insureds;
2. Insureds making claims for extra expense;
3. Claims made for extra expense;
4. Claims processed for catastrophes; or
5. Customers serviced in the event of a catastrophe.

B. The Aggregate Limit shown in the Schedule above is the most we will pay for the sum of all necessary extra expenses incurred as a result of catastrophes which occur during the "policy period."

C. Subject to **B.** above and the deductible amount set forth in the Schedule above for each catastrophe, the Each Catastrophe Limit is the most we will pay under this endorsement for the sum of all necessary extra expenses sustained in any one catastrophe.

D. The Limits of Liability of this endorsement apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the "policy period" shown in the Declarations, unless the "policy period" is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for the purposes of determining the Limits of Liability.

E. 1. The Deductible Amount stated in the Schedule above will be deducted from the sum of all extra expenses for all claims because of one catastrophe to which this insurance applies.

2. The Limits of Liability, as described above, will apply to any extra expense which remains after the deduction of the Deductible Amount.

IV. If we and you disagree on the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser.

The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the amount of the loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

A. Pay its chosen appraiser; and

B. Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

V. In the event a claim is made for the insurance provided by this endorsement, you must:

A. Give us prompt notice of loss.

B. As soon as possible, give us details of the extra expense you incurred as a result of providing professional services to your customers due to the PCS declared catastrophe.

C. As often as may reasonably be required, permit us to inspect your records proving your extra expense loss.

D. Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

E. Cooperate with us in the investigation or settlement of the claim.

F. Permit us to examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

Includes copyrighted material of Insurance Services Office, Inc.,   14-E-0095 Ed. 12-98
with its permission.

# EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE
## THIS INSURANCE PROVIDES CLAIMS-MADE COVERAGE.

The following spaces preceded by an asterisk (*) need not be completed if this Coverage and the Policy have the same inception date.

ATTACHED TO AND FORMING          *EFFECTIVE DATE              *ISSUED TO:
PART OF POLICY NO.:               OF COVERAGE:
5171558 EO

This form modifies insurance provided under the Insurance Agents and Brokers Errors and Omissions Insurance Policy. or the Life Insurance Agents and Brokers Errors and Omissions Insurance Policy.

## SCHEDULE OF DECLARATIONS

**LIMITS OF INSURANCE:**

Policy Aggregate Limit $500,000
Each "Claim" Limit $500,000

**RETENTION AMOUNT:**

Each "Claim" $5,000

**COINSURANCE PARTICIPATION:**   0 %

Subject To A Maximum Of: $0        Each "Claim"

The insurance provided by this Employment-Related Practices Liability Coverage; including the Limits of Insurance, Retention Amounts and Coinsurance Participation amounts stated herein; applies independently of the terms and provisions of the Agents and Brokers Errors and Omissions coverage except as provided below in Condition **13.** of Section **VI** of this Coverage.

**RETROACTIVE DATE:**

This Insurance does not apply to "claims" for "employment-related practices" which took place before the Retroactive Date, if any, shown herein: Retroactive Date: 09-01-1999

(Enter Date or "None" if no Retroactive Date applies.)

**OPTIONAL EXTENDED REPORTING PERIOD PREMIUM:**

In Section **VII** - EXTENDED REPORTING PERIODS, we agree to provide an Optional Extended Reporting Period under certain conditions. The premium for such an Optional Extended Reporting Period is:

$ 678.00 _____ (12 Months)    or    $ 1,319.00 _____ (36 Months).

**ADVANCE PREMIUM:**

Total Advance Premium $0
Policy Writing Minimum Premium $0

**FORMS AND ENDORSEMENTS:**

Forms and Endorsements applying to this Coverage and made part of this Insurance at time of Issue:
See Attached 14-E-0001

---

The Coverage which provides Employment-Related Practices Liability Coverage applies on a claims-made basis.

---

The following provides a general description of this coverage and is subject to the terms and provisions of the actual Coverage Form. Terms in quotation marks are defined in the Coverage Form.

A. The Coverage Form, subject to its terms and conditions, provides full prior acts coverage if no Retroactive Date is entered in the Declarations. If a Retroactive Date is entered in the Declarations, the Coverage Form will not apply to "claims" for "employment-related practices" which took place before the Retroactive Date. The Coverage Form will not apply to "claims" for "employment-related practices" which take place after the expiration of the "policy period."

B. The Coverage Form will apply to "claims" for "employment-related practices" which took place on or after the Retroactive Date, if any, but before the beginning of the "policy period" **only if** any "claim" is made according to **D.** below.

C. The Coverage Form will not apply to any "employment-related practice" for which "claim" is first made after the expiration of the "policy period" or any Automatic or Optional Extended Reporting Period described in the Extended Reporting Period Section of the Coverage Form.

D. The Coverage Form will apply only to "claims" which are first made:

   1. During the "policy period";

   2. During the sixty day Automatic Extended Reporting Period described in the Extended Reporting Period Section of the Coverage Form;

   3. During the five year Automatic Extended Reporting Period described in the Extended Reporting Period Section of the Coverage Form for "claims" arising out of "employment-related practices" reported, under the policy provisions, no later than sixty days after the end of the "policy period"; or

   4. During the 12 month or 36 month Optional Extended Reporting Period described in the Extended Reporting Period Section of the Coverage Form. Such Optional Extended Reporting Period must be requested by the first Named Insured in writing, by the later of sixty days after the date of "termination of coverage," or thirty days after the date of mailing by us of notice to the first Named Insured advising of premiums for and provisions of the Optional Extended Reporting Periods, in order to allow "claims" to be made against the policy coverage after the expiration of any Automatic Extended Reporting Period.

E. We will send to the first Named Insured shown in the Declarations a written notice, within thirty days after any notice of "termination of coverage," of the premiums for and provisions of the Extended Reporting Periods, unless we cancel for nonpayment of premium or fraudulent activities of an insured.

F. For the first three years of claims-made coverage, premiums will be comparatively lower than for occurrence coverage, and will increase for each renewal of those policies. Claims-made prices will still be somewhat lower than occurrence prices for mature accounts (in their fourth or later years). The purchase of Optional Extended Reporting Periods, as described above, requires additional premium payments.

     Includes copyrighted material of Insurance Services Office, Inc., with its permission.     14-E-0131 Ed. 7-98

THE SCHEDULE OF DECLARATIONS FOR THIS COVERAGE AND THE OTHER FORMS AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY.

THIS COVERAGE IS LIMITED TO THOSE CLAIMS THAT ARE FIRST MADE AGAINST THE INSURED DURING THE "POLICY PERIOD" OR ANY EXTENDED REPORTING PERIOD PROVIDED.

ANY "DEFENSE COSTS" PAID UNDER THIS COVERAGE WILL REDUCE THE AVAILABLE LIMIT OF LIABILITY AND MAY EXHAUST IT COMPLETELY. SUCH COSTS WILL ALSO BE APPLIED AGAINST ALL APPLICABLE RETENTION AMOUNTS. IF THE LIMIT OF LIABILITY IS EXHAUSTED, THE INSURER WILL HAVE NO FURTHER LIABILITY FOR "DEFENSE COSTS," JUDGMENTS OR SETTLEMENTS UNDER THIS COVERAGE.

Throughout this Coverage the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we," "us" and "our" refer to the Utica Mutual Insurance Company.

The word "insured" means any person or organization qualifying as such under WHO IS AN INSURED (Section III) of this Coverage

## SECTION I - DEFINITIONS

1. "Claim" means a written or oral notice presented by:
   a. Any of your "employees," "leased workers," "temporary workers," former "employees" or applicants for employment;
   b. The legal representative of any individual in I **1.a.** above; or
   c. The EEOC or any other federal, state or local administrative or regulatory agency on behalf of any person in part I **1.a.** above;

   that the insured is responsible for "damages" as a result of injury arising out of an "employment-related practice."

   "Claim" includes any civil proceeding in which either "damages" are alleged or fact finding will take place, when either is the actual or alleged result of an "employment-related practice" to which this insurance applies. This includes:
   (1) An arbitration proceeding in which such "damages" are claimed and to which the insured submits with our consent;
   (2) Any other alternative dispute resolution proceeding in which such "damages" are claimed and to which the insured submits with our consent; or
   (3) Any administrative proceeding instituted under such federal, state or local laws as may be applicable to "employment-related practices" covered under this insurance.

2. "Coverage territory" means:
   a. The United States of America (including its territories and possessions) and Puerto Rico; or
   b. Anywhere in the world with respect to the activities of a person whose place of employment is in the territory described in part I **2.a.** above, while he or she is away for a short time on your business;

provided that the insured's responsibility to pay "damages" is determined in a suit (or in any other type of civil proceeding included in the definition of "claim") on the merits in, and under the substantive law of, the United States of America (including its territories and possessions) or Puerto Rico.

3. "Damages" means monetary amounts to which this insurance applies and which the insured is legally obligated to pay as judgments or awards; or as settlements to which we have agreed in writing.
   "Damages" include:
   a. "Prejudgment interest" awarded against the insured on that part of the judgment we pay;
   b. To the extent allowed by law, any portion of a judgment or award that represents a multiple of the compensatory amounts; or punitive or exemplary damages; and
   c. Statutory attorney fees.
   "Damages" do not include:
   (1) Civil, criminal, administrative or other fines or penalties;
   (2) Equitable relief, injunctive relief, declarative relief or any other relief or recovery other than monetary amounts; or
   (3) Judgments or awards because of acts deemed uninsurable by law.

4. "Defense costs" mean payments allocated to a specific "claim" for its investigation, settlement, or defense, including:
   a. Attorney fees and other litigation expenses.
   b. The costs of bonds to appeal a judgment or award in a "claim" we defend. We do not have to furnish such bonds.
   c. The costs of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish such bonds.

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

d. Reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the "claim," including actual loss of earnings up to $250 a day because of time off from work.

e. Costs taxed against the insured in the "claim."

"Defense costs" do not include:

(1) Salaries and expenses of our employees or your "employees," except for:

 (a) That portion of our employed attorneys' fees, salaries and expenses allocated to a specific "claim" for the defense of the insured; or

 (b) Expenses included in paragraph I **4.d.** above.

(2) Interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the amount available for the judgment under the provisions of Section **IV** - Limits Of Insurance And Retentions.

**5.** "Employee" means a person:

 a. Employed by you for wages or salary; or

 b. Who is a current or former member of your board of directors.

But "employee" does not include an independent contractor, employees of an independent contractor while acting within the scope of their employment, a "leased worker" or a "temporary worker."

**6.** "Employment-related practices" mean any of the following listed practices, whether actual or alleged:

 a. Which are directed against any of your "employees," "leased workers," "temporary workers," former "employees" or applicants for employment; and

 b. For which remedy is sought under any federal, state or local statutory or common civil law relating to employment practices.

"Employment-related practices" listed:

(1) Wrongful refusal to employ a qualified applicant for employment;

(2) Wrongful failure to promote or wrongful deprivation of career opportunity;

(3) Wrongful demotion, negligent evaluation, negligent reassignment or wrongful discipline;

(4) Wrongful termination of employment, including retaliatory or constructive discharge;

(5) Employment related misrepresentation;

(6) Harassment, coercion, discrimination or humiliation as a consequence of race, color, creed, national origin, marital status, medical condition, gender, age, physical appearance, physical and/or mental impairments, pregnancy, sexual orientation or sexual preference or any other protected class or characteristic established by an applicable federal, state or local statute; or

(7) Oral or written publication of material that slanders, defames or libels; or violates or invades a right of privacy.

**7.** "Interrelated employment-related practices" means "employment-related practices" which arise out of and have as a common basis:

 a. Related circumstances, situations, events, transactions or facts;

 b. A series of related circumstances, situations, events, transactions or facts; or

 c. A common pattern of conduct in carrying on your business.

**8.** "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker."

**9.** "Policy period" means:

 a. That period from the effective date of this insurance to the expiration date stated in the Declarations of the policy, or to its earlier termination date, if any.

 b. If there is a "termination of coverage" as defined in parts I **12.b.** or I **12.c.** of the definition of "termination of coverage," the "policy period" will be understood to end on the date of such change, but only with respect to such changed coverage.

**10.** "Prejudgment interest" means interest added to a settlement, verdict, award or judgment based on the amount of time prior to the settlement, verdict, award or judgment; whether or not made part of the settlement, verdict, award or judgment.

**11.** "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

**12.** "Termination of coverage" means any:

 a. Cancellation or nonrenewal of this insurance;

**b.** Decrease in limits, reduction of coverage, increased deductible, new exclusion; or

**c.** Other change in coverage less favorable to the insured.

## SECTION II - EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE

### 1. Insuring Agreement.

**a.** We will pay on behalf of the insured "damages" from "claims" for "employment-related practices" to which this insurance applies. We have no obligation under this insurance to make payments or perform acts or services except as provided for in this Insuring Agreement and in part **II 2.**, Defense Of Claims, Administrative Hearings And Settlement Authority, below.

**b.** This insurance applies to such "damages" only if:

  **(1)** The "employment-related practices" took place in the "coverage territory";

  **(2)** Such "employment-related practices" occurred after the Retroactive Date, if any, shown in the Declarations and before the end of the "policy period"; and

  **(3)** A "claim" is first made against an insured and reported to us, in accordance with part **II 1.c.** below and Condition **2.** of Section **VI.**, during the "policy period" or any Extended Reporting Period provided under Section **VII** - Extended Reporting Periods.

**c.** A "claim" will be deemed to have been made at the earlier of the following times:

  **(1)** When notice of such "claim" is received and recorded by you or by us, whichever comes first; or

  **(2)** When we make settlement in accordance with part **II 2.a.** below.

**d.** All "claims" for "damages" based on or arising out of:

  **(1)** One "employment-related practice"; or

  **(2)** "Interrelated employment-related practices" by one or more insureds shall be deemed to be one "claim" and to have been made at the time the first of those "claims" is made against any insured.

Each payment we make for "damages" or "defense costs" reduces the Limit of Insurance available, as provided under Section **IV** - Limits Of Insurance And Retentions.

Each payment we make for "damages" is subject to your Coinsurance Participation, as described in Section **V** - Coinsurance For Payment Of Damages.

### 2. Defense Of Claims, Administrative Hearings And Settlement Authority.

**a.** We have the right and duty to defend an insured against "claims" to which this insurance applies and to pay related "defense costs" even if the allegations of the "claim" are groundless, false or fraudulent. However, we will have no obligation to defend an insured against any "claim" to which this insurance does not apply. We may at our discretion:

  **(1)** Investigate any "employment-related practice"; and

  **(2)** Settle any "claim" which may result, provided:

    **(a)** We have your written consent to settle; and

    **(b)** The settlement is within the applicable Limit of Insurance available.

**b.** If you refuse to consent to a "claim" settlement we recommend which is acceptable to the claimant:

  **(1)** Our liability under this policy for such "claim" will not exceed the amount we would have paid for "damages" and "defense costs" if you had consented at the time of our recommendation; and

  **(2)** After such refusal, you will have the duty to negotiate and defend that "claim" at your own cost and without our involvement.

**c.** Our right and duty to defend the insured against "claims" end when we have used up the Limit of Insurance available, as provided under Section **IV** - Limits Of Insurance And Retentions. This applies both to "claims" pending at that time and those filed thereafter.

**d.** When we control defense of a "claim", we will pay associated "defense costs" and choose a counsel of our choice from the panel of attorneys we have selected to deal with "employment-related practices" "claims". If you give us a specific written request when a "claim" is first made:

  **(1)** You may select from one of our panel of employment law attorneys; or

  **(2)** You may ask us to consider the approval of a defense attorney of your choice that is not on our panel.

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

We will use the panel attorney you selected according to part II **2.d.(1)** above or consider your request according to part II **2.d.(2)** above, in engaging the counsel we deem most appropriate for the required defense of such "claim."

**e.** **(1)** If by mutual agreement or court order the insured assumes control of such defense before the applicable Limit of Insurance is used up, we will reimburse the insured for reasonable "defense costs" according to part II **2.e.(2)** below.

**(2)** If we defend you under a reservation of rights, both your and our counsel(s) will be required to maintain records pertinent to your "defense costs." These records will be used to determine the allocation of any "defense costs" for which you may be solely responsible, including defense of any allegation not covered by this insurance.

In any case, however, we will only pay amounts in excess of the Retention Amount and such payments will reduce the Limit of Insurance available, as provided under Section **IV** - Limits Of Insurance And Retentions.

**f.** Upon prior notice to us and with our approval, the first Named Insured is authorized to act on behalf of all insureds with respect to the payment of "damages" in settlement of an Administrative Hearing or other nonjudicial proceeding before the Federal Equal Employment Opportunity Commission, or any similar federal, state or local body or commission. This authorization is limited to:

**(1)** "Damages" covered by this insurance;

**(2)** "Defense costs" under paragraph I **4.d.** of the Definition of "defense costs"; and

**(3)** Amounts not in excess of two times the Retention Amount stated in the Declarations.

### 3. Exclusions.

This insurance does not apply to:

**a.** "Claims" arising directly or indirectly from any:

**(1)** Dishonest, fraudulent, criminal or unlawful act or omission of an insured; or

**(2)** Willful failure by an insured, or with an insured's consent, to comply with a law or a governmental or administrative order or regulation relating to employment practices. Willful means acting with intentional or reckless disregard for such employment-related laws, orders or regulations.

In interpreting this exclusion no insured's wrongful act shall be imputed to another insured.

**b.** "Claims" arising directly or indirectly from any:

**(1)** "Employment-related practices" which were the subject of a demand, suit or other proceeding initiated against any insured; or

**(2)** Facts and circumstances which would cause a reasonable person to believe a "claim" would be made and which were known to an insured:

Prior to the earlier of:

**(a)** The effective date of the first policy providing this type of coverage that we issued to you which this policy was an uninterrupted renewal of; or

**(b)** The effective date of this insurance.

**c.** "Claims" arising directly or indirectly from any breach of an express contract of employment or an express obligation to make payments in the event of termination of employment.

**d.** "Claims" arising directly or indirectly from any obligation to pay "damages" by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for "damages" that the insured would have in the absence of the contract or agreement.

**e.** "Claims" arising directly or indirectly from any of the following laws:

**(1)** Workers compensation, disability benefits or unemployment compensation laws, or similar laws. However, this exclusion shall not apply to "claims" based upon, arising from, or in consequence of any actual or alleged retaliatory treatment of a claimant by an insured on account of such claimant's exercise of rights pursuant to such law;

Includes copyrighted material of Insurance Services Office, Inc., with its permission. 14-E-0131 Ed. 7-98

**(2)** Employees' Retirement Income Security Act of 1974, Public Law 93-406, (E.R.I.S.A.) as now or hereafter amended, or any similar state or other governmental law. This includes fiduciary liability, liability arising out of the administration of any employee benefit plan or other liability under such laws;

**(3)** The Fair Labor Standards Act, the National Labor Relations Act of 1938, the Worker Adjustment and Retraining Notification Act (Public Law 100-37991988), the Consolidated Omnibus Budget Reconciliation Act of 1985, or the Occupational Safety and Health Act.

This exclusion also applies to:

**(a)** Rules or regulations and amendments thereto promulgated under any of the foregoing and any similar provisions of other federal, state or local laws; and

**(b)** To that part of any "damages" awarded for the cost or replacement of any insurance benefits due or alleged to be due to any current or former "employee."

**f.** "Claims" arising directly or indirectly from any oral or written publication of material, if such material:

**(1)** Was published by or at the direction of an insured with knowledge of the material's falsity; or

**(2)** Was first published before the Retroactive Date, if any, shown in the Declarations.

**g.** "Claims" arising directly or indirectly from bodily injury, sickness, disease or death of any person. However, this exclusion does not apply to liability for "damages" for mental anguish from an "employment-related practice."

**h.** "Claims" arising directly or indirectly from damage to or destruction of tangible property, including loss of use thereof.

**i.** "Claims" arising directly or indirectly from any "employment-related practices" which occur when or after:

**(1)** You file for or are placed in any bankruptcy, receivership, liquidation or reorganization proceeding; or

**(2)** Any other business entity acquires an ownership interest in you greater than fifty percent.

**j.** "Claims" arising directly or indirectly from any costs of complying with physical modifications to your premises or any changes to your usual business operations as mandated by the Americans with Disabilities Act of 1990 including any amendment thereto, or any similar federal, state or local law.

**k.** "Claims" arising directly or indirectly from any lockout, strike, picket line, related worker replacement(s) or other similar actions resulting from labor disputes or labor negotiations.

**l.** "Damages" for which insurance is provided by any other insurance policy issued to you by any member company of the Utica National Insurance Group. This exclusion does not apply to an Excess Liability Policy written specifically to apply in excess of the limits of this policy.

## SECTION III - WHO IS AN INSURED

**1.** If you are designated in the Declarations as:

**a.** An individual, you are an insured, but only with respect to the conduct of a business of which you are the sole owner.

**b.** A partnership or joint venture, you are an insured. Your current or former members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

**c.** A limited liability company, you are an insured. Your current or former members are also insureds, but only with respect to the conduct of your business. Your current or former managers are insureds, but only with respect to their duties as your managers.

**d.** An organization other than a partnership or joint venture, you are an insured. Your current or former directors are insureds, but only with respect to their duties as your directors.

**2.** Each of the following is also an insured:

**a.** Your current or former "employees" but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business.

**b.** Your current or former "leased workers" but only while performing duties related to the conduct of your business.

**c.** Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this policy.

3. Any heirs, executors, administrators, assignees or legal representatives of any individual insured above, in the event of the death, bankruptcy or incapacity of such insured, but only to the extent this insurance would have been available to such insured.

4. Any organization you newly acquire or form, other than a partnership or joint venture, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

   a. You must provide us notice of such acquisition or formation within 30 days of the effective date of your acquisition or formation of such organization;

   b. Coverage under this provision is afforded only until the 90th day after you acquire or form the organization, or the end of the "policy period," whichever is earlier;

   c. Coverage does not apply to "employment-related practices" that occurred before you acquired or formed the organization; and

   d. You must pay us any additional premium due, as a condition precedent to the enforceability of this additional extension of coverage.

   This part III 4. does not apply to any organization after it is shown in the Declarations or added to this Coverage by endorsement.

   No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

## SECTION IV - LIMITS OF INSURANCE AND RETENTIONS

1. The Limit of Insurance stated in the Declarations as the Policy Aggregate Limit is the most we will pay for the sum of:

   a. All "damages" from all "claims" for "employment-related practices" to which this insurance applies; and

   b. All "defense costs" for all "claims" seeking "damages" payable under paragraph IV 1.a. above.

   Each payment we make for such "damages" or "defense costs" reduces the Policy Aggregate Limit by the amount of the payment. This reduced limit will then be the Policy Aggregate Limit of Insurance available for further "defense costs" and "damages" under this policy.

2. Subject to part IV 1. above, the Limit of Insurance stated in the Declarations as the Each "Claim" Limit is the most we will pay for the sum of:

   a. All "damages" from any one "claim" for "employment-related practices" to which this insurance applies, whether such "claim" is brought by one or more claimants; and

   b. All "defense costs" allocated to that specific "claim" as described in part IV 2.a. immediately preceding.

3. In addition to the payments for "damages" and "defense costs" in parts IV 1. and IV 2. above, we will also pay all interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the amount available for the judgment under the provisions of parts IV 1. and IV 2. above.

   These Limits of Insurance apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the "policy period" shown in the Declarations, unless the "policy period" is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

4. a. The Retention Amount stated in the Declarations will be deducted from the sum of all "damages" and "defense costs" for each "claim" because of "employment-related practices" to which this insurance applies. If there are no "damages" paid for a "claim," you must still pay the applicable Retention Amount for any "defense costs" connected with that "claim."

   b. The Limits of Insurance, as described above, will apply to "damages" and "defense costs" which remain after the deduction of the Retention Amount.

   c. All other terms of this insurance apply regardless of the application of the Retention Amount. This includes those concerning Defense Of Claims, Administrative Hearings And Settlement Authority in Section II; and the Duties In The Event of "Employment-Related Practices" or "Claims" Condition.

   d. We may pay any part or all of the Retention Amount to settle a "claim" and you agree to promptly reimburse us for such part of the Retention Amount paid by us.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

14-E-0131 Ed. 7-98

## SECTION V - COINSURANCE FOR PAYMENT OF "DAMAGES"

**1. a.** You will be responsible for your share, in excess of the applicable Retention Amount, of all "damages" from each "claim" because of "employment-related practices" to which this insurance applies. This is so whether such "claim" is brought by one or more claimants.

**b.** Your share will be determined by multiplying the amount of such "damages," after deduction of the Retention Amount, by the percentage shown in the Declarations as the Coinsurance Participation. Your Coinsurance Participation is limited, as shown in the declarations, to a maximum dollar amount per "claim." We will be responsible for the remaining "damages" payable under this insurance, subject to the applicable Limits of Insurance.

**2.** Subject to the provisions of this section, we may make payments for "damages" and then request you to pay us your percentage share. You agree to reimburse us for your share. We do not waive our right to recover your share of such payments by making payments for "damages."

## SECTION VI- CONDITIONS

The following conditions apply in addition to the Common Policy Conditions, which appear at the end of this Section VI.

**1. Bankruptcy.**

Subject to exclusion II 3.i., the bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this insurance.

**2. Duties in Event of "Employment-Related Practices" or "Claims."**

**a.** You must see to it that we are notified as soon as practicable of any specific "employment-related practices" which you believe may result in an actual "claim." Your belief must be reasonably certain and result from specific allegations made by a potential claimant or such potential claimant's representative, or from specifically identifiable injury sustained by a potential claimant. To the extent possible, notice should include:

(1) How, when and where such "employment-related practices" took place;

(2) The names and addresses of any potential claimants and witnesses; and

(3) The nature of any injury arising out of such "employment-related practices."

Notice of such "employment-related practices" is not notice of a "claim," but preserves any insured's rights to future coverage for subsequent "claims" arising out of such "employment-related practices" as described under Automatic Extended Reporting Period, paragraph VII 3.a.

**b.** If a "claim" is received by any insured:

(1) You must immediately record the specifics of the "claim" and the date received;

(2) You and any other involved insured must see to it that we receive written notice of the "claim," as soon as practicable, but in any event we must receive notice either:

(a) During the "policy period"; or

(b) With respect to any "claim" first made during any Extended Reporting Period provided under Section VII - Extended Reporting Periods, during such Extended Reporting Period;

as a condition precedent for coverage under this insurance. Such notice must provide us with the same information as is required in item VI 2.a. above; and

(3) You and any other involved insured must:

(a) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "claim";

(b) Authorize us to obtain records and other information;

(c) Cooperate with us in the investigation, settlement or defense of the "claim"; and

(d) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

**c.** No insureds will, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense without our consent, other than those specific payments authorized under Section II, part 2., Defense Of Claims, Administrative Hearings And Settlement Authority.

**3. Legal Action Against Us.**

No person or organization has a right under this insurance:

a. To join us as a party or otherwise bring us into a "claim" seeking "damages" from any insured; or

b. To sue us on this coverage unless all of its terms have been fully complied with. A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured obtained after an actual trial; but we will not be liable for "damages" that are not payable under the terms of this policy or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

**4. Other Insurance.**

If other valid and collectible insurance is available to the insured for "damages" or "defense costs" we cover under this policy, our obligations are limited as follows:

a. Primary Insurance

This insurance is primary except when **VI 4.b.** below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in **VI 4.c.** below.

b. Excess Insurance

(1) This insurance is excess over any other insurance, whether primary, excess contingent, or on any other basis available to the insured for any "employment-related practice" which took place prior to the "policy period."

(2) This insurance is excess over any other insurance, whether primary, excess, contingent, or on any other basis available to any individual, except a Named Insured, who is insured under this insurance.

(3) When this insurance is excess, we will have no duty to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit." If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

(4) When this insurance is excess over other insurance, we will pay only our share of the amount of loss, if any, that exceeds the sum of:

(a) The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

(b) The total of all deductible and self-insured amounts under all that other insurance.

(5) We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations or Schedule for this insurance.

c. Method of Sharing

If all of the other insurance permits contribution by equal shares, we will follow this method also.

Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

**5. Payment of Premiums, Retention and Coinsurance Amounts.**

a. We will compute all premiums for this insurance in accordance with our rules and rates; and

b. The first Named Insured shown in the Declarations is responsible for the payment of all premiums, retention amounts and coinsurance payments due and will be the payee for any return premiums we pay.

**6. Representations.**

By accepting this coverage, you agree:

a. The statements in the Declarations or the Schedule are accurate and complete;

b. Those statements are based upon representations you made to us in your application for this insurance. That application is attached to and incorporated into this policy and forms the basis of our obligations under this insurance; and

c. Since we have issued this insurance in reliance upon your representations, this insurance is voidable if any material fact or circumstance relating to the subject of this insurance is omitted or misrepresented in your application.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

14-E-0131 Ed. 7-98

**7. Separation Of Insureds.**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this coverage to the first Named Insured, this insurance applies:

**a.** As if each Named Insured were the only Named Insured; and

**b.** Separately to each insured against whom "claim" is made.

**8. Sole Agent.**

The first Named Insured is authorized to act on behalf of all insureds as respects the giving or receiving of notice of cancellation or nonrenewal, receiving premium refunds, requesting any Optional Extended Reporting Period and agreeing to any changes in this insurance.

**9. Transfer Of Rights Of Recovery Against Others To Us.**

If the insured has rights to recover all or part of any payment we have made under this insurance, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will sue those responsible or transfer those rights to us and help us enforce them.

**10. Transfer of Your Rights and Duties Under This Coverage.**

Your rights and duties under this insurance may not be transferred without our written consent.

**11. When We Do Not Renew.**

If we decide not to renew this insurance, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date. If notice is mailed, proof of mailing will be sufficient proof of notice.

**12. Your Right to "Claim" and "Employment -Related Practice" Information.**

We will provide the first Named Insured shown in the Declarations the following information relating to this and any preceding Employment-Related Practices Liability claims-made insurance we have issued to you during the previous three years:

**a.** A list or other record of each "employment-related practice," not previously reported to any other insurer, of which we were notified in accordance with paragraph **2.a.** of the Duties in the Event of "Employment-Related Practices" or "Claims" Condition (Section **VI**). We will include the date and brief description of the "employment-related practice" if that information was in the notice we received. We will also include any estimated reserves on reported "employment-related practices."

**b.** A summary by policy year, of payments made and amounts reserved, stated separately, for "damages" or "defense costs" under any applicable Aggregate Limit.

**c.** A description of closed "claims" and/or open "claims" including the date and description of "employment-related practices," amount of payment, if any, and an estimate of reserves, if any; stated separately, for "damages" or "defense costs."

Amounts reserved are based on our judgment. They are subject to change and should not be regarded as ultimate settlement values.

You must not disclose this information to any claimant or claimant's representative without our consent.

If we cancel or elect not to renew this insurance, we will provide such information no later than 30 days before the date of policy termination. In other circumstances, we will provide this information only if we receive a written request from the first Named Insured. In this case, we will provide this information within 45 days of receipt of the request.

We compile "claim" and "employment-related practice" information for our own business purposes and exercise reasonable care in doing so. In providing this information to the first Named insured, we make no representations or warranties to insureds, insurers, or others to whom this information is furnished by or on behalf of any insured. Cancellation or nonrenewal will be effective even if we inadvertently provide inaccurate or incomplete information.

**13. State Changes.**

Any state amendatory endorsement changing Cancellation or Nonrenewal Conditions for any part of this policy shall also apply to this endorsement.

**COMMON POLICY CONDITIONS**

These Common Policy Conditions apply only for this Employment-Related Practices Liability Endorsement and not to the Agents and Brokers Errors and Omissions coverage.

## A. Cancellation.

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

   b. 30 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. The "policy period" will end on that date.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

## B. Changes.

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

## C. Examination Of Your Books And Records.

We may examine and audit your books and records as they relate to this policy at any time during the "policy period" and up to three years afterward.

## D. Inspections And Surveys.

We have the right but are not obligated to:

1. Make inspections and surveys at any time;

2. Give you reports on the conditions we find; and

3. Recommend changes.

Any inspections, surveys, reports or recommendations relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

1. Are safe or healthful; or

2. Comply with laws, regulations, codes or standards.

This condition applies not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

## SECTION VII - EXTENDED REPORTING PERIODS

1. We will provide an Automatic Extended Reporting Period as described in paragraph VII 3., or if the first Named Insured purchases it, an Optional Extended Reporting Period Endorsement as described in paragraphs VII 4. and VII 5. below, in the event of any "termination of coverage."

2. a. If we provide an Extended Reporting Period, a "claim" first made during the Extended Reporting Period will be deemed to have been made during the "policy period," provided that the "claim" is for "employment-related practices" which took place before the end of the "policy period" of this insurance (but not before any applicable Retroactive Date).

   b. Extended Reporting Periods:

   (1) Do not extend the "policy period" or change the scope of coverage provided;

   (2) Do not reinstate or increase the Limits of Insurance applicable to any "claim" to which this insurance applies;

   (3) Apply only to the coverage terminated or reduced; and

   (4) Apply only as excess insurance over any other valid and collectible insurance available to the insured, whether primary, excess, contingent, or on any other basis, whose policy period begins or continues after the Extended Reporting Period takes effect.

3. **Automatic Extended Reporting Period.**

   The Automatic Extended Reporting Period is provided without additional charge. This period starts at the end of the "policy period" and lasts:

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

14-E-0131 Ed. 7-98

a. Five years for "claims" arising out of "employment-related practices" reported to us, no later than 60 days after the end of the "policy period," in accordance with Condition **2.** of Section **VI**; or

b. Sixty days for all other "claims."

The Automatic Extending Reporting Period may not be cancelled.

**4. Optional Extended Reporting Period.**

If this insurance is subject to any "termination of coverage," then the first Named Insured shall have an option to purchase an Optional Extended Reporting Period as described below.

If the first Named Insured purchases the Optional Extended Reporting Period Endorsement, the Optional Extended Reporting Period will start 60 days after the end of the "policy period" and will last either:

a. Twelve months; or

b. Thirty-six months.

**5. Optional Extended Reporting Period Notice and Acceptance.**

a. Part **VII 5.f.** below describes the premium for the Optional Extended Reporting Period Endorsement.

b. We will notify the first Named Insured in writing, within 30 days after the date of "termination of coverage" of the premium for and provisions of the Extended Reporting Periods unless we cancel for nonpayment of premium or fraudulent activities of an insured and the policy has been in effect for less than one year. If the policy is cancelled for nonpayment of premium or fraudulent activities of an insured, we will only provide a premium quotation for the Optional Extended Reporting Period upon the request of the first Named Insured.

c. The first Named Insured will have until the later of 60 days after the date of "termination of coverage" or 30 days after the date of mailing of the notice of "termination of coverage" described in **VII 5.b.** above to request the Optional Extended Reporting Period. The request must:

(1) Be submitted to us in writing;

(2) Show the length of the period of extension desired; and

(3) Include payment of the premium for the requested extension.

d. If, in the event of any "termination of coverage" the first Named Insured elects to purchase the Optional Extended Reporting Period Endorsement:

(1) Any return premium due for the "termination of coverage" will be credited to the premium due for the Optional Extended Reporting Period Endorsement; and

(2) Any additional premium or retention amount due us for the period the policy was in force must be fully paid before any payments will be applied to the premium due for the Optional Extended Reporting Period Endorsement.

e. The Optional Extended Reporting Period Endorsement will not take effect unless the additional premium is paid when due. If that premium is paid when due, the Endorsement may not be cancelled.

f. The premium for the Optional Extended Reporting Period Endorsement:

(1) Will be determined in accordance with our rules and rates;

(2) Is shown in the Declarations or in any endorsement changing the premium because of any change in the nature or extent of the risk during the "policy period";

(3) Will be commensurate with the coverage provided; and

(4) Will be fully earned when the Optional Extended Reporting Period Endorsement takes effect.

g. The Optional Extended Reporting Period Endorsement shall set forth the terms, not inconsistent with this Section, applicable to the Optional Extended Reporting Period including a provision to the effect that the insurance afforded for "claims" made during such period is excess over any other valid and collectible insurance available under policies in force after the Optional Extended Reporting Period starts.

POLICY NUMBER: 5171558 EO

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# DIMINISHING DEDUCTIBLE

**(For attachment to Insurance Agents and Brokers Errors and Omissions Liability Policy)**

**(Claims-Made Policy)**

**SCHEDULE**

I.   Effective Date:

(If no date entered, coverage is effective from policy inception.)

II.   Under SECTION **V** - LIMITS OF LIABILITY, the following is added to Paragraph **6.** Deductible:

For each consecutive twelve month period in which you do not have a "loss" under this insurance, the Each Loss Deductible amount stated in the Declarations will be reduced by 10%, subject to a maximum reduction of 50%. If you do not have a "loss" for five consecutive twelve month periods, the Each Loss Deductible amount stated in the Declarations will be reduced by 50%. If you have a "loss", the Each Loss Deductible amount stated in the Declarations will not be reduced on any subsequent "losses" during the remainder of the policy period and the next twelve month period.

For the purposes of this endorsement, a "loss" has not occurred until:

(1)  The amount paid for "loss" exceeds the "net deductible", whether the "net deductible" is loss only or loss and litigation; or

(2)  Defense costs exceed $5,000 for a loss only deductible.

As used in this endorsement, "net deductible" means the Each Loss Deductible amount stated in the Declarations, less any applicable reduction provided by this endorsement.

Regardless of any credit applied to the Each Loss Deductible amount stated in the Declarations, the Aggregate Deductible will not be affected.

The coverage provided by this endorsement applies to active policies only. Inactive policies or terminated policies subject to an Extended Reporting Period are not eligible for this coverage.

14-E-1097  Ed. 07-2008                                                                                                    Page 1 of 1

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION - INSOLVENCY

Under **Section III - Exclusions**, the **Insolvency** exclusion is replaced by the following:

This insurance does not apply to any "claim" directly or indirectly, in whole or in part, arising out of, involving, resulting from, or caused by any of the following:

**Insolvency**

The financial inability to pay, insolvency, receivership, bankruptcy or liquidation of any insurance company or reinsurance company, Health Maintenance Organization, Preferred Provider Organization, Dental Service Plan, Individual Practice Association, Risk Retention Group, Risk Provider Group, Risk Purchasing Group, captive insurer, self-insurance program, Multiple Employer Trust or Multiple Employer Welfare Arrangement, pool, syndicate, association, or other combination formed for the purpose of providing insurance or reinsurance, investment fund or healthcare provider.

However, this exclusion does not apply if at the time the insured placed coverage with any of the above-described entities:

1. Such entity or entities were rated as B+ or higher by AM Best;
2. Such entity or entities were member insurers of the state guaranty fund or guaranty association in the state or states of domicile of the subject risk;
3. Such entity or entities were guaranteed by a governmental body or bodies and/or operated by a governmental body or bodies;
4. The coverage was placed with an insurance carrier through a state established residual market insurance program; or
5. The coverage was placed with a County Mutual reinsured by carriers rated as B+ or higher by AM Best.

# CLAIMS-MADE DISCLOSURE NOTICE ADDENDUM

**THIS DISCLOSURE NOTICE IS BEING PROVIDED TO HIGHLIGHT CERTAIN IMPORTANT FEATURES OF YOUR POLICY. THIS NOTICE PROVIDES NO COVERAGE NOR CAN IT BE CONSTRUED TO REPLACE ANY PROVISION OF YOUR POLICY. FOR COMPLETE INFORMATION ON YOUR COVERAGES, READ YOUR POLICY AND REVIEW YOUR DECLARATIONS PAGE. IF THERE IS ANY CONFLICT BETWEEN THE POLICY AND THIS NOTICE, <u>THE PROVISIONS OF THE POLICY SHALL PREVAIL.</u>**

1. The Insurance Agents And Brokers Errors And Omissions Policy is written on a claims-made basis. The policy only covers claims made against you during the policy period or any Extended Reporting Period.

2. The policy provides no coverage for claims arising out of wrongful acts which took place prior to the Retroactive Date, if any, stated in the policy.

3. All coverage under the policy ceases upon the termination of this policy, except for the Automatic Extended Reporting Period Coverage, unless you purchase Optional Extended Reporting Period Coverage.

4. <u>Automatic Extended Reporting Period Coverage.</u>

   In the event of any termination of coverage, we will provide an Automatic Extended Reporting Period. This period starts upon termination of coverage and lasts for sixty (60) days. Any claim first made during the Automatic Extended Reporting Period will be considered made during the policy period.

5. <u>Optional Extended Reporting Period Coverage.</u>

   In the event of any termination of coverage, an Optional Extended Reporting Period is available, but only by an endorsement and for an extra premium charge. The Optional Extended Reporting Period starts when the Automatic Extended Reporting Period described in Paragraph **4.** above ends. Any claim first made during the Optional Extended Reporting Period will be considered made during the policy period. You may purchase an Optional Extended Reporting Period that lasts for:*
   a. Twelve (12) months;
   b. Twenty-four (24) months;
   c. Thirty-six (36) months;
   d. Forty-eight (48) months;
   e. Sixty (60) months; or
   f. One hundred and twenty (120) months.

   *If your policy includes the Agency Ally endorsement, you may purchase an Optional Extended Reporting Period of twelve (12), twenty-four (24) or thirty-six (36) months.

6. A review of the Extended Reporting Period provisions in the Coverage Form, as summarized above, will underscore the importance of both the Automatic and Optional Extended Reporting periods. Potential coverage gaps may arise upon the expiration of the Automatic or Optional Extended Reporting Period.

7. During the first several years of claims-made coverage, premiums will be comparatively lower than occurrence coverage premiums. As such, you can expect substantial annual premium increases in subsequent years, independent of overall rate level increases, until the claims-made coverage reaches maturity.



**Utica National Insurance Group**

Insurance that starts with you.

Utica Mutual Insurance Company and its affiliated companies, New Hartford, N.Y. 13413

www.uticanational.com

14-L-0054  Ed. 09-2012

# POLICYHOLDERS NOTICE - INSOLVENCY EXCLUSION

THIS POLICYHOLDERS NOTICE PROVIDES A SUMMARY OF RECENT COVERAGE CHANGES THAT APPLY TO YOUR POLICY. THIS NOTICE PROVIDES NO COVERAGE NOR CAN IT BE CONSTRUED TO REPLACE ANY PROVISION OF YOUR POLICY. FOR COMPLETE INFORMATION ON YOUR COVERAGES, READ YOUR POLICY AND REVIEW YOUR DECLARATIONS PAGE. IF THERE IS ANY CONFLICT BETWEEN THE POLICY AND THIS SUMMARY, <u>THE PROVISIONS OF THE POLICY SHALL PREVAIL.</u>

THIS NOTICE HIGHLIGHTS CHANGES IN COVERAGE BUT DOES NOT REFERENCE EVERY EDITORIAL CHANGE MADE IN THE FORM AND NOT ALL COVERAGE FORMS MAY BE INCLUDED IN YOUR POLICY.

<b>PLEASE READ THIS NOTICE CAREFULLY.</b>

*An Endorsement Has Been Added To Your Policy Which Modifies The Insolvency Exclusion As Follows:*

- An exception has been added to this exclusion which extends insolvency coverage to entities that were member insurers of the state guaranty fund or guaranty association in the state of domicile of the subject risk. This is a broadening of coverage.

- The current insolvency exclusion does not apply to an insolvent insurer, other entity or County Mutual that was rated "B" or higher by AM Best at the time coverage was placed. This exception to the exclusion has been revised to apply to an insolvent insurer, other entity or County Mutual that was rated "B+" or higher by AM Best at the time coverage was placed. To the extent that insolvency coverage would have been provided in the past for insurers, other entities or a County Mutual rated "B" by AM Best, this change represents a reduction of coverage.

We appreciate your business and thank you for putting your trust in Utica National.



**Utica National Insurance Group**

Insurance that starts with you.®

Utica Mutual Insurance Company and its affiliated companies, New Hartford, NY  13413

www.uticanational.com  •  1-800-274-1914

14-L-0064 Ed. 09-2014          Copyright, Utica Mutual Insurance Company, 2014.                    Page 1 of 1

**UTICA NATIONAL INSURANCE GROUP**
**UTICA, NEW YORK**
**(HEREINAFTER CALLED THE COMPANY)**

# INSURANCE AGENTS AND BROKERS
# ERRORS AND OMISSIONS INSURANCE

## THIS IS A CLAIMS-MADE POLICY

THIS POLICY IS LIMITED TO THOSE CLAIMS THAT ARE FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD OR ANY EXTENDED REPORTING PERIOD PROVIDED.

## PLEASE REVIEW THE POLICY CAREFULLY.

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine your rights, duties, and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we," "us" and "our" refer to the Company providing this insurance.

The word "insured" means any person or organization qualifying as such under **SECTION IV - WHO IS AN INSURED**.

Other words and phrases that appear in quotation marks have special meaning. Refer to **SECTION I - DEFINITIONS**.

## SECTION I - DEFINITIONS

1. "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

   a. Notices that are published include material placed on the Internet or on similar electronic means of communication; and

   b. Regarding web-sites, only that part of a web-site that is about your products or services for the purposes of attracting customers or supporters is considered an advertisement.

2. "Claim" means a written demand or written notice, including service of a subpoena, "suit" or demand for arbitration, received by one or more insureds which alleges a "wrongful act" or asks for money or services.

3. "Claim expense" means:

   a. Fees charged by an attorney retained by us to defend you;

   b. Fees charged by an attorney retained by us to assist you or provide advice regarding the production of documents, or prepare you for and represent you during testimony;

   c. All other fees, costs, and expenses resulting from the investigation, adjustment, and defense of a "claim" if incurred by us or by the insured with our consent; and

   d. Fees charged by any attorney hired by the insured with our written consent.

   However, "claim expense" does not include salaries of regular employees or officials of the insured or us.

4. "Coverage territory" means anywhere in the world provided that the insured's responsibility to pay "loss" is determined by:

   a. A "claim" made or "suit" filed in the United States of America, its territories or possessions, Puerto Rico or Canada; or

   b. Settlement of a "claim" or "suit" we agree to.

5. "Dealer organization" means an entity organized for the purpose of selling equity-based products and securities.

6. "Interrelated wrongful acts" means "wrongful acts" which arise out of and have as a common basis:

   a. Related circumstances, situations, events, transactions or facts;

   b. A series of related circumstances, situations, events, transactions or facts; or

   c. A common pattern of conduct in selling or servicing products to which this insurance applies.

7. "Litigation expense" means fees and disbursements charged by any attorney retained by us, or hired by you with our written consent, to defend a "suit" against you or consult on such defense. "Litigation expense" does not include salaries or other expenses of our regular employees or officials, or the fees, disbursements, or other expenses of any counsel retained by us prior to any actual "suit" filing.

8. "Loss" means any amount which an insured becomes legally obligated to pay as damages for any "claim" arising out of a "wrongful act" to which this insurance applies and shall include judgments and settlements. "Loss" shall include punitive or exemplary damages only to the extent that such damages are insurable under the law pursuant to which the policy shall be construed. "Loss" shall not include:

   a. Fines, penalties or sanctions imposed by law;

   b. The return, reimbursement or repayment of any money received by or credited to an insured for premium, fees, commissions, escrow monies or brokerage charges, loss payments, profit sharing, compensation or other remuneration, payments, costs or expenses;

   c. Taxes; and

   d. Other matters deemed uninsurable under the law pursuant to which the policy shall be construed.

9. "Personal injury" means one or more of the following offenses:

   a. False arrest, detention, or imprisonment;

   b. Malicious prosecution;

   c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling, or premises that a person occupies by or on behalf of its owner, landlord, or lessor;

   d. Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products, or services; or

   e. Oral or written publication, in any manner, of material that violates a person's right of privacy.

   f. The use of another's advertising idea in your "advertisement"; or

   g. Infringing upon another's copyright, trade dress or slogan in your "advertisement".

"Personal injury" does not include:

   (1) The oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity; or

   (2) The willful violation of a penal statute or ordinance committed by or with the consent of the insured.

10. "Policy period" means the period from the inception date to the expiration date, stated in the Declarations for this policy, or to its earlier termination date, if any.

11. "Suit" means a civil proceeding in which damages because of "loss" are alleged. "Suit" includes:

   a. An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

   b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

12. "Termination of coverage" means any cancellation or nonrenewal of the policy.

13. "Wrongful act" means any negligent act, negligent error, negligent omission, or "personal injury" committed by an insured in the lawful performance of their duties for you.

## SECTION II - COVERAGE

### 1. Insuring Agreement

   a. We will pay on behalf of the insured all "loss" to which this insurance applies.

   We will have the right and duty to defend the insured against any "suit" seeking such "loss" even if the allegations of the "suit" are groundless, false, or fraudulent. However, we will have no duty to defend an insured against any "suit" to which this insurance does not apply. We have the right, but not the duty, to appeal any judgment.

   We may, at our discretion:

   (1) Investigate any allegation of a "wrongful act"; and

   (2) Settle, according to the Settlement-Consent of The Insured Condition, any "claim" or "suit" that may result. But:

   (a) The amount we will pay for damages is limited as described in **SECTION V - LIMITS OF LIABILITY**; and

   (b) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of "loss".

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under **2. Supplementary Payments**.

**b.** This insurance applies only to "wrongful acts" which take place:

  **(1)** In the "coverage territory";

  **(2)** During the "policy period" and "claim" is first made against any insured during the "policy period" or any Extended Reporting Period provided; or

  **(3)** Prior to the "policy period", but on or after the Retroactive Date, if any, shown in the Declarations for this policy, provided that prior to the effective date of this policy:

   **(a)** The insured did not give notice to any prior insurer of such "wrongful act";

   **(b)** The insured had no knowledge that such "wrongful act" was likely to give rise to a "claim" hereunder; and

   **(c)** The "claim" is first made against any insured during the "policy period" or any Extended Reporting Period provided.

**c.** A "claim" will be considered first made at the earliest of the following times:

  **(1)** When notice of such "claim" is received and recorded by any insured or by us, whichever comes first.

  **(2)** When we make settlement in accordance with paragraph **1.a.** above.

  **(3)** On the date during the "policy period" when the first written notice of any facts or circumstances which may subsequently give rise to a "claim" which would be insured hereunder is received by us from an insured. Any "claim" made against an insured arising out of such facts or circumstances after the date of receipt of such notice by us will be considered to have been made on the date we received the first notice of facts or circumstances. Only the policy in force on that date and no other shall apply to all "claims" from such facts or circumstances.

**d.** All "claims" based on or arising out of a single "wrongful act" or all "interrelated wrongful acts" of one or more insureds shall be deemed to be one "claim" and to have been made at the time the first of those "claims" is made against any insured.

**e.** The "loss" must arise out of "wrongful acts" committed in the conduct of the insured's business, by the insured or any person for whose "wrongful acts" the insured is legally liable in rendering or failing to render professional services for others as:

  **(1)** A General Insurance Agent;

  **(2)** An Insurance Broker;

  **(3)** An Insurance Agent;

  **(4)** An Insurance Consultant;

  **(5)** A Managing, Master or Brokerage General Agent;

  **(6)** A Life and Accident and Health Insurance Agent;

  **(7)** A Surplus Lines Broker;

  **(8)** A Notary Public;

  **(9)** An Expert Witness; or

  **(10)** An Instructor of Insurance Subjects.

**f.** Professional services include the following for policies written or placed by you:

  **(1)** Arranging premium financing through a non-related entity.

  **(2)** Real estate appraising and loss adjustment.

  **(3)** Providing insurance advice for employee benefit programs.

  **(4)** Providing insurance program and risk management services and advice.

  **(5)** Providing loss control services.

**2. Supplementary Payments**

We will pay with respect to any "claim" we investigate or settle, or any "suit" against an insured we defend:

**a.** All "claim expenses" and "litigation expenses" we incur.

**b.** The cost of appeal bonds or bonds to release attachments, but only for bond amounts within the applicable limit of liability. We do not have to furnish these bonds.

**c.** All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the "claim" or "suit," including actual loss of earnings up to $500 a day because of time off from work. Such expenses shall include fees charged by any attorney hired by the insured with our written consent.

**d.** All court costs taxed against the insured in the "suit". However, these payments do not include attorneys' fees or attorneys' expenses taxed against the insured.

**e.** Pre and post-judgment interest on that part of the judgment that we pay up to the policy limits.

These payments will not reduce the Limits of Liability except as stated in part **5.**, **Deductible**, of **SECTION V - LIMITS OF LIABILITY**.

**3. Regulatory Response Coverage**

We will pay "claim expenses" required to evaluate or respond to a "claim" from any:

**a.** Insurance department;

**b.** State regulatory agency; or

**c.** Other governmental agency;

which is due to or results from an actual or alleged "wrongful act" committed by an insured in the conduct of your business.

You agree to the use of an attorney retained by us, or hired by you with our written consent.

The most we will pay under this supplemental coverage is $25,000 per "policy period".

The most we will pay under this supplemental coverage during any Optional Extended Reported Period provided is $25,000.

This supplemental coverage does not apply to payment of any "loss".

## SECTION III - EXCLUSIONS

This insurance does not apply to any "claim" directly or indirectly, in whole or in part, arising out of, involving, resulting from, or caused by any of the following:

**1. Intentional, Fraudulent, Criminal Or Malicious Acts**

Any intentional, criminal, fraudulent, dishonest, malicious, knowing or willful conduct committed or alleged to have been committed by or at the direction of any insured. If a "suit" is brought against an insured alleging both "wrongful acts" within the coverage of the policy and intentional, criminal, fraudulent, dishonest, malicious, knowing or willful conduct, then we will defend the insured in the trial court, but we shall not have any liability for any judgment for intentional, criminal, fraudulent, dishonest, malicious, knowing or willful conduct nor shall we have any further obligation to defend after judgment in the trial court.

This exclusion applies only to insureds who are alleged to have participated in, obtained a financial benefit from, acted with knowledge of, acquiesced to, or disregarded such conduct.

We shall be entitled to recover from any insured who is determined or adjudged to have committed, or directed the commission of, any intentional, criminal, fraudulent, dishonest, malicious, knowing, or willful conduct, or who has admitted to engaging in such conduct, any and all "claim expense" incurred in defending a "claim" against any insured that in any way is based upon or related to such conduct.

**2. Prior Or Subsequent Conduct**

**a.** "Wrongful acts" which took place before the Retroactive Date, if any, shown in the Declarations for this policy; or

**b.** A "wrongful act" which with any "wrongful act" described in **a.** above would constitute "interrelated wrongful acts"; or

**c.** "Wrongful acts" which take place after the "policy period".

**3. Prior Notice**

**a.** A "wrongful act" or circumstance, situation or fact which has been the subject of notice given prior to the effective date of this policy under other insurance which provided protection for the insured; or

**b.** A "wrongful act" which with any "wrongful act" described in **a.** above would constitute "interrelated wrongful acts".

**4. Bodily Injury Or Property Damage**

**a.** Bodily injury from whatever cause including emotional distress, sickness, disease, or death, or for care and loss of consortium, support, companionship, or services of any kind resulting from bodily injury; or

**b.** Damage to tangible property, including loss of use thereof.

**5. Violation Of Laws Applicable To Notaries**

The certification or acknowledgment of a signature by an insured acting as a notary without the proper compliance with the applicable laws and regulations of the state having jurisdiction.

**6. Partial Ownership**

Conduct by any entity or individual which:

**a.** Is wholly or partially owned, operated, managed, or controlled by the insured;

**b.** Did wholly or partially own, operate, manage, or control the insured; or

**c.** Is wholly or partially under the same ownership, operation, management, or financial control as the insured.

However, this exclusion does not apply if the percentage of partial ownership, operation, management, or control is 10% or less.

**7. Employment-Related Practices**

   **a.** Refusal to employ;

   **b.** Termination of employment; or

   **c.** Coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination, or other employment-related practices, policies, acts, or omissions.

   This exclusion applies:

   **(1)** Whether an event described in Paragraph **a., b.** or **c.** above occurs before, during or after a person's employment;

   **(2)** Whether the insured may be liable as an employer or in any other capacity; and

   **(3)** To any obligation to share damages with or repay someone else.

**8. Discrimination**

   Discrimination or unfair competition of any type.

**9. ERISA And Similar Laws**

   Actual or alleged violations of the Employee Retirement Income Security Act of 1974 (ERISA), the Pension Benefits Act and the Consolidated Omnibus Budget Reconciliation Act of 1986 (COBRA) including any amendments, regulations or enabling statutes pursuant thereto, or any similar federal, state, or provincial statute or regulation.

**10. RICO Violations**

   Actual or alleged violation of any federal or state security law or the Racketeer Influenced and Corrupt Organizations Act and/or any of their amendments and regulations.

**11. Investment Advice**

   **a.** Any investment advice given or alleged to have been given relating to the performance or lack of performance of any investment or resulting from variations in the value of any investment, including, but not limited to, stocks, bonds, real estate, oil or gas, gold, silver, diamonds, or any non-insurance investment.

   **b.** "Loss" arising out of an insured's representations or omissions regarding:

     **(1)** Interest rates; or

     **(2)** Future premium payments or market value of insurance products.

**12. Other Professional Services**

   Services as an attorney, accountant, actuary, tax preparer or tax consultant, real estate broker, security broker, security dealer, mortgage broker, financial planner, or any other professional services unless such professional services are specifically insured hereunder and an additional premium paid.

**13. HMO's And Similar Organizations**

   The involvement by any insured in the ownership, formation, creation, management, administration, operation or oversight of any entity formed for the purpose of providing insurance or benefits including but not limited to any pool, syndicate, Health Maintenance Organization, Preferred Provider Organization, Self-Insurance Program, Risk Retention Group and/or Risk Purchasing Group formed under the Federal Liability Retention Act of 1981 and 1986 as amended or any amendment thereto, Multiple Employer Trust, or Multiple Employer Welfare Arrangement.

**14. Insolvency**

   The financial inability to pay, insolvency, receivership, bankruptcy, or liquidation of any entity, person, corporation, estate, trust, or other organization including, but not limited to:

   **a.** Insurance companies or reinsurance companies;

   **b.** Health Maintenance Organizations, Preferred Provider Organizations, Dental Service Plans, or Individual Practice Associations;

   **c.** Risk Retention Groups, Risk Purchasing Groups or captive insurers;

   **d.** Investment funds, or self-insurance programs;

   **e.** Multiple Employer Trusts or Multiple Employer Welfare Arrangements;

   **f.** Any pool, syndicate, association or other combination for the purpose of providing insurance or reinsurance; or

   **g.** Any healthcare provider or any reinsurer with which the insured placed the subject risk.

   However, this exclusion does not apply:

   **(1)** To any entity described above, if the entity was rated "B" or higher by AM Best at the time the insured placed the risk with such entity;

   **(2)** To any entity described above, if the entity was operated by a government body or bodies (including but not limited to assigned risk plans, Joint Underwriting Associations, Fair Plans);

   **(3)** If the insured placed the coverage with a County Mutual reinsured by carriers rated "B" or higher by AM Best; or

   **(4)** To any self-insurance program designed for the purpose of covering exposures of a single individual or entity other than the Named Insured.

### 15. Employee Benefit Plans

Any pension, profit sharing, health or welfare or other employee benefit plan or trust sponsored by the insured as an employer.

### 16. Fiduciary Status

The insured's status as a fiduciary.

### 17. Third Party Administrators

The insured's activities as third party administrator of any plan, whether insured or self-insured and whether or not the insured performs such activities.

### 18. Trade Secrets

Actual or alleged misappropriation or unauthorized use of trade secrets, patents, processing methods, customer lists or other proprietary information by an insured.

### 19. Unauthorized Information Disclosure

Actual or alleged unauthorized disclosure of, use of, or access to, any person's or organization's confidential, non-public personal information including, but not limited to their social security number, tax identification number, driver's license number or other state identification number, financial information, credit or debit card information, medical or healthcare data, or any other type of non-public information.

### 20. Dealer Organizations

"Loss" by a "dealer organization".

### 21. Distribution Of Material In Violation Of Statutes

Any actual or alleged violation of:

a. The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

b. The CAN-SPAM Act of 2003, including any amendment of or addition to such law; or

c. Any federal, state or local statute, ordinance or regulation, other than the TCPA or CAN-SPAM Act of 2003 and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

### 22. Viatical Or Life Settlements

a. Viatical settlements, viatical insurance benefits, viatical investment pools or any security backed by viatical settlements; or

b. Life settlements.

### 23. Unjust Enrichment

Any personal profit or advantage gained by an insured to which the insured was not legally entitled.

### 24. Nuclear Energy

"Loss":

a. With respect to which an insured under this insurance is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada, or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

b. Resulting from the "hazardous properties" of "nuclear material" and with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

c. Resulting from the "hazardous properties" of "nuclear material", if:

(a) The "nuclear material" (i) is at any "nuclear facility" owned by, or operated by or on behalf of, an insured or (ii) has been discharged or dispersed therefrom;

(b) The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported, or disposed of by or on behalf of an insured; or

(c) The "loss" arises out of the furnishing by an insured of services, materials, parts, or equipment in connection with the planning, construction, maintenance, operation, or use of any "nuclear facility," but if such facility is located within the United States of America, its territories or possessions, or Canada, this exclusion (c) applies only to "loss" to such "nuclear facility" and any property thereat.

As used in this exclusion:

"Hazardous properties" include radioactive, toxic, or explosive properties;

"Nuclear material" means "source material," "special nuclear material," or "by-product material";

"Source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof;

"Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor";

"Waste" means any waste material (i) containing "by-products material"; other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and (ii) resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

"Nuclear facility" means:

(a) Any "nuclear reactor";

(b) Any equipment or device designed or used for (i) separating the isotopes of uranium or plutonium, (ii) processing or utilizing "spent fuel", or (iii) handling, processing, or packaging "waste";

(c) Any equipment or device used for the processing, fabricating, or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

(d) Any structure, basin, excavation, premises, or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site, and all premises used for such operations;

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material;

"Loss", in this exclusion, includes all forms of radioactive contamination of property.

## SECTION IV - WHO IS AN INSURED

Each of the following is an insured to the extent set forth below:

1. The individual, partnership, corporation or limited liability company designated as the Named Insured in the Declarations;

2. Your executive officers or directors, but only with respect to their duties as your officers and directors;

3. Your partners or members, but only with respect to the conduct of your business;

4. Your employees (regular, leased, or temporary) or managers, but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business; or

5. Your licensed solicitors or office brokers (who is not an employee) but only as respects:

   a. Such persons who are named in the Real Estate Agents and Brokers Errors And Omissions Insurance Endorsement while acting on your behalf; or

   b. Such persons who are named in the Mutual Fund And Variable Annuity Coverage Endorsement while acting on your behalf.

6. Any natural person who is an independent contractor licensed to provide professional services covered by this policy acting on your behalf as your sub-producer for "claims" arising out of "wrongful acts" committed in connection with business placed through or serviced by you.

7. Any person who was formerly an insured under parts 1., 2., 3., 4., 5. or 6. above, but only with respect to "wrongful acts" which took place prior to the termination of such relationship.

8. a. Any merged entity for which coverage was added at any time by our Merged or Consolidated Entity Endorsement, 14-E-0006.

   b. This insurance does not apply to "wrongful acts" which any insured had knowledge of prior to the effective date of the original endorsement which added such coverage.

9. a. You, for legal liability from "wrongful acts" of any merged entity for which coverage was added at any time by our Merged or Consolidated Entity Endorsement, 14-E-0006.

   b. This insurance does not apply to "wrongful acts" which any insured had knowledge of prior to the effective date of the original endorsement which added such coverage.

10. a. You, for legal liability from "wrongful acts" of any purchased entity for which coverage was added at any time by our Purchased Entity Endorsement, 14-E-0005.

    b. This insurance does not apply to "wrongful acts" which any insured had knowledge of prior to the effective date of the original endorsement which added such coverage.

    c. This insurance does not apply to "wrongful acts" which occurred prior to the effective date of the original endorsement which added such coverage.

11. The heirs, executors, administrators, or legal representatives of each insured in the event of death, incapacity, or bankruptcy, but solely with respect to the liability of each insured as otherwise insured herein.

12. Any organization you newly acquire or form, and over which you maintain ownership or majority interest will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

   a. Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier; and

   b. Coverage does not apply to "wrongful acts" that occurred before you acquired or formed the organization.

13. The lawful spouse or legal domestic partner, of any insured:

   a. For "wrongful acts" actually or allegedly committed by that insured; and

   b. Solely by reason of such spouse's or legal domestic partner's status as spouse or legal domestic partner of that insured.

   Notwithstanding this provision, no spouse or legal domestic partner shall have any greater coverage under this Coverage Form than the insured. This provision does not extend coverage for "wrongful acts" actually or allegedly committed by the spouse or legal domestic partner of any insured.

Except as stated in **8.**, **9.** and **10.** above, no person or organization is an insured with respect to the conduct of such person or organization, or any current or past partnership or limited liability company that is not shown as a Named Insured in the Declarations.

## SECTION V - LIMITS OF LIABILITY

1. The Limits of Liability shown in the Declarations and the provisions of this section determine the most we will pay for damages regardless of the number of:

   a. Persons insured;

   b. Persons or entities making "claims" or bringing "suits"; or

   c. "Claims" made or "suits" brought.

2. The total limit of our liability for all payments for all "losses" under this policy shall not exceed the Aggregate Limit of Liability stated in the Declarations.

3. a. Subject to **2.** above, the Each Loss limit is the most we will pay for all "loss" from any one "wrongful act" or "interrelated wrongful acts" of one or more insureds; and

   b. Only one Deductible Amount applies to all such "loss".

4. a. Our Limit of Liability for Each Loss applies in excess of the applicable Deductible Amount set forth in the policy for Each Loss.

   b. Subject to the Deductible Amount for Each Loss, the total Deductible Amount for all "losses" under this policy shall not exceed the Aggregate Deductible Amount stated in the Declarations.

   c. Such Aggregate Deductible Amount applies in conjunction with any and all Deductible Amounts, whether set forth in the policy Declarations or in endorsements forming a part of the policy.

## 5. Deductible

The insured shall pay the Deductible Amount set forth in the Declarations for Each Loss.

   a. If the Deductible Amount indicated in the Declarations applies to Loss Only, the Deductible Amount will only be applied to payments for "loss".

   b. If the Deductible Amount indicated in the Declarations applies to Loss And Litigation Expense, the deductible will be applied to payments for both "loss" and "litigation expense".

   c. We may pay any part or all of the Deductible Amount to effect settlement of any "claim" or "suit" and, upon notification of the action taken, you shall promptly reimburse us for such part of the Deductible Amount as has been paid by us.

   d. Such Deductible Amounts shall, upon written demand by the company, be paid by the Named Insured within ten days. The total payments requested from the insured with respect to each "loss" shall not exceed the applicable Deductible Amount stated in the policy.

The determination of the company as to the reasonableness of the "litigation expense" shall be conclusive for all parties.

## SECTION VI - CONDITIONS

1. **Duties In The Event Of Wrongful Act, Claim Or Suit**

   a. You must see to it that we are notified in writing as soon as practicable of any "wrongful act" which may result in a "claim". To the extent possible, notice should include:

      (1) How, when and where the "wrongful act" took place;

      (2) The names and addresses of persons involved in the "wrongful act" and witnesses; and

      (3) The nature of the harm resulting from the "wrongful act".

**b.** If a "claim" is received by an insured, you must:

   **(1)** Immediately record the specifics of the "claim" and the date received; and

   **(2)** Notify us as soon as practicable.

   You must see to it that we receive written notice of the "claim" as soon as practicable.

**c.** You and any other involved insured must:

   **(1)** Immediately send us copies of any demands, notices, summonses, subpoenas or legal papers received in connection with the "claim" or "suit";

   **(2)** Authorize us to obtain records and other information;

   **(3)** Cooperate with us in the investigation, settlement, or defense of:

      **(a)** Any "claim" or "suit"; or

      **(b)** Facts or circumstances which may subsequently give rise to a "claim";

   **(4)** Submit to examination or questioning under oath, attend hearings, depositions and trials and assist in effecting settlements, securing and giving evidence and obtaining the attendance of witnesses at deposition and at trial; and

   **(5)** Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to an insured because of "loss" to which this insurance may also apply.

**d.** No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense without our consent.

**2. Settlement - Consent Of The Insured**

   We shall not settle any "claim" without the consent of the insured. If, however, the insured:

   **a.** Refuses to consent to any settlement recommended by us and elects to contest the "claim" or continue any legal proceeding in connection with such "claim", then our liability for the "claim" will not exceed the lesser of the amount for which the "claim" could have been settled or the Limits Of Liability plus the incurred "claims expense" up to the time of such refusal.

   **b.** Cannot be located by us after a search using reasonable diligence, then we will use our best efforts to make such settlement as we deem appropriate considering the circumstances and facts.

**3. Other Insurance**

   This insurance is excess over any other applicable insurance whether such insurance is primary, excess, contributory, contingent, or otherwise and whether such insurance is collectible or not; unless such other insurance is written to be specifically excess over the insurance provided by this policy.

**4. Transfer Of Rights Of Recovery Against Others To Us**

   If the insured has rights to recover all or part of any payment we have made under this policy, those rights are transferred to us. The insured must do nothing after a "wrongful act" to prejudice such rights. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them. Any amounts recovered will be applied to reduce the amount we paid for "loss" and expense (after application of the deductible) before being applied to reduce your deductible.

**5. Cancellation**

   **a.** The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

   **b.** We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

      **(1)** 10 days before the effective date of cancellation, if we cancel for nonpayment of premium; or

      **(2)** 60 days before the effective date of cancellation, if we cancel for any other reason.

   **c.** We will mail or deliver our notice of cancellation to the first Named Insured's last mailing address known to us.

   **d.** The notice of cancellation will state the effective date of cancellation. The "policy period" will end on that date.

   **e.** If this policy is canceled, we will send the first Named Insured any premium refund due. If we cancel, any refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

   **f.** If notice of cancellation is mailed, proof of mailing will be sufficient proof of notice.

## 6. Premium

The first Named Insured shown in the Declarations:

**a.** Is responsible for the payment of all premiums and deductibles; and

**b.** If the premium is not financed, will be the payee for any return premium; but

**c.** If the premium is financed the Named Insured authorizes us to pay any return premium to the premium finance company.

## 7. Nonrenewal

If we decide not to renew this policy, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 60 days before the expiration date. If notice is mailed, proof of mailing will be sufficient proof of notice.

## 8. Your Right To Claim And Wrongful Act Information

Upon written request, we will provide the first Named Insured shown in the Declarations the following information relating to this and any other Insurance Agents and Brokers Errors and Omissions Liability claims-made policy we have issued to you during the previous three years:

**a.** A list or other record of each "wrongful act", not previously reported to any other insurer, of which we were notified in accordance with paragraph **1.a.** of this Section. We will include the date and a brief description of the "wrongful act" if that information was in the notice we received.

**b.** A summary by policy year, of payments made and amounts reserved, stated separately under the applicable Aggregate Limit.

Amounts reserved are based on our judgment. They are subject to change and should not be regarded as ultimate settlement values. You must not disclose this information to any claimant or any claimant's representative without our consent.

If we cancel or elect not to renew this policy, we will provide such information no later than 30 days before the date of policy termination. In other circumstances, we will provide this information only if we receive a written request from the first Named Insured. In this case, we will provide this information within 45 days of receipt of the request.

We compile "claim" and "wrongful act" information for our own business purposes and exercise reasonable care in doing so. In providing information to the first Named Insured, we make no representations or warranties to insureds, insurers, or others to whom this information is furnished by or on behalf of any insured. Cancellation or nonrenewal will be effective even if we inadvertently provide inaccurate or incomplete information.

## 9. Action Against Company

No action shall lie against us unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this policy, nor until the amount of the insured's obligation to pay shall have been finally determined either by judgment after actual trial or by written agreement of the insured, the claimant, and us.

Any person or organization or the legal representative thereof, who is signatory to such judgment or written agreement, shall thereafter be able to recover under this policy to the extent of the insurance afforded by this policy. No person or organization shall have any right under this policy to join us as a party to any action against an insured to determine the insured's liability, nor shall we be impleaded by an insured or an insured's legal representative.

## 10. Bankruptcy

Bankruptcy or insolvency of the insured shall not relieve us of any of our obligations hereunder.

## 11. Changes

This policy embodies all agreements existing between each insured and us or any of our agents relating to this insurance. Only the first Named Insured shown in the Declarations is authorized to request changes in the terms of this policy. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

## 12. Agency Of Named Insured

By acceptance of this policy the first Named Insured agrees to act on behalf of all insureds with respect to the giving and receiving of notices to and from us, the cancellation of this policy, the payment of premiums and deductibles when due, and the receiving of any return premiums that may become due. In addition, all insureds agree that the first Named Insured shall act on their behalf. If the first Named Insured does not comply with the obligations under this policy then each Named Insured agrees that it will be responsible for the payment of premiums and deductibles when due.

**13. Sale, Transfer, Or Assignment**

The controlling interest of any insured under this policy shall not be assignable to any other person without our written consent. In the event of the death or incompentency of the insured, this policy shall cover the insured's legal representative as an insured as respects any liability of that insured which is covered by this policy.

Coverage under this policy ends on the date ownership of (or stock which comprises a controlling interest in) any Named Insured is sold, transferred, or assigned unless our written consent is obtained before said date.

**14. Application**

By acceptance of this policy, you and all insureds affirm as of the effective date of this policy that the statements in the application attached hereto and made a part hereof are each insured's agreements and representations and are binding on each insured. You and all insureds acknowledge that we have issued this policy in reliance upon the truth and accuracy of such representations.

**15. Conformance To Statute**

Any terms of this policy which conflict with the statutes of the state where this policy is issued are hereby amended to conform to such statutes.

**16. Liberalization Clause**

If, after the effective date of this policy or of the latest renewal certificate attached thereto, we adopt revised provisions for this policy form affording broader coverage with no premium increase, then this policy shall be construed in accordance with the revised provisions as of the effective date of such revision.

**17. Notification of Newly Acquired or Formed Organizations**

If you acquire or form a new organization, you shall notify us by either the end of the policy period or 90 days after the effective date of such changes, whichever comes first.

**SECTION VII - EXTENDED REPORTING PERIODS**

1. We will provide an Automatic Extended Reporting Period as described in paragraph **3.**, or if you purchase it, an Optional Extended Reporting Period Endorsement as described in paragraphs **4.** through **7.** below, in the event of any "termination of coverage".

2. If we provide an Extended Reporting Period, a "claim" first made during an Extended Reporting Period will be considered made during the "policy period". Extended Reporting Periods:

**a.** Do not extend the "policy period" or change the scope of coverage provided.

**b.** Apply only to "claims" for "wrongful acts" that occurred:

   **(1)** On or after the Retroactive Date, if any, shown in the Declarations; and

   **(2)** Before the end of the "policy period".

**c.** Apply only as excess insurance over any other valid and collectible insurance available to the insured, whether primary, excess, contingent, or on any other basis, whose policy period begins or continues after the Extended Reporting Period takes effect.

**3. Automatic 60 Day Extended Reporting Period**

The Automatic Extended Reporting Period is provided without additional charge. This period starts upon "termination of coverage" and lasts for sixty (60) days. The Automatic Extended Reporting Period may not be cancelled.

**4. Optional Extended Reporting Period**

If this policy is subject to any "termination of coverage," then you shall have an option to purchase an Optional Extended Reporting Period according to the schedule in **5.** below.

**5. Available Options**

If you purchase the Optional Extended Reporting Period Endorsement, the Optional Extended Reporting Period will start when the Automatic Extended Reporting Period described in Paragraph **3.** above ends and will last:

**a.** Twelve (12) months for a premium of 70% of the last full annual premium;

**b.** Twenty-four (24) months for a premium of 100% of the last full annual premium;

**c.** Thirty-six (36) months for a premium of 130% of the last full annual premium;

**d.** Forty-eight (48) months for a premium of 160% of the last full annual premium;

**e.** Sixty (60) months for a premium of 190% of the last full annual premium; or

**f.** One hundred and twenty (120) months for a premium of 200% of the last full annual premium.

**6. Optional Extended Reporting Period Notice and Acceptance**

a. We will notify you in writing within thirty (30) days of the date of "termination of coverage" of the premium for and provisions of the Extended Reporting Period unless we cancel for nonpayment of premium or fraudulent activities of an insured.

   If the policy is cancelled for nonpayment of premium or fraudulent activities of an insured, we will only provide a premium quotation for the Optional Extended Reporting Period upon your request.

b. You will have until the later of sixty (60) days after the date of "termination of coverage," or thirty (30) days after the date of mailing of the Extended Reporting Period notice provided for above, to request the Optional Extended Reporting Period. Your request must:

   (1) Be submitted to us in writing;

   (2) Show the length of the period of extension desired; and

   (3) Include payment of the premium for the requested extension.

c. If such request and premium payment are not received, the Extended Reporting Period options may not be exercised at a later date.

d. If, in the event of "termination of coverage" you elect to purchase the Optional Extended Reporting Period Endorsement:

   (1) Any return premium due you for the "termination of coverage" will be credited to the premium due for the Optional Extended Reporting Period Endorsement; and

   (2) Any additional premium or Deductible Amount due us for the period the policy was in force must be fully paid before any payments will be applied to the premium due for the Optional Extended Reporting Period Endorsement.

e. The Optional Extended Reporting Period Endorsement will not take effect unless the additional premium is paid when due. If that premium is paid when due, the Endorsement may not be cancelled.

f. The premium for the Optional Extended Reporting Period Endorsement:

   (1) Is determined as shown above or in any endorsement changing the premium because of any change in the nature or extent of the risk during the "policy period";

   (2) Will be commensurate with the coverage provided; and

   (3) Will be fully earned when the Optional Extended Reporting Period Endorsement takes effect.

g. The Optional Extended Reporting Period Endorsement shall set forth the terms, not inconsistent with this Section, applicable to the Optional Extended Reporting Period including a provision to the effect that the insurance afforded for "claims" made during such period is excess over any other valid and collectible insurance available under policies in force after the Optional Extended Reporting Period starts.

**7. Optional Extended Reporting Period Aggregate Limit**

If you purchase the Optional Extended Reporting Period Endorsement, the each "loss" limit shown in the Declarations will continue to apply. Subject to the each "loss" limit, we will provide a single aggregate limit of liability for the entire Optional Extended Reporting Period equal to the Aggregate Limit of Liability entered in the Declarations.

The Optional Extended Reporting Period aggregate limit of liability described above applies only for "claims" first made during the Optional Extended Reporting Period.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# PENNSYLVANIA EMPLOYMENT-RELATED PRACTICES COVERAGE CHANGES - LOSS INFORMATION

This endorsement modifies insurance provided under the following:

EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE PART

Condition **12.** Your Right to "Claim" and "Employment-Related Practice" Information (Section VI) is replaced by the following:

**12. Your Right to "Claim" and "Employment-Related Practice" Information.**

a. When we cancel or non-renew:
Midterm cancellation or nonrenewal notices shall state that, at the insured's request, we shall provide "claim" and "employment-related practice" information to the insured for the lesser of:

**(1)** At least three years; or

**(2)** The period of time during which we have provided coverage to the insured.

This information shall contain:

**(a)** Information on closed "claims," including the date and description of "employment-related practices," and the amounts of payments, if any; stated separately, for "damages" or "defense costs."

**(b)** Information on open "claims," including the date and description of "employment-related practices," and the amount of reserves, if any; stated separately, for "damages" or "defense costs."

**(c)** Information on notices of "claims," including the date and description of "employment-related practices" and the amount of reserves, if any.

The insured's written request for information must be made within 10 days of the insured's receipt of the midterm cancellation or nonrenewal notice. We have 30 days from the date of receipt of the insured's written request to provide the requested information.

b. In other circumstances:
If we receive a written request from the first Named Insured within 60 days after the end of the "policy period" we will provide the first Named Insured, within 45 days of the receipt of the request, the following information relating to this and any preceding Employment-Related Practices Liability claims-made insurance we have issued to you during the previous three years:

**(1)** A list or other record of each "employment-related practice," not previously reported to any other insurer, of which we were notified in accordance with paragraph **2.a.** of the Duties in the Event of "Employment-Related Practices" or "Claims" Condition (Section **VI**). We will include the date and brief description of the "employment related practice" if that information was in the notice we received. We will also include any estimated reserves on reported "employment-related practices."

**(2)** A summary by policy year, of payments made and amounts reserved, stated separately, for "damages" or "defense costs" under any applicable Aggregate Limit.

**(3)** A description of closed "claims" and/or open "claims" including the date and description of "employment-related practices," amount of payment, if any, and an estimate of reserves, if any; stated separately, for "damages" or "defense costs."

Amounts reserved are based on our judgment. They are subject to change and should not be regarded as ultimate settlement values.

We compile "claim" and "employment-related practice" information for our own business purposes and exercise reasonable care in doing so. In providing this information to the first Named Insured, we make no representations or warranties to insureds, insurers, or others to whom this information is furnished by or on behalf of any insured. Cancellation or nonrenewal will be effective even if we inadvertently provide inaccurate information.

THIS NOTICE WITH THE COVERAGE FORM(S), DECLARATIONS PAGE AND
ENDORSEMENT, IF ANY, COMPLETES YOUR POLICY.

**REPUBLIC-FRANKLIN INSURANCE COMPANY**

**DIVIDEND PROVISION - PARTICIPATING COMPANIES:**
The named insured shall be entitled to participate in a distribution of the surplus of the Company, as determined and approved by its Board of Directors from time to time.

**IN WITNESS WHEREOF,** the Republic-Franklin Insurance Company has caused this policy to be signed by its chief executive officer and secretary at Columbus, Ohio, and countersigned on the declarations page by a duly authorized representative of the company.

Secretary

Chief Executive Officer

8-L-936  Ed. 11-2008

Utica Mutual Insurance Company
180 Genesee Street
New Hartford, N.Y.  I34I3

# IMPORTANT INFORMATION TO POLICYHOLDERS

For purposes of inquiries, to obtain
coverage information, and to provide
assistance in resolving complaints.

**Please call 1-800-598-8422**

or Write:
Utica Mutual Insurance Company
PO Box 530
Utica, N.Y.  13503-0530



**Utica National Insurance Group**
Insurance that starts with you.®
Utica Mutual Insurance Company and its affiliated companies, New Hartford, NY 13413
www.uticanational.com • 1.800.598.8422

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# PENNSYLVANIA NOTICE

An Insurance Company, its agents, employees, or service contractors acting on its behalf, may provide services to reduce the likelihood of injury, death or loss. These services may include any of the following or related services incident to the application for, issuance, renewal or continuation of, a policy of insurance:

1. Surveys;
2. Consultation or advice; or
3. Inspections.

The "Insurance Consultation Services Exemption Act" of Pennsylvania provides that the Insurance Company, its agents, employees or service contractors acting on its behalf, is not liable for damages from injury, death or loss occurring as a result of any act or omission by any person in the furnishing of or the failure to furnish these services.

The Act does not apply:

1. If the injury, death or loss occurred during the actual performance of the services and was caused by the negligence of the Insurance Company, its agents, employees or service contractors;
2. To consultation services required to be performed under a written service contract not related to a policy of insurance; or
3. If any acts or omissions of the Insurance Company, its agents, employees or service contractors are judicially determined to constitute a crime, actual malice, or gross negligence.

# EXHIBIT "G"

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| AMERICAN BUILDERS INSURANCE COMPANY, | : | |
| | : | |
| Plaintiff, | : | |
| | : | Civil Action No. _____ |
| vs. | : | |
| | : | |
| KEYSTONE INSURERS GROUP, INC. and EBENSBURG INSURANCE AGENCY, | : | |
| | : | |
| Defendant. | : | **JURY TRIAL DEMANDED** |
| | : | |

## COMPLAINT

American Builders Insurance Company, formerly known as Association

Insurance Company ("American"), through its undersigned attorneys, avers as

follows:

### Nature of the Action

1. American commences this action for:

(a) compensatory damages, consequential damages, pre and

post judgment interest, costs, and attorneys' fees against defendant Keystone

Insurers Group ("Keystone") for breach of contract;

(b)     compensatory damages, consequential damages, pre and post judgment interest, and costs against Keystone and Ebensburg for professional negligence;

(c)     compensatory damages, consequential damages, pre and post judgment interest, and costs against Ebensburg and Keystone for negligent misrepresentation;

(d)     compensatory damages, consequential damages, punitive damages, pre and post judgment interest, and costs against Ebensburg and Keystone for fraudulent misrepresentation.

## The Parties

2.     American is a corporation organized and existing under the laws of the State of Delaware, which maintains its principal place of business at 2410 Paces Ferry Road, SE, Atlanta, Georgia. American is authorized by the Pennsylvania Department of Insurance to sell and issue workers' compensation insurance in the Commonwealth of Pennsylvania. American is a citizen of the States of Delaware and Georgia.

3.     Keystone is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania, which maintains its principal place of business at 1995 Point Township Drive, Northumberland, Pennsylvania. Keystone

-2-

is a citizen of the Commonwealth of Pennsylvania. Keystone is comprised of approximately 300 agency partners, including defendant Ebensburg.

4. Ebensburg is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania, which maintains a principal place of business at 129 E. High Street, P.O. Box 90, Ebensburg, Pennsylvania. Ebensburg is an insurance agency and is a Keystone partner agency. Ebensburg is a citizen of the Commonwealth of Pennsylvania.

## Jurisdiction and Venue

5. This Court has subject matter jurisdiction over this dispute pursuant to 28 U.S.C. §1332(a)(1) because complete diversity of citizenship exists between plaintiff and defendants and the amount in controversy exceeds $75,000 exclusive of interest and costs.

6. This Court has personal jurisdiction over defendants Keystone and Ebensburg because both defendants are Pennsylvania corporations and regularly conduct business in this Commonwealth.

7. Venue is proper in this district pursuant to 28 U.S.C. §1391(b) because Keystone maintains business offices in this district and a substantial part of the events and omissions forming the basis of America's claims occurred here.

-3-

## Factual Background

8.      This action arises out of defendant Keystone's breaches of contractual and professional duties owed to American and defendant Keystone and Ebensburg's negligent and/or fraudulent misrepresentations of material facts that induced American to issue a workers' compensation insurance policy to Custom Installations Contracting Services, Inc. ("Custom Installations"). But for defendants' breaches of duties and misrepresentations of material facts, American would not have issued the workers' compensation insurance policy to Custom Installations. Defendants' actions have caused American to sustain damages in an amount yet to be determined, but believed to be in excess of $1 million.

9.      On or about June 16, 2008, Keystone entered into an Agency Agreement with Builders Insurance Group, Association Insurance Company (now known as American Builders Insurance Company), and Vinings Insurance Company. A true and correct copy of the Agency Agreement is attached hereto as Exhibit A.

10.      Keystone is a partnership of approximately 300 insurance agencies. Keystone supports its partner agencies with "expertise and insight." Keystone bolsters its partner agencies with added resources, creates and manages specialty insurance programs, and trains agents to become product experts.

-4-

Keystone also provides its partner agencies with "risk management offerings" to improve its partner agencies' the ability to attract and return business.

11.    In the Agency Agreement, American grants Keystone the authority to solicit, receive, and accept proposals for insurance, including workers compensation insurance. *See* Agency Agreement, § 1.1 (Exhibit A). Keystone's authority is limited by the underwriting rules and guidelines of American and the terms and conditions contained in the Agency Agreement. *Id.*

12.    Keystone delegates to its partner agencies its authority under the Agency Agreement to solicit, receive, and accept proposals for insurance.

13.    Under the Agency Agreement, Keystone and its partner agencies, including Ebensburg, receive a commission based on the premium for the insurance policies that it helps to place. *See* Agency Agreement, § 1.3 and § 2.2 (Exhibit A).

14.    The Agency Agreement has an implied duty of good faith and fair dealing that, among other things, imposes on Keystone the duty to provide accurate information to American in soliciting proposals for insurance coverage made by Keystone and its partner agencies.

15.    Ebensburg is an insurance agency that has obtained insurance policies for businesses and individuals in the Commonwealth of Pennsylvania for

over 50 years. A substantial portion of Ebensburg's business involves obtaining workers' compensation insurance for Pennsylvania businesses.

16. As one of Keystone's partner agencies, Ebensburg has the actual, apparent, and/or ostensible authority to submit insurance proposals to American.

17. Custom Installations has been a client of Ebensburg since at least 2012. Custom Installations engages in the roofing business, among other things.

18. Before 2015, Custom Installations obtained its workers' compensation insurance from the Pennsylvania State Workers' Insurance Fund or SWIF. Upon information and belief, prior to 2015, Custom Installation stated on its workers' compensation insurance applications that it was engaged in the roofing business and that its employees worked over 15 feet above the ground.

19. Premiums for insurance obtained through SWIF are higher than private insurance companies, and insurance agencies such as Ebensburg do not receive commissions when their clients obtain SWIF workers' compensation insurance. As a result, in our about June 2015, Ebensburg sought to obtain workers' compensation insurance for Custom Installations from a private insurer.

-6-

20.     In an attempt to procure workers' compensation insurance for Custom Installation, one or more Ebensburg's employees took information from Custom Installation's prior applications to SWIF and completed applications to approximately four insurers, including American.

21.     On one or more applications submitted to insurance companies other than American, Ebensburg accurately stated that Custom Installations' business involves roofing work and that its employees work over 15 feet above the ground.

22.     On one such application, another insurer declined to provide coverage because, among other reasons, Custom Installations is involved in "higher than normal roofing work."

23.     On Custom Installations' behalf, Ebensburg completed American's Workers Compensation Application ("Application") by providing narrative answers to certain and specific questions contained within the Application and also contained in associated documents, including but not limited to an Underwriter Questionnaire ("Questionnaire") and Risk Questionnaire ("Risk Questionnaire"). The Application, Questionnaire, and Risk Questionnaire are attached hereto and are marked Exhibits B, C & D respectively.

-7-

24. The information sought by American in the Application,

Questionnaire and Risk Questionnaire was essential to allow it to determine

whether to provide workers' compensation insurance for the type of work

identified in the application and also to allow it to underwrite accurately the risk to

be insured under the Policy.

25. The Application contains a section titled "Nature of

Business/Description of Operations" that required Custom Installations to

comment and provide a description regarding its work. Specifically, this section

provides:

> Give Comments And Descriptions of Business,
> Operations and Products, Manufacturing — Raw
> Materials & Processes, Product, Equipment, Contractor-
> Type of Work, Sub-Contracts, Mercantile-Merchandise,
> Customers, Deliveries, Service — Type, Location, Farm-
> Acreage, Animals, Machinery, Sub-Contracts.

Ebensburg answered this question on Custom Installations' behalf by inserting the

phrase "Commercial Remodeling." *See* Exhibit B.

26. In the General Information section of the Application, Custom

Installation was asked "[is] any work performed . . . above 15 feet." Ebensburg

answered "No" for Custom Installations. *See* Exhibit B, p. 3.

-8-

27. In the Questionnaire and Risk Questionnaire Custom Installation was asked several questions regarding the nature of its work and was asked specifically whether it performed worked above a specific, defined height.

28. Question 3 on the Questionnaire asked Custom Installations whether "[a]ny [of its] work [was] performed . . . above 15 feet?" On Custom Installations' behalf, Ebensburg reaffirmed the answer provided in the Application and again answered "No." *See* Exhibit C, p. 1.

29. Question 3.1 on the Questionnaire asked Custom Installations "[w]hat is the maximum height [of your work]?" Again, on Custom Installation's behalf, Ebensburg reaffirmed the answer provided in the Application and affirmatively answered "15 FT." *See* Exhibit C, p. 1.

30. Question 6 on the Questionnaire asked Custom "[a]re subcontractors used?" Custom answered "No."

31. Question 1 on the Risk Questionnaire asked Custom Installations whether "[a]ny exterior work [was performed] above 3 stories?" On Custom Installations' behalf, Ebensburg answered "No." *See* Exhibit C.

32. Question 4 on the Risk Questionnaire asked Custom whether "[] roofing [was] performed by [its] own employees?" Custom answered "No."

-9-

33.     In Question 6 of the Questionnaire and Question 4 of the Risk

Questionnaire Custom Installations represented through Ebensburg that it did not

perform any roofing work — directly through its employees or indirectly through

subcontractors.

34.     The Application ends with the following statement and

admonition:

> ANY PERSON WHO KNOWINGLY AND WITH
> INTENT TO DEFRAUD ANY INSURANCE
> COMPANY OR ANOTHER PERSON FILES AN
> APPLICATION FOR INSURANCE OR STATEMENT
> OF CLAIM CONTAINING ANY MATERIAL FALSE
> INFORMATION OR CONCEALS FOR THE
> PURPOSE OF MISLEADING INFORMATION
> CONCERNING ANY FACT MATERIAL THERETO,
> COMMITS A FRAUDULENT INSURANCE ACT,
> WHICH IS A CRIME AND SUBJECTS THE PERSON
> TO CRIMINAL AND CIVIL PENALTIES.

35.     Custom, through its corporate secretary, Michael F. Bichko,

signed the application beneath the foregoing statement and admonition and in

doing so represented that each answer provided in the Application, Questionnaire

and Risk Questionnaire, including the answers referenced above in paragraphs 15

through 13, (collectively "Answers") were true, correct and accurate.

36.     Custom Installations' Answers, provided by Ebensburg, which

generally misrepresented the nature of its work and specifically misrepresented

that Custom Installations did not perform roofing work or work above the defined

height of 15 feet, contained essential facts that formed the inducement for
American to issue the Policy to Custom Installations.

37. As a matter of business policy, American does not contract to
sell workers' compensation insurance policies to companies that engage in roofing
work or work above the defined height of 15 feet and does not issue workers'
compensation insurance coverage for such work.

38. American did not learn that Ebensburg completed the
Application, Questionnaire, and Risk Questionnaire for Custom Installations until
the November 7, 2017 depositions of Ebensburg employees Karen Ligda and
Kurtis Deyulis.

39. On July 20, 2015, American issued Custom Installations a
workers' compensation insurance policy identified by number WCV-0196284-00
(the "Policy"). American issued the Policy in reliance on the accuracy of the
information contained in the Application, the Questionnaire, and the Risk
Questionnaire that Custom Installations does not engage in the roofing business
and its workers do not work more than 15 feet above ground.

40. Because of the above-described misrepresentations of material
fact, American has sued Custom Installations in this Court, Civil Action No. 3:15-
cv-00295 for rescission of the workers' compensation insurance policy and for

-11-

fraud (the "Custom Installations Lawsuit"). In the Custom Installations Lawsuit, Custom Installation has admitted that its application to American contains false information.

41. Upon information and belief, Custom Installations intended to provide American with true, correct and accurate answers to the questions contained on the Application, Questionnaire and Risk Questionnaire, but did not.

42. At the time American and Custom Installations formed their contractual relationship, American intended to sell and issue the Policy to Custom based solely on the information provided by Custom on the Application, Questionnaire and Risk Questionnaire.

43. At the time American and Custom formed the subject contractual relationship, American intended only to provide Custom Installations with workers' compensation coverage that related to the specific type of risk it insured in Pennsylvania and only with workers' compensation insurance coverage of the type it sold in Pennsylvania.

44. American issued the Policy to Custom Installation based on materially false information provided in the Application, Questionnaire and Risk Questionnaire.

-12-

45.   If American had known accurate information relating to Custom Installations' business, it would not have issued the Policy to Custom Installations.

46.   By virtue of the Agency Agreement, Keystone maintains express and implied contractual obligations to provide accurate information on the clients of its partner agencies to American in making proposals for the issuance of insurance policies.  Moreover, Keystone owes professional duties to American to ensure that the information contained in proposals submitted to American is accurate.

47.   Keystone breached its contractual and professional duties to American when Ebensburg, its partner agency, submitted materially false information in its proposal for the issuance of a workers' compensation policy to Custom Installations.

48.   Ebensburg owed a duty to American to use reasonable care in submitting information on Custom Installations in applying for workers compensation insurance.  Ebensburg failed to utilize reasonable care in submitting information to American.

49.   Alternative, Ebensburg intentionally and/or recklessly submitted materially false information on Custom Installations to American for the

-13-

purpose of inducing American to issue the Policy, which enabled Ebensburg to earn a commission.

50.     Keystone is vicariously liable for the negligent and/or fraudulent misrepresentations of material fact made by its agent Ebensburg.

51.     On or about September 8, 2015, less than two months after the effective date of the Policy, Custom Installations' employee, James Scott, Jr. ("Scott") is alleged to have sustained injury while performing roofing work and falling from his work location, which was approximately 25 feet above the ground.

52.     Following his injury, Scott made a claim for workers' compensation benefits to American.

53.     Based on information available to it at the time of Scott's injury and pursuant to the Policy, America made the following payments on Custom Installations' behalf directly to Scott or on his behalf:

     (a)     Wage indemnity - $ 10,945.95; and

     (b)     Medical payments: $ 1,008,268.68.

54.     Upon information and belief, Scott may submit additional claims against and argue entitlement to be paid under the Policy.

## Count One
### (Breach of Contract)
### American v. Keystone

55.     American incorporates by reference the above paragraphs as if set forth fully herein.

56.     The Agency Agreement is a valid and enforceable contract between American and Keystone by which American authorized Keystone to make proposals for the issuance of insurance on behalf of Keystone's clients.

57.     Keystone's business is comprised of approximately 300 partner agencies, including Ebensburg. Keystone entered into the Agency Agreement with the express purpose of enabling its partner agencies to submit proposals for insurance to American and other related insurance companies. But for the Agency Agreement, Ebensburg would not be authorized to make proposals for the issuance of insurance policies to American.

58.     Keystone authorizes its member agencies, including Ebensburg, to submit proposals to issue insurance policies directly to American.

59.     The proposals for the issuance of insurance policies made by Keystone and its partner agencies involve the submission of applications, questionnaires, and risk questionnaires to American, which contain information on the proposed insured to enable American to decide whether it issue a policy or decline to issue a policy.

-15-

60. The Agency Agreement is engrafted with an implied covenant of good faith and fair dealing, which among other things, obligates Keystone and its member agencies to submit accurate information on their clients on the applications, questionnaires, and risk questionnaires, upon which Keystone and its member agencies know American will rely in decided whether it issue insurance policies.

61. Keystone breached its contractual obligations, including its implied covenant of good faith and fair dealing, to American when Ebensburg submitted the Application, the Questionnaire, and the Risk Questionnaire to American containing materially inaccurate information.

62. As a direct and proximate result of Keystone's contractual breaches, American has sustained damages in an amount in excess of $1 million.

63. Under the Agency Agreement, Keystone agrees to indemnify, defend, and hold American harmless against "any and all claims, demands, actions, proceedings, liability, losses, damages, fines and penalties, costs or expenses, including without limitation, attorneys' fees, disbursements, and court costs, made or instituted against or incurred by ... [American] and which arise out of any action or inaction of the Agency or any agent or their employees, representatives, in connection with any obligations of the Agency arising out of this Agreement." *See* Agency Agreement, § 4.7 (Exhibit A).

64.     Pursuant to the indemnity provision in the Agency Agreement, Keystone is obligated to indemnify American for all damages, including costs and attorneys' fees, relating to its partner agency Ebensburg's submission of material false information in its proposal to issue insurance to Custom Installations.

WHEREFORE, for the foregoing reasons, American requests this Court to enter judgment in its favor and against Keystone for compensatory and consequential damages in excess of $75,000, pre and post judgment interest, costs, and attorneys' fees. American also requests this Court to grant such further relief as it deems to be just and proper.

## Count Two
### (Professional Negligence)
### American v. Keystone and Ebensburg

65.     American incorporates by reference the above paragraphs as if set forth fully herein.

66.     As insurance brokers, Keystone and Ebensburg owe professional duties to use reasonable care in the submission of information contained in applications, questionnaires, and risk questionnaires to American for the purpose of obtaining insurance policies for its clients and the clients of its approximately 300 partner agencies.

-17-

67.     Upon information and belief, Keystone delegated the obligation to submit accurate information to American to its partner agency Ebensburg for its clients.

68.     Keystone has a legal duty to American to supervise its partner agencies who it permits to submit proposals to issue insurance to American under the Agency Agreement and touts on its website the steps it takes to bolster its partner agencies, create and manage insurance programs for its member agencies, train agents to become product experts, and provide risk management offerings to improve its partners' ability to attract and retain business.

69.     Ebensburg has a legal duty to American use reasonable care to ensure that the information that it places onto applications, questionnaires, and risk questionnaires proposing insurance is accurate and complete.

70.     Ebensburg breached its professional duties to American when it submitted materially inaccurate information to American in support of the proposal to issue workers' compensation insurance to Custom Installations.

71.     Keystone breached its professional duties owed to American when Ebensburg failed to submit accurate information in support of the proposal to issue workers' compensation insurance to Custom Installations and/or by failing to

use due care in the delegation to and/or supervision of Ebensburg in acting as an insurance agent for American.

72. As a direct and proximate result of Keystone's and Ebensburg's breaches of their respective professional duties, American has sustained damages in an amount in excess of $1 million.

WHEREFORE, for the foregoing reasons, American requests this Court to enter judgment in its favor and against Keystone and Ebensburg for compensatory damages and consequential damages in excess of $75,000, pre and post judgment interest, and costs. American also requests this Court to grant such further relief as it deems to be just and proper.

## Count Three
### (Negligence Misrepresentation)
### American v. Ebensburg and Keystone

73. American incorporates by reference the above paragraphs as if set forth fully herein.

74. In connection with presenting a proposal to American to issue workers' compensation insurance to Custom Installations, Ebensburg prepared and submitted to American the Application, Questionnaire, and Risk Questionnaire, all of which contained information pertaining to Custom Installations' business and the risk to American in issuing a workers' compensation insurance policy.

-19-

75.     Ebensburg knew that American would be relying on the accuracy of the information contained in the Application, Questionnaire, and the Risk Questionnaire and submitted these documents to induce American to issue the Policy, for which Ebensburg would receive a commission.

76.     Ebensburg failed to utilize reasonable care to ensure that the information contained in the Application, the Questionnaire, and the Risk Questionnaire was accurate. In fact, the Application, Questionnaire, and the Risk Questionnaire contain materially false information, including the misrepresentations that Custom Installations is not involved in the roofing business, and its employees do not work more than 15 feet above the ground.

77.     Ebensburg was negligent in submitting materially false information to American in the Application, the Questionnaire, and the Risk Questionnaire.

78.     Ebensburg is the actual, apparent, and/or ostensible agent of Keystone, and Keystone is vicariously liable for Ebensburg's misrepresentations.

79.     American does not issue workers' compensation insurance policies to companies engaged in the roofing business, and but for the material misrepresentations in the Application, Questionnaire, and the Risk Questionnaire,

and American's reasonable reliance thereon, American would not have issued the
Policy to Custom Installations.

80.     Subsequent to issuing the Policy, Scott, a Custom Installations
employee, was working on a roof, fell approximately 25 feet, and sustained grave
injuries. Scott made a claim for workers' compensation benefits, and to date,
American has paid $10,945.95 for wage indemnity and $1,008,268.68 for medical
expenses. Upon information and belief, Scott may submit additional claims
against and argue entitlement to be paid under the workers' compensation policy.

81.     As a direct and proximate result of Ebensburg's negligent
misrepresentations of material facts, American has sustained damages in an
amount yet to be determined but believed to be well in excess of $1 million.

WHEREFORE, for the foregoing reasons, American requests this Court to
enter judgment in its favor and against Ebensburg and Keystone for compensatory
and consequential damages in excess of $75,000, pre and post judgment interest,
and costs.

## Count Four
### (Fraudulent Misrepresentation)
### American v. Ebensburg and Keystone

82.     American incorporates by reference the above paragraphs as if
set forth fully herein.

-21-

83.    In connection with presenting a proposal to American to issue

workers' compensation insurance to Custom Installations, Ebensburg prepared and

submitted to American the Application, Questionnaire, and Risk Questionnaire, all

of which contained information pertaining to Custom Installations' business and

the risk to American in issuing a workers' compensation insurance policy.

84.    Ebensburg knew that American would be relying on the

accuracy of the information contained in the Application, Questionnaire, and the

Risk Questionnaire and submitted these documents to induce American to issue a

workers' compensation insurance policy, for which Ebensburg would receive a

commission.

85.    Ebensburg intentionally and/or recklessly misrepresented

material facts concerning Custom Installations' business in the Application, the

Questionnaire, and the Risk Questionnaire, including misrepresentation that

Custom Installations is not involved in the roofing business, and its employees do

not work more than 15 feet above the ground.

86.    Ebensburg intentionally and/or recklessly misrepresented

material facts to American to induce American to issue the workers' compensation

policy to Custom Installations so that Ebensburg could earn a commission to which

it would not otherwise be entitled to and so that Ebensburg could otherwise

generate income from its relationship with Custom Installations.

87.   Ebensburg is the actual, apparent, and/or ostensible agent of
Keystone, and Keystone is vicariously liable for Ebensburg's misrepresentations.

88.   American does not issue workers' compensation insurance
policies to companies engaged in the roofing business, and but for the material
misrepresentations in the Application, Questionnaire, and the Risk Questionnaire,
and American's reasonable reliance thereon, American would not have issued the
workers' compensation insurance policy to Custom Installations.

89.   Subsequent to issuing the workers' compensation policy, Scott,
a Custom Installations employee, was working on a roof, fell approximately 25
feet, and sustained grave injuries. Scott made a claim for workers' compensation
benefits, and to date, American has paid $10,945.95 for wage indemnity and
$1,008,268.68 for medical expenses. Upon information and belief, Scott may
submit additional claims against and argue entitlement to be paid under the
workers' compensation policy.

90.   As a direct and proximate result of Ebensburg's fraudulent
misrepresentations of material facts, American has sustained damages in an
amount yet to be determined but believed to be well in excess of $1 million.

91.    Ebensburg's actions in misrepresenting material facts to
American are so outrageous, intentional, willful, wanton, reckless, grossly
negligent that they warrant the imposition of punitive damages.

WHEREFORE, for the foregoing reasons, American requests this Court to
enter judgment in its favor and against Ebensburg and Keystone for compensatory
and consequential damages in excess of $75,000, punitive damages, pre and post
judgment interest, and costs.

**WHITE AND WILLIAMS LLP**

Of Counsel:

BY:

Thomas B. Fiddler
White and Williams LLP
One Liberty Place | 1650 Market St.
Suite 1800
Philadelphia, PA 19103
(215) 864-7081

Konrad R. Krebs (PA #319253)
One Liberty Place | 1650 Market St.
Suite 1800
Philadelphia, PA 19103-7395
krebsk@whiteandwilliams.com
(215) 864-7018
*Attorneys for Plaintiff*
*American Builders Insurance*
*Company*

Dated: August 28, 2019

EXHIBIT "A"

1542 / 1543

RECEIVED

MAY 2 8 2008

BUILDERS INSURANCE GROUP


*Builders Insurance Group*

RECEIVED

MAY 2 8 2008

BUILDERS INSURANCE GROUP,

## Agency Agreement

This agreement (this "Agreement") is entered into by and between one or more of Builders Insurance (A Mutual Captive Company), Association Insurance Company, and Vinings Insurance Company (hereinafter referred as the "Insurer(s)") and __KEYSTONE INSURERS GROUP__ (Agency). The Insurers and the Agency are sometimes collectively referred to as the "Parties."

### WITNESSETH

WHEREAS, Builders Insurance Group, Inc. (the "Company") has entered into an administrative service agreement with the Insurers to provide administrative services in the name of and on behalf of the Insurers;

WHEREAS, the Insurer desires to utilize the services of the Agency to solicit proposals for the line of coverage specifically enumerated in the Attachment to this Agreement; and

WHEREAS, the Agency is a licensed insurance agent, agency or broker in the respective state.

NOW, THEREFORE, in consideration of the mutual promises herein contained, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties do hereby agree as follows:

### I. AUTHORITY AND DUTIES OF THE AGENCY

1.1 Authority to solicit proposals. The Insurer hereby grants to the Agency the authority to solicit, receive and accept proposals for insurance covering such lines of business in such states as the Insurer may, from time to time, authorize to be written, provided that the Agency and the Insurer are duly licensed where such coverage is solicited or accepted in each such state. The Agency's authority shall be limited by the underwriting rules and guidelines of the Insurer and by the terms, conditions, and provisions as set forth in this Agreement.

1.2 Authority and duties with respect to binding coverage. The Agency shall have no authority, actual or apparent; to bind the Insurer to any new or renewal coverage or to otherwise commit the Insurer to insure an applicant without receiving prior written approval from the Company's authorized personnel. Subject to the terms and conditions of this Agreement, and the underwriting rules and guidelines of the Insurer, the Agency, upon release of the premium quote by the Company, may offer coverage through the Insurer, provided, that the Agency has received from the Company an authorized quote prepared subsequent to or upon the Company's underwriting approval, and provided that the coverage offered reflects those terms as set forth in the authorized quotation. Such authorized quotation from the Company to the Agency shall be valid for a period of not more than thirty (30) days from the date of its issue, or for such other period as may be stated in the premium quote or otherwise mandated by applicable law. The Agency shall forward copies of all binders and certificates issued to applicants by the Agency and otherwise notify the Company of all liability accepted not later than three (3) business days following the effective date of coverage. The Agency shall not cancel, non-renew, or attempt to cancel or non-renew any policy, except with the written authority of the Company, the Insurer or the policyholder.

1.3 Premiums and commission. Any and all premiums and return premiums received by the Agency, either before, during or subsequent to the termination of this Agreement, shall be held in a fiduciary capacity as trustee for the Insurer. The Agency shall promptly remit to the Company or the policyholder, respectively, any premium or return premium so held. The Agency shall pay to the Company all amounts due as return commission on cancelled policies or reductions in premiums at the same rate at which commissions were originally retained. As and when reasonably requested by the Company, the Agency shall use its best efforts to collect premium from any policyholder with regard to business placed with the Insurer pursuant to this Agreement and shall assist the Company in obtaining full cooperation and compliance from the policyholder with regard to payroll audits, if any.

1.4 The Agency's Duty to Report. The Agency shall have a duty to report any and all claims against the Insurer under coverage sold by the Agency. The Agency shall promptly report such claims to the Company, but in no event shall such claims be reported more than thirty (30) days after Agency becomes aware of the facts potentially giving rise to a claim. The Agency shall also have a duty to notify the Company of any material change in the business of a policyholder. Such material changes are those that may affect the coverage of the policyholder under the coverage as written by the Insurer. The Agency shall promptly report such material changes to the Company, but in no event shall such material changes be reported more than thirty (30) days after the Agency becomes aware of the changes.

1.5 Advertising. The Agency shall not use the name, trade name, logo, trademark or any other such information of the Company or the Insurer in any advertisement, marketing material, literature or other media without the express prior written consent of the Company or the Insurer.

## II. DUTIES OF BUILDERS INSURANCE GROUP, INC.

2.1 Billing and collection. The Company shall be responsible for generating and mailing premium invoices directly to the policyholder (direct bill), unless the Company notifies the Agency of its election to generate and mail premium invoices otherwise (agency bill). With respect to direct bill policies, a copy of annualized estimated and final audit bills will be mailed to the Agency upon request.

2.2 Commission Schedule. The Company shall compute and pay to the Agency commission in accordance with the Schedule of Commission as set forth in the Attachment to this Agreement, or as otherwise agreed to in writing by the Parties. The Company may, from time to time, revise or modify the Commission Schedule by providing a revised Commission Schedule to Agency by first class mail, fax, email or overnight delivery service, at the most recent address on file with the Company; such revised Commission Schedule to apply to all transactions which occur on or after the effective date set forth in such Commission schedule, which date shall be not less than 30 days after date the revised Commission Schedule is distributed.

2.3 Commission Payment. Commission will be paid based upon the amount collected by the Company from the policyholder, provided that the Company has not resorted to the use of a professional debt collector, attorney or other similar action in efforts to collect the premium, in which case, no commission will be paid to the Agency. No commission will be paid to the Agency with respect to premium subject to any bankruptcy proceeding. Payment shall be mailed to the Agency within thirty (30) days after the end of the calendar month in which the premiums are received and recorded by the Company, less commission on return premium or overpayment.

## III. TERMINATION OR SUSPENSION

3.1 Grounds for termination. This Agreement shall terminate:

a) Automatically and without notice if the Agency's license or authorization to engage in insurance business is terminated, canceled, suspended, revoked or declined renewal by a regulatory authority in any state.

b) Automatically and without notice on the effective date of the sale or transfer of the Agency or a substantial portion of the Agency's business or its consolidation with a successor firm, unless this Agreement is assigned to the buyer, transferee or successor with the prior written consent of the Company.

c) Automatically and without notice, with respect to the Insurer and any corresponding line of business provided for in the Attachment to this Agreement, in the event the service or management agreement between the Company and the Insurer is terminated. Any termination of a service or management agreement between the Company and any one or more Insurers shall not have the effect of terminating this agreement with respect to any other Insurer(s).

d) Immediately upon either party giving written notice to the other in the event of abandonment, fraud, insolvency, gross or willful misconduct or material breach of this Agreement on the part of such other party.

e) Upon either party giving not less than thirty (30) days prior written notice to the other, or such other period as may be required by applicable law. Such notice shall include the date of the notice and the effective date of

termination. Such notice shall be deemed duly given when mailed by certified mail, return receipt requested, to the party at the address provided hereafter.

3.2 **Effect of termination.** In the event that this Agreement is terminated pursuant to Section 3.1(e), the provisions hereof shall continue until all policies written hereunder have expired and all final audits, billings and retrospective adjustments have been completed, billed, paid, and/or remitted for direct collection of earned premium. However, any reference or implied consent in this Agreement or the Attachment which refers to the Agency's authority to solicit and accept proposals shall be deemed null and void from the effective date of termination.

3.3 **Accounting and payment.** Not later than five (5) business days after the effective date of the termination of this Agreement, the Agency shall account for and pay to the Company all premiums and other monies or securities collected by the Agency or held for or on behalf of the Company or the Insurer.

3.4 **Suspension.** If the Agency becomes delinquent in accounting or payment of monies due to the Company or the Insurer, the Company or the Insurer may immediately suspend the Agency, suspend this Agreement in its entirety, or suspend any provision or provisions hereof as deemed necessary in the sole discretion of the Company or the Insurer.

3.5 **Ownership of documents and records.** In the event of suspension or termination of this Agreement as provided above, the Agency's records and use and control of expirations shall remain the property of the Agency and shall remain in its possession, provided that the Agency has then rendered and continues to render timely accounts and payments of all amounts due the Company and the Insurer. Otherwise, the said records and use and control of expirations of business shall become vested in the Insurer, if, in disposing of such records and expirations, there is a deficiency with respect to debt or money owed to the Company or the Insurer, the Agency shall remain liable for the balance of such indebtedness. Any amount realized in excess of such indebtedness, less expenses, shall be returned to the Agency. All policy forms, manuals, membership agreements, endorsements or other supplies furnished to the Agency by the Company or the Insurer shall at all times remain the property of the Insurer and shall be returned within five (5) days after the effective date of termination or suspension, or immediately upon demand made by the Company or the Insurer.

## IV. GENERAL PROVISIONS

4.1 **Rules of construction.** Any and all references in this Agreement to the Insurer, line of business, state and Schedule of Commissions shall be deemed to refer to the specific Insurer, line of business, state and Schedule of Commission as enumerated in any and all Attachments to this Agreement, respectively. Wherever used in this Agreement, the singular shall include the plural, and the plural shall include the singular; and any reference to a particular gender shall include each and every other gender. The section headings used herein are provided for convenience only and shall have no bearing on the construction of this Agreement. This Agreement contains the entire agreement with respect to the subject matter hereof and supersedes all previous agreements regarding the same or similar subject matter made between the Parties.

4.2 **Independent contractor.** The Agency is an independent contractor and not an employee of the Company or the Insurer. The Agency's sole remuneration shall be the commission as set forth in the Attachment to this Agreement. Expenses incurred by the Agency shall be borne solely by the Agency and not by the Company or the Insurer.

4.3 **Designation of agent or agency of record.** In the event of a dispute as to which agent or agency is authorized to represent an existing or prospective policyholder as the agent of record, the policyholder's written statement designating an agent or agency shall be binding upon the Parties and the Company, provided that, at all times relevant, the designated agent or agency remains duly licensed in the respective state and appointed by the Insurer. Unless otherwise prohibited by law, the Company shall exercise exclusive discretion over whether to recognize an amendment or change to the designation of the agent of record prior to the expiration, termination or renewal of a policy.

4.4 **Professional liability.** The Company and the Insurer shall not be responsible for the errors and omissions of the Agency. The Agency agrees, warrants and represents that it has obtained and will continue to maintain professional liability insurance in an amount with limits of not less than one million dollars ($1,000,000.00) per claim with an insurer acceptable to the Company and the Insurer. A copy of the policy or a certificate of insurance shall be provided to the Company upon execution of this Agreement, on or about each anniversary thereafter, and at such other times as may be reasonably requested by the Company. Failure to provide a copy of the above listed documentation shall

result in an immediate termination of this Agreement at the option of the Company or the Insurer.

4.5 **Governing law and costs of litigation.** This Agreement shall be governed in accordance with the law of the state of Georgia. Any action to enforce this agreement may be brought in the District Court of the state of Georgia in Fulton County, or, if in federal court, in the United States District Court for the Northern District of Georgia. In the event of any litigation with regard to the subject matter hereof, the prevailing party shall be entitled to recover costs and reasonable attorneys' fees from the other party.

4.6 **Severability.** The invalidity or unenforceability of any particular provision of this Agreement shall not affect the validity or enforceability of any other provision hereof; and this Agreement shall be construed in all respects, to the extent possible, as if such invalid or unenforceable provision were omitted or were amended in compliance with the law.

4.7 **Indemnification and Hold Harmless With Respect to Builders Insurance Group, Inc. et. al.** The Agency shall indemnify, defend, and hold the Company, and its subsidiaries, affiliates, successors, insurers, reinsurers and assignees (including but not limited to the Insurer), as well as their shareholders, directors, officers, employees and agents harmless against and in respect of any and all claims, demands, actions, proceedings, liability, losses, damages, fines and penalties, costs or expenses, including without limitation, attorney's fees, disbursements, and court costs, made or instituted against or incurred by the Company or the Insurer(s) or such other indemnities and which arise, either directly or indirectly, out of any action or inaction of the Agency or any agent, or their employees or representatives, in connection with any obligations of the Agency arising out of this Agreement.

4.8 **Hold Harmless With Respect to Insurer.** The Agency shall have no claim or cause of action against the Insurer, and the Agent shall look solely to the Company and hold the Insurer harmless for any and all claims, expenses, costs, liabilities, causes of action and damages, including but not limited to extra-contractual damages or losses in excess of policy limits, that the Agency incurs which arise in any manner from actions taken or not taken by the Insurer or the Company.

4.9 **Collateral Assignment.** Pursuant to the Company's agreement with the Insurer, Builders Insurance Group Inc. has collaterally assigned jointly to the Insurer all rights and remedies it may have now or in the future against any Agency, under any contract between the Company and the Agency, or otherwise, relating in any manner to the policies. Such collateral assignment shall be fully effective and enforceable automatically and immediately if Builders Insurance Group, Inc. defaults in fulfilling any of its obligations to the Insurer. The Agency hereby agrees to be bound by and to comply with such assignment upon notice from the Insurer to the Agency that the assignment has become effective.

4.10 **Amendments Deemed Accepted.** From time to time the Insurer may make Amendments to this Agreement. Such Amendments will be mailed to the Agency pursuant to the provisions of Section 4.11 of the Agreement. The Agency shall have ninety (90) days to notify the Insurer of their non-acceptance of such Amendments. Should such notice of non-acceptance not be received by the Insurer, the Amendment(s) shall be deemed accepted.

4.11 **Notices.** Notice to any Party provided pursuant to this Agreement shall be deemed duly given when mailed via United States Postal Service, certified mail, return receipt requested as follows:

If to the Insurer, in care of the Company:

Builders Insurance Group, Inc.: Builders Insurance Group
2410 Paces Ferry Rd. Suite 300
Atlanta, GA 30339-4098
Attention: Agency Services

If to the Agency:

Either party may change its notice address by mailing notice of the new address to the other party as aforesaid.

1542 / 1543

4.12   Warranty. The Parties, by signing below, warrant that they are authorized to execute this Agreement.

IN WITNESS WHEREOF, the Parties have entered into this Agreement on the _____ day of _____,
_____ and it shall become effective on the _____ day of _____, _____.

Agency: Keystone Insurance Group

Signature: _Lea Ann Hawk_

Printed name: _Lera Ann Hawk_

Operations Officer
Title:

05-22-08
Date:

Insurer: BUILDERS INSURANCE GROUP

Signature: _Tom Maupin_

Printed name: _SP VP MARKeting_

Title: 6/16/08

Date:

Witness

Signature: _Holly L VanGilder_

Printed name: _Holly L VanGilder_

Witness

Signature: _Ericka Billue_

Printed name: _Ericka Billue_

Builders
Insurance
Group



*1542*

Builders
Insurance
Group

### BUILDERS INSURANCE GROUP
### 2008 VIRGINIA AGENCY PROFIT SHARING AGREEMENT

This Profit Sharing Agreement (hereinafter referred to as the "Agreement") is by and between you, our Agent (hereinafter referred to as "You" or "Your"), and the member companies of Builders Insurance Group set forth below (hereinafter referred to as "We," "Us," or "Our") that have appointed You as Our licensed representative under applicable state laws and regulations.

### I. PROFIT SHARING AWARD

To be eligible for an Award under this Agreement, You must have:
(i)   a minimum combined total of $250,000 of In-Force Premiums with any of the Builders Insurance Group member companies as of the Annual Evaluation Date;
(ii)  earned Premiums for the most recent year of at least $125,000;
(iii) an active Agency Agreement at the time of payment of the Award;
(iv)  a Loss Ratio of 45% or less for the Experience Period

### II. DEFINITIONS

**A. Agency Tier** (see Exhibit I) The table used to determine Your Profit Sharing Award shall be determined by Your In-Force Premium as of December 31 of Year One of the Experience Period.

**B. Earned Premiums** are calendar-year premiums related to all exposures recorded or estimated during the Experience Period.

**C. Claims Evaluation Date** shall be March 31 for all claims activity occurring during the most recently completed Experience Period.

**D. Experience Period** is the most recently concluded calendar year plus the two preceding calendar years. The most recent year shall be referred to as Year One, the middle year as Year Two and the most distant year as Year Three.

**E. Incurred Losses** include:

1.  Direct losses, case reserves and allocated loss adjustment expenses paid during the Experience Period.

2.  Change in case reserves during the Experience Period.

3.  Other Expenses – Additional costs or charges incurred by Us for:

    •  Underwriting charges imposed for any reinsurance facility, joint underwriting association business assumed, or other insurance programs required by statute or some other basis.
    •  Special state taxes and assessments or other charges.

**F. In-Force Premiums** include estimated annual premiums for all active policies (workers' compensation, general liability and builders risk) as of the evaluation date and recorded by Us during the Experience Period. In-Force Premiums do not include:

- Premiums for policies written through pools, associations, or syndicates.
- Premiums for policies written in any reinsurance facility, joint underwriting association, or other insurance program required by law.
- Policyholder dividends, expense fees, surcharges, and other like charges.
- Premiums for policies, lines of coverage or plans that We may exclude from this Agreement by amendment.

**G. Loss Ratio** shall be determined dividing your Incurred Losses by your Earned Premiums. **The Loss Ratio is determined from premiums and losses associated with Your workers' compensation and builders risk book of business only.**

Premiums and losses from other lines of business (i.e.: general liability) will not be used in the calculation of Your Loss Ratio until such time as We determine. We will inform you in writing of any change in the Loss Ratio formula.

**H. Premium Growth** shall be determined by dividing Your In-Force Premium (workers compensation, general liability and builders risk) as of December 31 of Year One of the Experience Period by Your In-Force Premium (workers compensation, general liability and builders risk) as of December 31 of Year Two of the Experience Period.

**I. Settlement Date** we will endeavor to make payment no later than April 30 following the end of the most recent Experience Period.

**J. Three-Year Loss Ratio** shall be determined by dividing Your Incurred Losses by Your Earned Premiums for the same period. **The Three-Year Loss Ratio is determined from Your workers' compensation book of business and your builders risk business only.** Your Three-Year Loss Ratio and Your Premium Growth in the workers' compensation, general liability and builders risk lines of business shall be used to determine Your Profit Sharing Award from the appropriate table in Exhibit I.

**K. Member Companies:** This agreement applies to business written in any of the following Builders Insurance Group member companies, Builders Insurance (A Mutual Captive Company), Association Insurance Company and Vinings Insurance Company.

## III. AGENCY INCENTIVE FORMULA

A. The applicable Profit Sharing percentage (refer to Exhibit I), as determined by Your Three-Year Loss Ratio (determined by your workers' compensation and builders risk losses only) and Your In Force Premium growth (workers' compensation, general liability and builders risk), shall be applied to Your In-Force Premium as of December 31 of Year One. $200 8

B. For years in which Your In-Force Premium does not meet or exceed $250,000 on December 31, You will not be eligible for a Profit Sharing Award. However, the experience (premium and losses) from years in which Your In-Force Premiums were below $250,000 will be included in the calculation of Your Agency Incentive Payment in subsequent years.

## IV. LARGE LOSS LIMITATION

To mitigate the adverse effects of any single loss on Your Agency Incentive Award, any loss or single occurrence charged to Your account shall be limited as follows:

A. Year One Losses: Any single Incurred Loss (occurring in Year One) shall be limited to Our per-occurrence reinsurance retention level for the year in which the loss occurred.

B. Year Two and Year Three Losses: Any single Incurred Loss (occurring in Year Two or Year Three) shall be limited to $100,000.

## V. AGENT OF RECORD TRANSACTIONS

History (premium and losses) on business moved from one agency to another by an agent of record letter will remain with the original agent for the period the original agent was recognized in our records as the agent of record. The new agent will be held accountable for the premium and losses following our recognition of the new agent as the agent of record.

## VI. TERMINATION

Upon the termination of Your Agency Agreement, this Agreement shall also terminate without further notice. Following termination of Your Agency Agreement, no Profit Sharing Awards shall be earned, due or paid for any Experience Period.

## VII. REQUIREMENTS AND CONDITIONS

A. We expressly reserve the right to charge costs in any Experience Period for expenses incurred with respect to prior Experience Periods.

B. Unless stated otherwise in this Agreement, Your Earned Premiums and Incurred Losses for all states in which You write business will be combined for purposes of determining eligibility and making calculations under this Agreement.

Page 3 of 6

*1542*

   **C.**     The combining of agencies under common ownership or control for the purpose of qualifying for the Profit Sharing Award shall be done at Our discretion.

   **D.**     All information required by this Agreement shall be computed by Us from Our records in accordance with Our usual accounting and statistical methods and procedures and all calculations shall be final and uncontestable.

   **E.**     We shall furnish You with a statement providing information used in the Agency Incentive Award calculations.

   **F.**     In signing this Agreement, you expressly agree that you understand its provisions and the calculation and payment terms. The equitable administration and interpretation of this Agreement is at Our sole discretion.

   **G.**     From time to time We may introduce new products. Any new products offered by Us and sold by You are not automatically included in this Agreement unless We inform you in writing of such inclusion.

## VIII. TERM OF AGREEMENT

This Agreement is effective on the date indicated below and shall apply to experience periods beginning on or after stated effective date and will remain in effect until terminated or modified by Us. We reserve the right to modify this agreement retroactively up to 150 days after the inception of the most recent Experience Period.

The undersigned herby agrees to the terms and conditions of the Builders Insurance Group Profit Sharing Agreement.

**Builders Insurance Group**

By _____ Date _6/16/08_

Printed Name _TOM MAUPIN_ Title _SR VP MARKETING_

**Agency Name** _Keystone Insurers Group, Inc_

By _____ Date _05-22-08_

Printed Name _Lea Ann Hawk_ Title _Operations Officer_

EXHIBIT I

**TIER ONE - Agency Volume of $250,000 to $999,999 (as of December 31 of Year Two of the experience period).**

| IN FORCE PREMIUM GROWTH | Decrease of 20% or Greater | Decrease of 19.9% to 7.5% | Decrease of 7.4% to Increase of 4.9% | Increase of 5% to 14.9% | Increase of 15% to 24.9% | Increase of 25% or Greater |
|---|---|---|---|---|---|---|
| THREE- YEAR LOSS RATIO | | | | | | |
| Greater than 45% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 36.1 to 45% | 0.00% | 0.25% | 0.50% | 0.65% | 0.80% | 1.00% |
| 27.1 to 36% | 0.00% | 0.75% | 1.00% | 1.25% | 1.50% | 1.75% |
| 18.1 to 27% | 0.00% | 1.25% | 1.50% | 2.00% | 2.25% | 2.75% |
| 9.1% to 18% | 0.00% | 1.75% | 2.25% | 2.75% | 3.25% | 4.00% |
| Less than 9% | 0.00% | 2.50% | 3.00% | 3.50% | 4.00% | 5.00% |

**TIER TWO - Agency Volume between $1,000,000 and $1,999,999 (as of December 31 of Year Two of the experience period).**

| IN FORCE PREMIUM GROWTH | Decrease Of 17.5% or Greater | Decrease of 17.4% to 5% | Decrease of 4.9 % to Increase of 4.9% | Increase 5% to 12.4% | Increase of 12.5% to 19.9% | Increase of 20% or Greater |
|---|---|---|---|---|---|---|
| THREE-YEAR LOSS RATIO | | | | | | |
| Greater than 45% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 36.1 to 45% | 0.00% | 0.25% | 0.50% | 0.65% | 0.80% | 1.00% |
| 27.1% to 36% | 0.00% | 0.75% | 1.00% | 1.25% | 1.50% | 1.75% |
| 18.1% to 27% | 0.00% | 1.25% | 1.50% | 2.00% | 2.25% | 2.75% |
| 9.1 to 18% | 0.00% | 1.75% | 2.25% | 2.75% | 3.25% | 4.00% |
| Less than 9% | 0.00% | 2.50% | 3.00% | 3.50% | 4.00% | 5.00% |

**TIER THREE - Agency Volume greater than $2,000,000 (as of December 31 of Year Two of the experience period).**

| IN FORCE PREMIUM GROWTH | Decrease of 15% or Greater | Decrease of 14.9% to 7.5% | Decrease of 7.4% to 0.1% | Increase of 0% to 7.4% | Increase of 7.5% to 14.9% | Increase of 15% or Greater |
|---|---|---|---|---|---|---|
| THREE-YEAR LOSS RATIO | | | | | | |
| Greater than 45% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 36.1 to 45% | 0.00% | 0.25% | 0.50% | 0.65% | 0.80% | 1.00% |
| 27.1 to 36% | 0.00% | 0.75% | 1.00% | 1.25% | 1.50% | 1.75% |
| 18.1 to 27% | 0.00% | 1.25% | 1.50% | 2.00% | 2.25% | 2.75% |
| 9.1 to 18% | 0.00% | 1.75% | 2.25% | 2.75% | 3.25% | 4.00% |
| Less than 9% | 0.00% | 2.50% | 3.00% | 3.50% | 4.00% | 5.00% |

## Phase-In Factors

**Year One:** The first calculation of the amount indicated by the Profit Sharing Formula shall be adjusted through the application of a factor of **.33**

**Year Two:** The second calculation of the amount indicated by the Profit Sharing Formula shall be adjusted through the application of a factor of **.67**

**Year Three and Later:** The third and subsequent calculations of the amount indicated by the Profit Sharing Formula shall be paid at 100% of the indicated amount.

Phase-in status for Agents, who have participated in Our Profit Sharing Agreement under a previous version of this agreement, shall be "Grandfathered" or "carried-over" from the previous agreement.

EXHIBIT "B"

07/20/2015  15:56   814/4993214   EBENSBURG INSURANCE                              No. 2653  · P. 2    PAGE  02/05
Jul. 20, 2015  10:56AM   EBENSBURG INSURANCE                                       No. 2653  · P. 2

*ACORD*           WORKERS COMPENSATION APPLICATION          DATE (MM/DD/YYYY)
                                                            07/17/2015

| AGENCY NAME AND ADDRESS | COMPANY    Association Insurance Co. |
| EBENSBURG INSURANCE AGENCY | UNDERWRITER   JEAN BYERS |
| P.O. BOX 60 | APPLICANT NAME  CUSTOM INSTALLATIONS CONTRACTING SERVICES INC |
| | OFFICE PHONE  814-948-7080         MOBILE PHONE: |
| PRODUCER | MAILING ADDRESS (Including ZIP + 4 or Canadian Postal) |   YEAR IN BUS: 4 |
| CS REPRESENTATIVE NAME | 413 JUNIPER ST |   SIC: |
| OFFICE | NORTHERN CAMBRIA, PA 16714 |   NAICS:  238130 |
| PHONE | |   WEBSITE ADDRESS: |
| MOBILE | |
| PHONE | TYPE OF BUSINESS: |
| FAX | CORPORATION [X]  CORPORATION  SUBCHAPTER S CORP  LLC  JOINT VENTURE  OTHER  TRUST |
| (AR, Ha.) | PARTNERSHIP |
| EMAIL | CREDIT BUREAU |   ID NUMBER: |
| ADDRESS: | |
| CODE  SUB CODE | FEDERAL EMPLOYER ID   TAX PAYER ID |   CUSTOMER STATUS DEPT AUTO AS OF: |
| | 662637083 |   STATE: |
| AGENCY CUSTOMER ID  0001000 | |

### BILLING/AUDIT INFORMATION

| [X] QUOTE  BOUND  ASSIGNED RISK (Attach ACORD 531) | BILLING PLAN  [X] AGENCY BILL  DIRECT BILL | PAYMENT PLAN  ANNUAL  SEMI-ANNUAL  QUARTERLY  [X] 25% DOWN, 9 PAY MONTHLY 10 PAY | AUDIT  [X] AT EXPIRATION  SEMI-ANNUAL  QUARTERLY  MONTHLY |

### LOCATIONS

| LOC # | STREET, CITY, COUNTY, STATE, ZIP |
| | |
| | *** See Schedule of Workplaces *** |
| | |

### POLICY INFORMATION

| PROPOSED EFF DATE  07/20/2015 | PROPOSED EXP DATE  07/20/2016 | NORMAL ANNIVERSARY RATING DATE  07/20/2016 | PART 2  EMPLOYERS LIABILITY | | STATE | | | RETRO PLAN |
| NORMAL ANNIVERSARY COMPENSATION (STATUS)  PA | $ 100,000 EACH ACCIDENT  $ 500,000 DISEASE-POLICY LIMIT  $ 100,000 DISEASE-EACH EMPLOYEE | | PART 3 - OTHER STATES INS  AL, GA, FL, IN, MD, MS, NC, OK, SC, TN, | APPLICABLE  [X] FOREIGN  [X] VOLUNTARY | ADVANCE  $ 0 | | OTHER COVERAGES  USL&H  VOLUNTARY COMP  PREMIUM ADJ | MULTIPLE EXPERIENCE OPTION |
| DIVIDEND PLAN/SAFETY GROUP | ADDITIONAL COMPANY INFORMATION | | | | | | |
| AGENCY ADDITIONAL INFORMATION NUMBER(S) | | | | | | | |

### TOTAL ESTIMATED ANNUAL PREMIUM - ALL STATES

| TOTAL ESTIMATED ANNUAL PREMIUM, ALL STATES  $ 3,853 | TOTAL INTERSTATE ANNUAL STATES  $ | TOTAL OUTPOST PREMIUM ALL STATES  $ |

### CONTACT INFORMATION

| TYPE | NAME | OFFICE PHONE | MOBILE PHONE | E-MAIL |
| INSPECTION  ACCTG/RECORD  CLAIM  INFO | BERNIE DOSPOY | | | KURT.DEYULIO@EBENSBURING. |

### INDIVIDUALS INCLUDED/EXCLUDED

PREMIUM, IF INCLUD, FOR STATES [Must be completed by local state operations] TO BE INCLUDED OR EXCLUDED...

| STATE | LOC # | NAME | DATE OF BIRTH | TITLE/ RELATIONSHIP | OWNER- SHIP % | INC/EXC | NUMBER | CLASS CODE | REMUNERATION/PAYROLL |
| PA | 0001 | ARCHIE LEAMAGLE | | PRESIDENT | 168 | INC | Included | | |
| PA | 0001 | MICHAEL PIREINO | | SECRETARY | 0 | INC | Exc | | |
| PA | 0001 | BERNIE DOSPOY | | TREASURER | 0 | INC | Included | | |
| | | | | | | | | | |

© 1994-2017 ACORD CORPORATION. All rights reserved.
The ACORD name and logo are registered marks of ACORD

ACORD 4b5 (2007/11)

07/29/2015 16:55 8147493219
Jul. 20, 2015 10:59AM EOLNSBORO INSURANCE                    No. 2653   P. 3   PAGE  03/05

STATE RATING SHEET#_____OF_____SHEETS                    AGENCY CUSTOMER ID_____

**STATE RATING WORKSHEET**

FOR MULTIPLE STATES, ATTACH AN ADDITIONAL PAGE 2 OF THIS FORM

RATING INFORMATION - STATE

| LOC # | CLASS CODE | ERROR CODE | CATEGORIES, DUTIES, CLASSIFICATIONS | # EMPLOYEES | | SIC | NAICS | ESTIMATED ANNUAL REMUNERATION/ PAYROLL | RATE | ESTIMATED ANNUAL MANUAL PREMIUM |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | FULL TIME | PART TIME | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | *** | Sub Schedule of Operations | *** | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

**PREMIUM**

| STATE | FACTOR | FACTORED PREMIUM | | | FACTOR | FACTORED PREMIUM |
|---|---|---|---|---|---|---|
| TOTAL | | $4,337 | | | | |
| INCREASED LIMITS | | $0 | SCHEDULE RATING | | | $0 |
| DEDUCTIBLE | | $0 | COPAY | | | |
| | | | STANDARD PREMIUM | | | |
| EXPERIENCE OR MERIT MODIFICATION | | $0 | PREMIUM DISCOUNT | | 0% | $0 |
| | | | MINIMUM COMPANY | | | $200 |
| ASSIGNED RISK SURCHARGE | | | TAXES/ASSESSMENTS | | | |
| ARAP | | | | | | |
| TOTAL ESTIMATED ANNUAL PREMIUM  5,363 | | MINIMUM PREMIUM | | DEPOSIT PREMIUM | | |

**REMARKS**

ACORD 131 (2011/01)

07/2015 26:55  014/455219
PRIOR  JUL 28, 2015 10:59AM  EDENSBURG INSURANCE         AGENCY CUSTOMER No. 2655  P. 4   PAGE  04/06

| YEAR | CARRIER | ANNUAL PREMIUM | MOD | # CLAIMS | AMOUNT PAID | RESERVE |
|------|---------|----------------|-----|----------|-------------|---------|
| Expiring Year | SWIF | $1 | 0 | 0 | $0 | $0 |
| 1st Prior Year | SWIF | $1 | 0 | 0 | $0 | $0 |
| 2nd Prior Year | SWIF | $1 | 0 | 1 | $436 | $0 |
| 3rd Prior Year | SWIF | $1 | 0 | 0 | $0 | $0 |

## NATURE OF BUSINESS/DESCRIPTION OF OPERATIONS

COMMERCIAL REMODELING

## GENERAL INFORMATION

| | YES | NO |
|---|---|---|
| DOES APPLICANT OWN, OPERATE OR LEASE AIRCRAFT/WATERCRAFT? | ☐ | ☒ |
| DOES HAVE PAST, PRESENT OR DISCONTINUED OPERATIONS INVOLVE(D) STORING, TREATING, DISCHARGING, APPLYING, DISPOSING, OR TRANSPORTING OF HAZARDOUS MATERIAL? (e.g. landfills, wastes, fuel tanks, etc) | ☐ | ☒ |
| ANY WORK PERFORMED UNDERGROUND OR ABOVE 15 FEET? | ☐ | ☒ |
| ANY WORK PERFORMED ON BARGES, VESSELS, DOCKS, BRIDGES OVER WATER? | ☐ | ☒ |
| IS APPLICANT ENGAGED IN ANY OTHER TYPE OF BUSINESS? | ☐ | ☒ |
| ARE SUB-CONTRACTORS USED? (If "YES", give % of work subcontracted) | ☐ | ☒ |
| ANY WORK SUBLET WITHOUT CERTIFICATES OF INSURANCE? (If YES, payroll for this work must be included in the State rating Worksheet on Page 2) | ☐ | ☒ |
| IS A WRITTEN SAFETY PROGRAM IN OPERATION? | ☐ | ☒ |
| ANY GROUP TRANSPORTATION PROVIDED? | ☐ | ☒ |
| ANY EMPLOYEES UNDER 16 OR OVER 60 YEARS OF AGE? | ☐ | ☒ |
| ANY SEASONAL EMPLOYEES? | ☐ | ☒ |

ACORD 130 (2007/11)

07/20/2015  16:55   8147499219   EBENSBURG INSURANCE                         No. 2653   P. 5   PAGE  05/

## GENERAL INFORMATION

| | YES NO |
|---|---|
| IS THERE ANY VOLUNTEER OR DONATED LABOR? (If YES, please specify) | ☐ ☒ |
| ANY EMPLOYEES WITH PHYSICAL HANDICAPS? | ☐ ☒ |
| DO EMPLOYEES TRAVEL OUT OF STATE? (If YES, indicate state(s) of travel and frequency) | ☐ ☒ |
| ARE ATHLETIC TEAMS SPONSORED? | ☐ ☒ |
| ARE PHYSICALS REQUIRED AFTER OFFERS OF EMPLOYMENT ARE MADE? | ☐ ☒ |
| ANY OTHER INSURANCE WITH THIS INSURER? | ☐ ☒ |
| ANY PRIOR COVERAGE DECLINED/ CANCELLED/NON-RENEWED IN THE LAST THREE (3) YEARS? (Not applicable in MO) | ☐ ☒ |
| ARE EMPLOYEE HEALTH PLANS PROVIDED? | ☐ ☒ |
| DO ANY EMPLOYEES PERFORM WORK FOR OTHER BUSINESSES OR SUBSIDIARIES? | ☐ ☒ |
| DO YOU LEASE EMPLOYEES TO OR FROM OTHER EMPLOYERS? | ☐ ☒ |
| DO ANY EMPLOYEES PREDOMINANTLY WORK AT HOME? If YES, # of Employees: | ☐ ☒ |
| ANY TAX LIENS OR BANKRUPTCY WITHIN THE LAST FIVE (5) YEARS? (If YES, please specify) | ☐ ☒ |
| ANY UNDISPUTED AND UNPAID WORKERS COMPENSATION PREMIUM DUE FROM YOU OR ANY COMMONLY MANAGED OR OWNED ENTERPRISES? If YES, EXPLAIN INCLUDING ENTITY NAME(S) AND POLICY NUMBER(S). | ☐ ☒ |
| | ☐ ☐ |

REMARKS (Attach additional sheets if more space is required)

APPLICABLE IN TENNESSEE AND VERMONT: IT IS A CRIME TO KNOWINGLY PROVIDE FALSE, INCOMPLETE OR MISLEADING INFORMATION TO ANY PARTY TO A WORKERS COMPENSATION TRANSACTION FOR THE PURPOSE OF COMMITTING FRAUD. PENALTIES INCLUDE IMPRISONMENT, FINES AND DENIAL OF INSURANCE BENEFITS.

ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR ANOTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME AND SUBJECTS THE PERSON TO CRIMINAL AND CIVIL SUBSTANTIAL CIVIL PENALTIES. (Not applicable in CO, FL, HI, MA, NE, OK, OR, OH, TX or VT; in KS, LA, ME, VA and WA, insurance benefits may also be denied)

| APPLICANT'S SIGNATURE (Managing Officer, Owner or Partner) | DATE | PRODUCER'S SIGNATURE | NATIONAL PRODUCER NUMBER |
|---|---|---|---|
| [signature] Corp. Sec. 7/20/2015 | | | |

ACORD 130 (2009/11)                                          Page 4 of 4

EXHIBIT "C"


**Builders Insurance Group**

eQuotes

## Underwriter Questionnaire

Agent: KURT DEYULIIS   Agency: EBENSBURG INSURANCE AGENCY

Carrier Association Insurance Co   Quote/Policy No: WCWC0108201-00

State: PA   Status: Bound/Issued   Insured: CUSTOM INSTALLATIONS - CONTRACTING SERVICES INC

| | Questions |
|---|---|
| 1 | DOES APPLICANT OWN, OPERATE OR LEASE AIRCRAFT/WATERCRAFT? |
| | No |
| 2 | DO/HAVE PAST, PRESENT OR DISCONTINUED OPERATIONS INVOLVE(D) STORING, TREATING, DISCHARGING, APPLYING, DISPOSING, OR TRANSPORTING OF HAZARDOUS MATERIAL? (e.g. landfills, wastes, fuel tanks, etc) |
| | No |
| 3 | ANY WORK PERFORMED UNDERGROUND OR ABOVE 15 FEET? |
| | No |
| 3.1 | What is the maximum height? |
| | 15FT |
| 3.2 | What is the maximum depth if any work is performed underground? |
| | 0 |
| 4 | ANY WORK PERFORMED ON BARGES, VESSELS, DOCKS, BRIDGES OVER WATER? |
| | No |
| 5 | IS APPLICANT ENGAGED IN ANY OTHER TYPE OF BUSINESS? |
| | No |
| 6 | ARE SUB-CONTRACTORS USED? (if "YES", give % of work subcontracted) |
| | No |
| 7 | ANY WORK SUBLET WITHOUT CERTIFICATES OF INSURANCE ? (If YES, payroll for this work must be included in the State Rating Worksheet on Page 2) |
| | No |
| 7.1 | Does the insured have a diary system to monitor certificate of insurance? |
| | No |
| 7.2 | Or alternatively do they check certificates of insurance prior to the start of the job? |
| | Yes |
| 8 | IS A WRITTEN SAFETY PROGRAM IN OPERATION? |
| | No |
| 9 | ANY GROUP TRANSPORTATION PROVIDED? |
| | No |
| 10 | ANY EMPLOYEES UNDER 16 OR OVER 60 YEARS OF AGE? |
| | No |
| 11 | ANY SEASONAL EMPLOYEES? |
| | No |
| 12 | IS THERE ANY VOLUNTEER OR DONATED LABOR? (If "YES", please specify) |
| | No |
| 13 | ANY EMPLOYEES WITH PHYSICAL HANDICAPS? |
| | No |

| 14 | DO EMPLOYEES TRAVEL OUT OF STATE? (If "YES", indicate state(s) of travel and frequency) |
|---|---|
| | No |
| 15 | ARE ATHLETIC TEAMS SPONSORED? |
| | No |
| 16 | ARE PHYSICALS REQUIRED AFTER OFFERS OF EMPLOYMENT ARE MADE? |
| | No |
| 17 | ANY OTHER INSURANCE WITH THIS INSURER? |
| | No |
| 18 | ANY PRIOR COVERAGE DECLINED/ CANCELLED/NON-RENEWED IN THE LAST THREE (3) YEARS? (Not applicable in MO) |
| | No |
| 19 | ARE EMPLOYEE HEALTH PLANS PROVIDED? |
| | No |
| 20 | DO ANY EMPLOYEES PERFORM WORK FOR OTHER BUSINESSES OR SUBSIDIARIES? |
| | No |
| 21 | DO YOU LEASE EMPLOYEES TO OR FROM OTHER EMPLOYERS? |
| | No |
| 22 | DO ANY EMPLOYEES PREDOMINANTLY WORK AT HOME? If "YES", # of Employees: |
| | No |
| 23 | ANY TAX LIENS OR BANKRUPTCY WITHIN THE LAST FIVE (5) YEARS? (If "YES", please specify) |
| | No |
| 24 | ANY UNDISPUTED AND UNPAID WORKERS COMPENSATION PREMIUM DUE FROM YOU OR ANY COMMONLY MANAGED OR OWNED ENTERPRISES? IF YES, EXPLAIN INCLUDING ENTITY NAME(S) AND POLICY NUMBER(S). |
| | No |

# EXHIBIT "D"


Builders
Insurance
Group

eQuotes

## Risk Questionnaire

Agent: KURT DEVOLIS   Agency: EBENSBURG INSURANCE AGENCY

Carrier: Association Insurance Co.   Quote/Policy No: WCV-0196284-00

State: PA   Status: Bound/Issued   Insured: CUSTOM INSTALLATIONS CONTRACTING SERVICES INC

| | Questions |
|---|---|
| 1. | Any exterior work above 3 stories? |
| | No |
| 2. | Are OSHA required fall protection systems such as guardrails, personal fall arrest systems or safety nets being used when working above 6 feet? |
| | Yes |
| 3. | Does the operation involve fire/water restoration? |
| | No |
| 4. | Is the roofing performed by the Insureds own employees? |
| | No |
| 5. | Is there any wrecking or demolition work? |
| | No |

JS 44 (Rev. 08/18)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS | |
|---|---|---|
| American Builders Insurance Company<br>2410 Paces Ferry Road, SE<br>Atlanta, GA | Keystone Insurance Group, Inc.<br>1995 Point Township Drive<br>Northumberland, PA | Ebensburg Insurance Agency<br>129 E. High Street, P.O. Box 90<br>Ebensburg, PA |

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant Northumberland
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorney's *(Firm Name, Address, and Telephone Number)*

Attorneys *(If Known)*
Unknown

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1  U.S. Government<br>Plaintiff

☐ 3  Federal Question<br>*(U.S. Government Not a Party)*

☐ 2  U.S. Government<br>Defendant

☒ 4  Diversity<br>*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated *or* Principal Place<br>of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated *and* Principal Place<br>of Business In Another State | ☒ 5 | ☐ 5 |
| Citizen or Subject of a<br>Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment<br>& Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted<br>Student Loans<br>(Excludes Veterans)<br>☐ 153 Recovery of Overpayment<br>of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☒ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product<br>Liability<br>☐ 320 Assault, Libel &<br>Slander<br>☐ 330 Federal Employers'<br>Liability<br>☐ 340 Marine<br>☐ 345 Marine Product<br>Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle<br>Product Liability<br>☐ 360 Other Personal<br>Injury<br>☐ 362 Personal Injury -<br>Medical Malpractice | **PERSONAL INJURY**<br>☐ 365 Personal Injury -<br>Product Liability<br>☐ 367 Health Care/<br>Pharmaceutical<br>Personal Injury<br>Product Liability<br>☐ 368 Asbestos Personal<br>Injury Product<br>Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal<br>Property Damage<br>☐ 385 Property Damage<br>Product Liability | ☐ 625 Drug Related Seizure<br>of Property 21 USC 881<br>☐ 690 Other | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal<br>28 USC 157<br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 835 Patent - Abbreviated<br>New Drug Application<br>☐ 840 Trademark | ☐ 375 False Claims Act<br>☐ 376 Qui Tam (31 USC<br>3729(a))<br>☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and<br>Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 485 Telephone Consumer<br>Protection Act<br>☐ 490 Cable/Sat TV<br>☐ 850 Securities/Commodities/<br>Exchange<br>☐ 890 Other Statutory Actions<br>☐ 891 Agricultural Acts<br>☐ 893 Environmental Matters<br>☐ 895 Freedom of Information<br>Act<br>☐ 896 Arbitration<br>☐ 899 Administrative Procedure<br>Act/Review or Appeal of<br>Agency Decision<br>☐ 950 Constitutionality of<br>State Statutes |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | **LABOR**<br>☐ 710 Fair Labor Standards<br>Act<br>☐ 720 Labor/Management<br>Relations<br>☐ 740 Railway Labor Act<br>☐ 751 Family and Medical<br>Leave Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Employee Retirement<br>Income Security Act | **SOCIAL SECURITY**<br>☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g))<br>**FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff<br>or Defendant)<br>☐ 871 IRS-Third Party<br>26 USC 7609 | |
| ☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | ☐ 440 Other Civil Rights<br>☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/<br>Accommodations<br>☐ 445 Amer. w/Disabilities -<br>Employment<br>☐ 446 Amer. w/Disabilities -<br>Other<br>☐ 448 Education | **Habeas Corpus:**<br>☐ 463 Alien Detainee<br>☐ 510 Motions to Vacate<br>Sentence<br>☐ 530 General<br>☐ 535 Death Penalty<br>**Other:**<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br>☐ 560 Civil Detainee -<br>Conditions of<br>Confinement | | | |
| | | | **IMMIGRATION**<br>☐ 462 Naturalization Application<br>☐ 465 Other Immigration<br>Actions | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1  Original<br>Proceeding
☐ 2  Removed from<br>State Court
☐ 3  Remanded from<br>Appellate Court
☐ 4  Reinstated or<br>Reopened
☐ 5  Transferred from<br>Another District<br>*(specify)*
☐ 6  Multidistrict<br>Litigation -<br>Transfer
☐ 8  Multidistrict<br>Litigation -<br>Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. §1332(a)(1)

Brief description of cause:
Breach of contract; professional negligence; misrepresentations

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $ 75,000+

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*  JUDGE _____  DOCKET NUMBER _____

DATE  8/28/09

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #_____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____